# Exhibit 1[1]

---

[1]Many of the exhibits included herein originated in the Baltimore Police file pertaining to the murder of Martrelle Creighton. Counsel for Mr. Higgs received the file in partially redacted format. Counsel have made further redactions of their own in order to comply with the Court's privacy policy. Should the Court wish to view the documents in the state in which they were originally received, counsel for Mr. Higgs will gladly file another set of exhibits under seal.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

SOUTHERN DIVISION

UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. PJM-98-482

VICTOR GLORIA

                DEFENDANT

                                    Greenbelt, Maryland

                                    November 22, 2000

        The above-entitled case came on for sentencing
before the Honorable Peter J. Messitte, United States
District Judge

                    A P P E A R A N C E S

For the Government:

        Deborah A. Johnston, AUSA
        Sandra Wilkinson, AUSA

For the Defendant:

        Paul Kemp, Esquire

Gail A. Simpkins, RPR
Official Court Reporter

2

PROCEEDINGS

THE CLERK:  The matter now pending before this Court is Criminal Action Number PJM-98-0482, United States of America versus Victor Gloria.  The matter now comes before this Court for sentencing.

THE COURT:  All right.  Counsel for the government identify yourselves and then defendant.

MS. JOHNSTON:  Your Honor, Deborah Johnston and Sandra Wilkinson for the government.  Seated with us at counsel table is Captain Robert Rule.

MR. KEMP:  And Paul Kemp for Mr. Gloria, who is present in Court, Your Honor.

THE COURT:  All right.  We are here for sentencing this morning.  Are there any issues with the presentence report, other than a possible 5K1.1 motion?

All right.  The --

MR. KEMP:  Not by the defendant, Your Honor.

THE COURT:  All right.  The Court then adopts the factual findings and Guideline application in the presentence report.  The total adjusted offense level would be 30, a Criminal History Category IV.  The custody range is 100 to 125 months.  The fine range is 12,500 to $125,000.

All right.  Ms. Johnston.

3

MS. JOHNSTON: Yes, Your Honor. Pursuant to the terms of the plea agreement, the government is moving under the Sentencing Guidelines, 5K1.1, for a downward departure for substantial assistance to the government. We are asking the Court to reduce Mr. Gloria's offense level by two, resulting in a criminal offense level of 25, with a sentencing range of 84 to 105 months.

The Court has seen Mr. Gloria testify in both the trials of Mr. Haynes and Mr. Higgs. The government cannot emphasize enough to the Court that Mr. Gloria came forward -- didn't come forward with this information and didn't act as quickly as he should have after the events of January 1996 and, in fact, initially was not cooperative with authorities and lied in terms of where he was the night of the crime.

But in October of 1998, when law enforcement officers confronted him about his involvement, he provided them with a statement acknowledging that he was there, acknowledging what he saw happen that night, and he made that acknowledgment to law enforcement officers when he was not facing any charges in this case, although he had been arrested on a state drug offense, that drug offense being his

4

acting as a lookout for Mr. Haynes' approximately two gram sale of crack cocaine to undercover Officer Mark Coulter.

After being -- after making that statement and being released on the state charges, he was then arrested on a federal charge, came in and immediately agreed to cooperate with the government.

As the Court knows from seeing Mr. Gloria's testimony here in court, and hearing the evidence in this case, the government could not have proceeded and obtain a conviction against Mr. Higgs certainly without the assistance of Mr. Gloria. Of course with Mr. Haynes' case we did have Mr. Haynes' confession, but Mr. Gloria's testimony was instrumental there as well.

For those reasons we believe that he has provided substantial assistance and is entitled, or the government believes it's justified that he receive some reduction in his criminal offense level, and we believe that a two-level reduction is appropriate. We would move the Court to reduce his Guideline range by two levels.

THE COURT:  Mr. Kemp.

MR. KEMP:  Your Honor, obviously we certainly don't oppose that motion, and I would like to talk at

5

the appropriate time about the sentence within the range.

THE COURT:  All right.  Let's hold off one moment.

Does the custody range change at all -- not the custody range.  Does the supervised release range change at all?  It's still three?

MS. JOHNSTON:  I don't believe -- the supervised release doesn't change.  The fine range does.

THE COURT:  The fine range does, though?

MS. JOHNSTON:  Yes, Your Honor.  I believe the fine range becomes 10,000 to 100,000.

THE COURT:  The government has moved for a two-level downward departure pursuant to Sentencing Guideline 5K1.1 based on defendant's substantial assistance to authorities.

The Court considers the factors that are set out in that Sentencing Guideline, evaluating the significance and usefulness of the defendant's assistance and particularly, the government's evaluation of that assistance, also the truthfulness, completeness and reliability of any information or testimony provided by the defendant and the extent of his assistance, any injury or risk of injury or danger resulting from his assistance, and the timeliness of

6

the defendant's assistance.

Obviously the Court sat through the two death penalty proceedings involving Mr. Haynes and Mr. Higgs, and there is no question that Mr. Gloria's assistance in that regard was critical to their convictions, which was important, and that he was in these proceedings truthful, complete and reliable in regard to what he said.

Obviously there was some risk involved. That became apparent in the course of the trials. Even though there might have not been immediately timeliness, it was timely enough for purposes of this testimony given.

So the Court finds that there is full and adequate reasons to grant the two-level downward departure, which would then, with a total offense level of 25 and a criminal history category of four, result in a custody range of 84 to 105 months, a supervised release range of still the two to three years, and a fine range of 10,000 to $100,000.

All right. On disposition?

MS. JOHNSTON: Thank you, Your Honor.

Under the terms of the plea agreement, the government has reserved the right to recommend any sentence within the Sentencing Guideline range. I'm

7

not really going to talk about Mr. Gloria's testimony because I think the Court, in granting that two-level downward departure, has taken into account the assistance he has provided to the government, but I would like to share with the Court the government's experience in terms of Mr. Gloria.

He has been incarcerated since October of 1998. Since that time we have had occasion to meet with Mr. Gloria initially a couple of times in 1998, and then again this past year in getting him ready to testify in those two trials.

Between the time that Mr. Gloria was arrested in October of 1998 until his testimony in the Haynes trial, he was in the general population over in the Montgomery County Detention Center.  And in preparation for the Haynes trial and anticipating possible cross-examination of him, we did obtain his detention, his records from the Montgomery County Detention Center.

While I don't have them here today, in reviewing them I noted that he had successfully completed a number of programs there, that he in fact was a representative in his dorm and served in that capacity for those individuals.

Since his testimony in the Haynes case, he has

8

been in protective custody. As a result of his testimony, as a result of the publicity concerning his testimony, he has been in protective custody. And in meeting with him after that --

Some inmates might resent, some defendants, cooperators might resent the fact that they were being put in protective custody, thinking of it as punishment when they have done something for the government.

But Mr. Gloria's attitude was not of that sort. Instead, he said that he in essence didn't mind being in protective custody. It gave him an opportunity to read and do some other things that he hadn't had a chance to do before.

In addition to that, between the time that the government first met with Mr. Gloria in, I believe it was November of 1998, late October of 1998, up until his testimony in the Higgs case, which was the last time we had occasion to meet with him, it is appropriate to say that Mr. Gloria has matured significantly during these two years that he spent in jail. My observations of him were that indeed, he has an appreciation for what had occurred.

I will tell the Court that Mr. Gloria sat in our office at one point and cried over what had happened.

He expressed remorse for what had happened to these three young ladies, acknowledged the fact that at least one of them would not have been there if he hadn't been there that night and feels directly responsible in that regard.

Mr. Gloria has a criminal history. There is no disputing that. The government hopes that with this time in prison Mr. Gloria will develop the trades, some trades and some skills so that when he gets out of prison, he will find a way to support himself without being involved in criminal conduct again.

For all of those reasons, the government is going to recommend that he receive a sentence at the low end.

THE COURT: Mr. Kemp.

MR. KEMP: Thank you, Your Honor.

Obviously I will join with the government in that and feel very strongly about it.

First of all, insofar as the fine is concerned, I think based on paragraphs 94 and 95 of the presentence investigative report, the Court make a finding that he is not capable or not able to make, pay any kind of a fine under the circumstances. I just want to deal with that more as a housekeeping issue than anything else.

10

But in line with what the government proffered, at the time he had to be placed in protective custody, he was in several programs which had to be terminated. One of those was a self-awareness program known as More Recognition Therapy. He was in the anger management program, and was taking a spousal abuse seminar, not that he had ever been involved in anything of that ilk, but it was a program that was available to him and he had begun taking it. That all had to be terminated when he was moved to the PC wing of the Montgomery County Detention Center.

In addition to the normal taunts I think that go along with any person cooperating with the government and then word gets out, and then it hits the press and the TV's, which are on constantly over at the detention center or any of the detention centers, resulting in Mr. Gloria receiving inmate taunts, there were even some taunts that came from jail guards that I'm going to take issue with after Mr. Gloria has left that institution because it's very upsetting to me that someone who would set out to do this is receiving trash talk not just from inmates, but from jail guards. That is the kind of thing that I just think should not occur, and I'm going to bring it to the attention of the Internal Affairs Division of the

11

Montgomery County Police and/or the Marshal's Division, Marshal's Department, whoever is the more appropriate agency.

The remorse which he has shown throughout this from my involvement in this case, beginning I guess in late October of 1998, after I was appointed. There was never any story, there was no game playing. By that point he had given a statement to one of the government agents involved in this case that admitted his involvement it in.

I think it's important to point out that he never tried to soft sell his presence, his attempt to, in his drunken state, help them wipe the apartment clean after the time of the commission of this horrible crime, and insofar as his participation was concerned, just was very forthcoming with that.

So there wasn't that normal wall that I have to break through or that defense attorneys commonly have to break through at the very outset of a case, well, how is this going to help me, how is this going to help me? He was much more concerned at that point with the enormity of the crime and his remorse, insofar as I can tell, is very genuine, even though he was not obviously the primary actor in any of the horrible events which took place on that night.

12

Because he has been in protective custody, he may only have visitation after 9 p.m. at night and as a result of that, he has not been able to see his two children.  He has one child who is eight and another child who is much younger, and they cannot come to the detention center at that hour.  And so because of protective custody, that is something that he has sorely missed.

His eight year old child, whose name is Aja, A J A, after he was arrested in this case essentially shut down and became uncommunicative.  I spoke with the mother of that child, whose name is Katrina Haviland.  There have been significant problems, and for that he feels particularly guilty.  This is a situation, as he knows, of his own making and yet, it's being visited upon his eight year old child.

He is a very sensitive young man and I think his honestly is his leading characteristic.  It is rare that somebody just in the middle of a conference thanks a court-appointed attorney but for no reason other than I think he genuinely felt it.

He thanked me a couple of weeks ago when we were getting ready for today and appreciated all the efforts that I had made, which have been, frankly, with a defendant like him, minimal.  He's just an easy

client to represent.

He was concerned, unlike so many people, with doing the right thing, given the horrible facts of this case, to try and show his remorse in connection with it.

I would implore the Court to impose a sentence at the lowest end of the Guidelines under the circumstances of this case.

He knows -- he has had a prior record, obviously nothing like this, much more of a record that bespeaks either a drug user, a drug seller at a certain point.

He was involved in the fight down in Marion, Virginia, which had a lot of mitigating circumstances, but nevertheless stands as a conviction.

THE COURT:  There are a number of detainers out, though, as I see.

MR. KEMP:  There is really only one operative detainer.  Well, there is a violation of probation from Marion, Virginia that I think he is going to have to go back and answer for at some point.  That may serve as a detainer.

He has the detainer -- there should be a detainer from Prince George's County for the pending drug charge, and I think that's the totality of it, if I'm not mistaken.

14

It's going to interrupt the time he would have normally in a Bureau of Prisons installation, which has already -- for 25 months he has been kept in local incarceration as part of his preparation for trial on these cases, and that's a long period of time, as long as any that I have seen for somebody who is incarcerated pretrial, Your Honor.

I am going to ask the Court to consider a recommendation both for boot camp -- he would like that. He has heard about it, and I would like that recommendation to be made. I know that the Bureau of Prisons will make that consistent with his security needs insofar as this case is concerned and with the problems that he has had in this case that the Court has already alluded to potentially from other defendants.

Then the Intensive Drug Confinement Program I think would have particular application. The people at Annapolis Junction tell me he would qualify for that, that this offense does not in his case involve use of a weapon. So he is not precluded from entering into that. So I am going to ask the Court to make that recommendation.

I've already mentioned the fine, and I would ask the Court to make a specific finding that he is not

15

capable of paying a fine under the circumstances of this case. Other than that, I would submit it to the Court's discretion.

THE COURT: Mr. Gloria, you have an opportunity to address the Court at this time, and I'll hear from you.

THE DEFENDANT: At first my intentions was to come in and tell you how much I love my family and how much I feel they need me, but I mean even the government is aware of that.

So I just want to right now just apologize to the victims and their families and apologize for being a coward. I mean maybe if I had done anything, we wouldn't all be here right now.

I want to apologize for not jumping in front of the gun or not walking away, I mean anything, something that could have changed it. I just want to say I'm sorry. I never, I never meant for anything like this to happen, you know. I just pray they can get through it. That's it.

THE COURT: All right. Mr. Gloria, obviously yours is a typical case. You've got a criminal record, and I can't congratulate you for that obviously. I mean you come to a very sorry point in your life where, as a young man, you have done enough.

16

You went right to the brink in this case.

I understand you were not a participant as far as conceiving this idea or executing it. You were there and maybe you could have done something, but you ran with some pretty bad people, and they have contributed significantly to some real loss in your own life.

Maybe you will get straight. It sounds to me like in the last couple of years some things have gone right for you. They sure weren't going right up to that point and, as I say, it got worse and worse, until you found yourself in this truly terrible situation.

Having said that, I mean the fact is you were the critical link in the conviction of these two men, who deserved to be convicted. I understand that's at some sacrifice to yourself, and I cannot ignore that. That is the most important thing about you at this point in the sentencing, and it overrides everything else.

I'm going to sentence you to 84 months incarceration and recommend boot camp and the Intensive Drug Confinement Program, and then place you on supervised release for a period of three years thereafter, subject to the standard terms and

17

conditions of supervised release.

You are to commit no crimes, federal, state or local, possess no firearm or dangerous weapon, and you shall satisfactorily participate in any treatment program approved by your probation officer during your supervised release period relating to substance and/or alcohol abuse. This may include evaluation, counseling and testing, as deemed necessary by your probation officer.

I will impose no fine by reason of inability to pay, but there is a $100 --

MS. JOHNSTON: Your Honor, I believe it is $50 because of when the crime occurred.

THE COURT: All right. I will impose no fine by reason of inability to pay, but the special assessment, I'm advised, is $50, which is due and payable immediately.

You are obviously in custody and continue to be. You've waived your right of appeal in this case. Any further matters in that regard, you can take up with Mr. Kemp.

Is there anything more to be said, Ms. Johnston?

MS. JOHNSTON: Your Honor, no. I think this was a single count --

MR. KEMP: It was.

18

MS. JOHNSTON:  -- indictment that the defendant pled guilty to.  There is another pending criminal case, but that's not before the Court, and we will resolve that by documentation.

THE COURT:  All right.  Mr. Gloria, you will have to live with yourself now.  Maybe your life will take a turn for the better.  A small beginning.  Many years ahead.  See what happens.  All right.

(The proceedings concluded.)

- - - - - - - - - -

REPORTER'S CERTIFICATE

I hereby certify that the foregoing transcript in the matter of United States of America vs. Victor Gloria, Defendant, Criminal No. PJM-98-482, before the Honorable Peter J. Messitte, United States District Judge, on November 22, 2000 is true and accurate.

_____

Gail A. Simpkins
Official Court Reporter

# Exhibit 2

POLICE DEPARTMENT
BALTIMORE, MARYLAND
18 JULY 1998

TO: Major Kathleen T. Patek
  Commanding Officer
  Crimes Against Persons Section

FROM: Detective Robert L. Patton
  Detective Kirk Hastings
  Homicide Unit

SUBJECT: **HOMICIDE BY STABBING**
  **MARTRELLE LAMAR CREIGHTON**
  **M/B/20 DOB** ███████
  ███ ███████████ ▄█ ████████████
  OCC: 18 JULY 1998 @ 0200 HOURS
  301 LIGHT STREET ( SIDE WALK AREA)
  CC# 98-1G13258 H-98-172

SIR:

## SYNOPSIS OF INCIDENT:

On the captioned date at 0206 hours Officer Moore was dispatched to the listed location for a reported stabbing. Upon arrival the Officer found the listed victim laying on the side walk suffering from an apparent stab wound to right neck area. Emergency medical Units arrived on the scene and the victim was ultimately transported to University of Maryland Shock Trauma Center by Medic # 12 Unit. Once at the trauma center the victim received emergency medical treatment and ultimately expired from his wound and was pronounced dead at 0230 hours.

Officer Moore in concert with backup Units secured the crime scene, made the appropriate notifications and were able to locate witnesses who were ultimately transported to the Homicide office for interview. Your Investigators ultimately found that the listed victim had been engaged in a argument and altercation with three unidentified black males and was stabbed once in the right neck area. The unidentified males then ran from the scene and were last seen running in the direction of Pratt Street. The victim next of kin, Ms. Judy Creighton of ███ ███████████ was notified and given the appropriate information.

## NOTIFICATION OF INCIDENT:

On the 18th of July 1998 at approximately 0215 hours Officer Kevin Moore Unit 7629 contacted the Homicide Units and reported the following information . Officer Moore reported that he was currently investigating a serious stabbing incident that occurred on the side walk area in front of Phillips Inn harbor restaurant located at 301 Light Street and requested assistance from the Homicide Unit.

**PAGE # 2**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

Based on this request your Investigators responded to the scene and initiated a preliminary investigation and ultimately interviewed the primary Officers and witnesses at the scene.

**CASE STATUS:**    Open.

**MOTIVE:**    Argument / Altercation.

**VICTIM:**    **MARTRELLE LAMAR CREIGHTON**
**M/B/20 DOB** ▮▮▮▮▮▮▮

On the captioned date and time the above victim is found suffering from an apparent stab wound to the right front neck area. The victim is transported to University of Maryland Shock trauma Center where he received emergency medical treatment and ultimately expired from his wound and was pronounced dead at 0230 hours. On this same date the victims body was transported to the O.C.M.E. where a post mortem examination was performed by Doctor David Fowler . Doctor Fowler reported at the conclusion of his examination that the victim sustained a single stab wound to the right front neck area. He added that the single wound lacerated the victims artery which was the cause of death. Doctor Fowler ruled the manner of death was Homicide by stabbing. One vial of the victims blood was recovered and submitted to E.C.S.

**FIRST OFFICERS REPORT:**

Officer Kevin W. Moore, Tactical Unit 7629 reported that on the captioned date and time he was dispatched to the captioned location for a reported stabbing. Upon arrival he found the listed victim suffering from an apparent single stab wound to the neck. Emergency medical assistance was requested and the victim was ultimately transported to university of Maryland Shock Trauma Center by Medic # 12 Unit. Officer Moore reported that he secured the crime scene , located and retained witnesses and made the appropriate notifications and requested assistance from the Homicide Unit.

**PAGE # 3**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

## CRIME SCENE EXAMINATION:

The crime scene in reference to the captioned incident is confined to the side walk area in front of Phillips Inn harbor restaurant located at 301 Light Street. In this area your Investigators observed several small pools of blood and the victims red baseball cap. The aforementioned area was photographed by the crime lad Unit and the victim baseball cap was recovered and submitted to E.C.S.

## WITNESSES:

DAVID BISHOP
M/B/24 DOB

410-

KEVIN SMITH
M/B/23 DOB

NO HOME TELEPHONE

CLARENCE FREDERICK WHITE
M/B/15 DOB

410-

The above listed witnesses are located at the crime scene and all indicated that they were friends with the listed victim and witnessed the captioned stabbing. All three witnesses stated that they were all at the Inner harbor and in concert with the listed victim had been talking to three unidentified black females. The witnesses indicated that the victim became upset when the unidentified females began talking to another group of black males who the witnesses believe were from the Washington D. C. area . The witnesses indicated that they bases their assumption that the unidentified males were from the Washington D.C. area Solly based on the way they were dressed. The witnesses indicated that the listed victim approached the unidentified males and engaged them in a argument which ultimately lead to a physical altercation. The witnesses indicated that during the altercation the victim was stabbed once in the neck . The witnesses stated that after the victim was stabbed the unidentified males ran from the area in the direction of Pratt. The witnesses indicated that they remained on the scene until emergency medical personnel and Police arrived on the scene.

**PAGE # 4**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

## SUSPECTS:

**(1)**   BLACK MALE, 20'S
MEDIUM TO DARK COMPLEXION
THIN BUILD, TALL, LAST SEEN
WEARING ,A WHITE TEE-SHIRT AND
SHORTS, REPORTEDLY FROM
WASHINGTON DC, NFD.

**(2)**   BLACK MALE, 20'S
LIGHT BROWN COMPLEXION, 5'7"
MEDIUM BUILD, ONE GOLD TOOTH,
SILVER OR HAZEL CONTACT LENSES,
BLACK HAIR THAT IS CUT CLOSE,
ALMOST BALLED. REPORTEDLY FROM
WASHINGTON DC, LAST SEEN
WEARING ,A WHITE TEE-SHIRT AND
SHORTS, NFD.

**(3)**   MIXED RACE BLACK MALE, 20'S,  VERY
LIGHT COMPLEXION, MEDIUM HEIGHT,
MEDIUM BUILD, CURLEY SANDY BLOND
HAIR, AND POSSIBLY A PORTO RICAN ,
SAME IS THE TWIN BROTHER OF SUSPECT
# 4. REPORTEDLY FROM WASHINGTON DC,
LAST SEEN
WEARING ,A WHITE TEE-SHIRT AND
SHORTS, NFD.

**(4)**   MIXED RACE BLACK MALE, THE TWIN
BOTHER OF SUSPECT # 3, VERY LIGHT
COMPLEXION, CURLEY SANDY BLOND
HAIR BREADED TO THE BACK, MEDIUM
BUILD, MEDIUM HEIGHT , POSSIBLY
PORTO RICAN REPORTEDLY FROM
WASHINGTON DC, LAST SEEN
WEARING ,A WHITE TEE-SHIRT AND
SHORTS, NFD.

## FOLLOW UP INVESTIGATION:

In reference to the follow up investigation your Investigators will attempt to identify the unidentified females and attempt to identify the listed suspects, see follow up reports.

**PAGE # 5**
**OFFICE REPORT**
**18 JULY 1998**
**H-98-172**

INVESTIGATION TO CONTINUE

SUPERVISOR

DETECTIVE ROBERT PATTON
C.I.B. HOMICIDE UNIT

# Exhibit 3

POLICE DEPARTMENT
BALTIMORE, MARYLAND

2 FEBRUARY 1999

TO:      Major Jeffrey Rosen
         Commanding Officer
         Crimes Against Persons Section

FROM:    Detective Robert L. Patton
         Detective Kirk Hastings
         Homicide Unit

SUBJECT: HOMICIDE BY STABBING
         MARTRELLE LAMAR CREIGHTON
         M/B/20 DOB ████████
         ████ ██████████████ ██ ████████████████
         OCC: 18 JULY 1998 @ 0200 HOURS
         301 LIGHT STREET ( SIDE WALK AREA)
         CC# 98-1G13258 H-98-172

SIR:

## FOLLOW UP INVESTIGATION/ ARREST OF SUSPECTS

SUSPECTS:        **KEITH MICHAEL SCOTT**
                 M/B/23 DOB ████

                 ( ARRESTED)

                 **KEVIN LEE SCOTT**
                 M/B/23 DOB ████

                 (ARRESTED)

                 **KEVIN ANTHONY MILLER**
                 AKA "KEVIN"
                 B/M/22 DOB ████

                 S.I.D # 1628168

**PAGE TWO**
**FOLLOW UP INVESTIGATION/**
**ARREST OF SUSPECTS**
**2 FEBRUARY 1999**
**H-98-172**

**VICTOR GLORIA**
AKA "VIC."
B/M/24

S.I.D. # 1565443

  On the 2nd of February 1999 at 1515 hours Detective Daza of the F.B.I. Fugitive Task Force, Calverton Office contacted the Homicide office and reported the following information. Detective Daza reported on this date at 1500 hours the listed suspects were and arrested in the 200 block of Red Clay Road, Anne Arundel County Maryland. Detective Daza said that the listed suspects were currently being detained at the M.S.P. Waterloo Barracks awaiting transport to Baltimore City.

  Based on this information Detective John Thanner in concert with Detective Kirk Hastings responded to the Waterloo Barracks where they took custody of the listed suspects and ultimately transported them to the Baltimore City Homicide office for interview. Once at the Homicide office both suspects waived their rights to counsel and provided statements in which the following information concerning the captioned investigation was gleaned.

  Concerning **Keith Michael Scott** he said during his taped interview. That he and his twin brother, Kevin Lee Scott and a third individual identified as **Kevin Anthony Miller, SID # 1628168** left Laurel Maryland together and drove to the Inner Harbor area on the date in question. He stated that his brother Kevin Scott was driving and that they were operating a white late model Chrysler or Plymouth four door vehicle that Kevin Scott had purchased from an individual known as "Paul." Keith Scott continued and stated when they arrived they parked their vehicle within blocks of the Inner Harbor and walked the rest of the way on foot. He said that they arrived sometime after 2100 hours and they walked to several drinking establishments in the vicinity.

  Keith Scott continued and stated that several hours later they were walking down the promenade in the direction of where their vehicle was parked. He stated it was during this time they meet and individual known as "**Vic.**", **Victor Gloria S.I.D. # 1565443** , a friend from Laurel Maryland who was walking in the opposite direction.

PAGE THREE
FOLLOW UP INVESTIGATION/
ARREST OF SUSPECTS
2 FEBRUARY 1999
H-98-172

Keith Scott said that they talked to Victor Gloria and continued walking in the direction of their vehicle. He stated it was during this time they encountered three unidentified black females who were later identified as **Ms. Barbara Bailey, Ms. Charnetta Bailey and Ms. Erica Jones**. Keith Scott stated that Victor Gloria was the main person who began conversations with the females. He stated a short time later the listed victim in company with two other individuals approached the group and began making sarcastic remarks toward the females.

Keith Scott stated that the females and the rest of their group walked away from the victim and his associates trying to avoid an altercation. He stated it was during this time the victim re-approached their group and in a threatening manner approached Victor Gloria from behind. He stated at this point Victor Gloria struck the victim once in the face and immediately began running toward the main Street. Keith Scott stated after the victim was struck in the face he started bleeding from the nose and stood in the same area and did not chase after the Victor Gloria.

Keith added that the altercation was over at this point, saying that only one punch was thrown. Keith stated that the only persons involved in any altercation that night was Victor Gloria and the victim. Keith stated that he did not know at the time that the victim was stabbed in the neck and did not see Victor Gloria armed with any type of weapon. He said that he learned of death after Police were looking for him and his brother in Laurel.

Keith stated after the altercation they walked to their vehicle and drove back to Laurel Maryland. He stated that Victor Gloria apparently made his own way home indicating that he did not ride in their vehicle. Concerning Kevin Lee Scott your Investigators will note that he provided the same basic information in his taped interview, see transcripts for detailed information.

INVESTIGATION TO CONTINUE

SUPERVISOR                    DETECTIVE ROBERT PATTON
                              C.I.B. HOMICIDE UNIT

# Exhibit 4

Police Department
Baltimore, Maryland

CI/209                                              Case Number_____

INFORMATION SHEET

Name _Clarence Frederick White_____ Nickname _Clarence_

Race _B_ Sex _M_ Age _15_ D.O.B. ███████████

Height _5'7"_ Weight _135_ Complexion _Med_

Address ███████████ SS# ███████████

Home Phone ███████ Date and time of interview _18 July 98  0355_

Parent's name ███████████ Address _S/A_

Boy/girlfriends name ███████████ Address ███████████

Last School Attended _Conrod Weiser_ Grade _9 th_

Employer _Unemployed_ Address _____

Employers Phone _____ Hours of employment _____

RELATIVES IN BALTIMORE NOT LIVING WITH WITNESS

Name ███████████ Relationship ███████

Address _S/A_ Phone _Same_

Name ███████████ Relationship ███████

Address ███████████ Phone ███████

Read and Write        Yes _X_        No _____

Under the influence of drugs   Yes _____   No _X_

If yes explain _____

Alcohol Check One Sober____  Had Been Drinking _X_ _2 Beers_ Intoxicated____

Description of clothing at time of Interview (note in bloodstained
torn etc.) _T. Shirt, Jeans, Tennis Shoes._

Note any injuries _None_

Meals Provided_____Date_____Time_____Date_____Time_____

Detective _Klein ota_ Detective _____

# Exhibit 5

Me + Demian + Montrel name downtown

We was Drinking.

Met up with Some Girls    Near Crazy Johns.

Split up.

Went to Inner Harbor.

Met up with Girls Again.

They talking with other Guys.

We All Started talking

Suspect became mad

Started to fight with Victim

V Got Cut in Neck

Suspects RAN Away.

it was 3/4 They all Ran Away Together.

Suspect #1

- White T-Shirt - White V-Neck on top.   Short Hair
  Brown/tan Shorts,          Low Cut Black Chuka Boots.

MB 19. Slim - 150  Light Skin

Saw him swing at Montrel — Montrel grabbed

his neck - And was bleeding bad.

#2  MBK    White T-Shirt  Dark Shorts.

#3  MBK    White T-Shirt  Dark Shorts.

Called 911 from pay phone      Light Rail Entrance.

Flagged down Police Car.

Can recognize if seen again.

# Exhibit 6

Today's date is the 11ᵗʰ of June 1999. The time now is approximately ah, 1347 hours. This is Detective Robert Patton and Detective John Thanner of the Homicide Unit. Ah, we're in Sgt. Barrack's office. We're interviewing Mr. Clarence White in reference to the stabbing incident of Montrell Creighton which occurred down at the Inner Harbor during the summer of 1998.

| | |
|---|---|
| Patton: | O. k. for the record ah, Mr. White would you say your full name and address please? |
| White: | Clarence White, ██████████████ |
| Patton: | O. k. and how old are you Clarence? |
| White: | 16. |
| Patton: | O. k. and ah, what's your date of birth? |
| White: | ████████ |
| Patton: | O. k. alright you remember the incident that happened down at the Inner Harbor where Montrell Creighton who's also known as Tank, was stabbed? Do you remember that? |
| White: | Yes. |
| Patton: | O. k. could you tell me what you remember about that incident? What happened? |
| White: | Um, this, |
| Patton: | And speak up loud. |
| White: | Alright, it was, we arrived like downtown like I guess like 12 or something and. |
| Patton: | Who, who was with you? |
| White: | It was Truck, it was Bishop and me. |
| Patton: | O. k. |
| White: | And we was, we was walking down to the side like I don't recall what street that is. We was, we was walking towards the harbor. And we were drinking and we was walking towards the harbor. We, we seen these females, it was 3 females. And so we were, we were talking to the females and the females was like, one of the girls who Montrell was rap, talking to |

Page #2
Statement of:          Clarence White

White:          she say that she was married and she was in the army like she was just trying to turn him down like easy or whatever but it's like she was just out there still trying to talk to males though and he couldn't understand that cause like he had that alcohol in him.  So we walked him down and we get so towards the harbor like next to the booth where the benches at and we walking down and we see the females again and we keep on going we rap. We, we get to them a little group where some guys rapping out there were rapping, time goes by and the females walked passed us and it's like soon as she looked like, he look over to the right and he them so he walked right there cause they was like right on the side of us.  He walked over there, he talking to them, he's talking to this female and he was like, "Why yall messing with them, the guys?"  He was like, "They ain't nobody" and this and that.  He say, like he, he was like um, he was like they whores.  He asked the, he asked the dudes like why was they rapping to the females, he was like they all spoken for like, she married and she in the army and the guy he came, he came out his mouth like, like fuck you or something.  So Montrell was he was call, he called him out there.  So the guy was like, "We can fight."  So it's, they get there to fighting like Truck jabbed him in the face and the dude throw his guards up.  When he throw his guards up he just swinged, he swinging and it look like he hit him in his neck.  It's like he held Truck, grabbed his neck and he say like, "I'm, I'm hit like he , he poked me or something."  And he started bleeding.

Patton:          Now,

White:          It's like.

Patton:          where did the guys, the guy go that, that stabbed him in the neck?  What did he do after he stabbed Montrell in the neck?

White:          The guy he, he ran.

Patton:          Now he was with some other guys?

White:          He was with two light skinned guys.  He was with those twins that you showed me.  He was with them and they all like clammed together like come on or whatever and they ran.  Like as if like they knew what he was doing.

Patton:          Now did anybody else fight Montrell other, just the one guy fought Montrell?

Page #3
Statement of:        Clarence White

White:        Just the brown skinned guy.

Patton:        O. k. now you said that Montrell swung at him and then the guy swung back and then the fight was over with?

White:        Yes.

Patton:        And then, what did Montrell do after the guy hit him?

White:        He clenched on his neck and he said, the just like he poked me.

Patton:        Huh. Huh.

White:        We well he was sitting there for so long before he said it that, that like we ain't know and it's like they already done ran off.

Patton:        And then he's bleeding from the neck?

White:        Huh. Huh.

Patton:        A lot?

White:        It was a lot.

Patton:        Alright, o. k. now did you know the girls?

White:        No.

Patton:        O. k. had you ever seen those 3 guys before?

White:        Uh. Uh.

Patton:        Were they, had you ever seen the guy that, that stabbed Montrell in the neck before?

White:        No.

Patton:        Did you see what kind of weapon he had in his hands when he hit Montrell in the neck?

White:        Nah.

Page #4
Statement of:                    Clarence White

Patton:        Couldn't, you couldn't see it?

White:         Uh. Uh.

Patton:        O. k. but he did hit him in the neck and then after that ah, Montrell stopped fighting and grabbed his neck?

White:         Huh. Huh.

Patton:        O. k. now earlier before we turned on the tape at about ah, 1325 hours which is 1:25 p.m. I showed you a photo line up card ah, that contained 6 black and white photographs, is that correct?

White:         Yes.

Patton:        And o. k. and did you identify anybody on that card?

White:         I identified the 6th picture,

Patton:        O. k. and that, did

White:         on down the bottom.

Patton:        and that's the ah the, the bottom row?

White:         The bottom right hand, hand the 3rd one.

Patton:        O. k. bottom right picture?

White:         Yes.

Patton:        O. k. and this person is the person that?

White:         He stabbed Montrell.

Patton:        O. k. and did you sign your name above the picture?

White:         Yes.

Patton:        O. k. and had you write something on the back?

White:         Yes.

Page #5
Statement of:          Clarance White

Patton:          O. k. and what did, what, what did you write on the back, can you read that?

White:          The guy in the picture that I identified looks like the person that stabbed Truck.

Patton:          O. k. and Truck is Montrell Creighton, right?

White:          Yes.

Patton:          O. k.

White:          Creighton.

Patton:          Creighton, I'm sorry. Now I also showed you 2 more photo line ups and you identified ah, the two light skinned guys is that correct?

White:          Yes.

Patton:          O. k. the, the first one I showed you was at um, 1 ah, 1:32 p.m. and did you identify anybody on that card?

White:          Yes the 3rd person on the top on the right hand side.

Patton:          O. k. and that was one of the guys that was there?

White:          Yes.

Patton:          O. k. and I showed you another one at ah, 1:37 p.m. did you identify anybody on that one?

White:          Yes.

Patton:          O. k. and where was that picture located?

White:          Down the bottom on the first.

Patton:          Bottom where?

White:          On the bottom of the 1st left hand side.

Patton:          O. k. and he was the this person was?

Page #6
Statement of:          Clarence White

White:          He was, he was the guy that was there.

Patton:         O. k. and you signed your name above each one of those photographs?

White:          Yes.

Patton:         O. k. Um, I also showed you a 4th line up but you couldn't identify anybody is that correct?

White:          Yes.

Patton:         O. k. Now you came down to Police Headquarters ah, or went to the hospital right, after Montrell was stabbed?

White:          Yes.

Patton:         And then ultimately you came down Police Headquarters and talked to the detectives that night,

White:          Yes.

Patton:         or that morning, right?

White:          Yeah.

Patton:         O. k. and you told them what happened?

White:          Yeah.

Patton:         Alright, o. k. um, now I asked you, do was this earlier and you said there was 2 light skinned guys and the guy that stabbed Montrell, was there any other person with them in that group,

White:          Uh. Uh.

Patton:         that you know of ?

White:          Nah if they have it, they would have to be far or something.

Patton:         O. k. so they weren't out in the immediate vicinity?   They weren't involved in what happened?

Page #7
Statement of:        Clarence White

White:        Nah.

Patton:       O. k. alright, o. k. John you have any questions?

Thanner:      **(Inaudible)** at any time Clarence did Detective Patton or myself pointed out anyone direct you to identify anyone,

White:        Uh. Uh.

Thanner:      out of those photographs that you looked at?

White:        No.

Thanner:      Ah, we didn't indicate in any way, shape or form, right?

White:        Right.

Thanner:      And ah, you weren't forced or coerced or threatened to give this statement?

White:        No.

Thanner:      O. k. that's all I have Bobby.

Patton:       O. k. alright the time now is approximately ah, 1356 hours. We're gonna conclude the interview.

Transcribed by:    Eva E. Cooper

# Exhibit 7

This is a tape statement of David Bishop being taken in the Homicide Unit by Detective Kurt Hastings.  The date is 18th July, 1998 and the time is 0416 hours.  We're in Lieutenant's Lieu's office in the Homicide Unit. For the tape sir state your name?

Bishop:          David Bishop.

Hastings:        Could you speak up sir?

Bishop:          David Bishop.

Hastings:        Your home address?

Bishop:          ███ ███████████

Hastings:        Your age and date of birth?

Bishop:          I'm 24 years old and I was born ███ ██, ████.

Hastings:        Can you read and write sir?

Bishop:          Yes.

Hastings:        How much education do you have?

Bishop:          I graduated from Southwestern High School.

Hastings:        Are you under the influence of drugs or alcohol right now?

Bishop:          No.

Hastings:        Are you giving this statement free and voluntarily?

Bishop:          Yes.

Hastings:        Mr. Bishop I'm investigating an incident that occurred 301 Light Street which is the Inner Harbor.  It happened around 2 AM this morning where a friend of yours Matrella Creighton known to you as Truck was stabbed, what can you tell me about this incident?

Bishop:          Well, we started we, we entered the Harbor from the entrance and started walking down me Truck and my friend Little Man we were walking down talking to some girls alright, than all of a sudden we ran into these girls one of them Truck was trying to talk to than it was some guys standing there one of the guys said something smart to Truck, Truck was ready to fight the guy than

Statement of Mr. David Bishop
Page 2

Bishop:        they started fighting alright Truck, the
               guy swung on Truck, Truck swung the guy
               swung back and it looked like a punch
               but, he cut him with something in his
               neck.  And, than the other one tried the
               light skin dude came up and hit him in
               his head and than they just backed up
               cause Truck wasn't trying to fight them
               after they hit him it wasn't trying to
               fight them so they just backed up cause
               I guessed they figure they stabbed him
               they did something to him.  And, I
               didn't realize that he was stabbed
               until, until um I started fighting the
               dudes and than they backed off and then
               I went to my friend and than he, he
               looked at me and he was black he was
               like they cut me with something and than
               that was his last words and than all the
               blood started shooting out of his neck,
               and air was coming out of his neck and I
               tried to put my hand over his neck to
               try to stop the bleeding and keep his
               air in.  And, than his head, his head
               started swelling up like a balloon his
               eyes started getting real big and his
               face started getting real puffy and
               blood started coming out of his mouth
               and his nose.  And, it was like he was
               standing up he was real stiff and when
               I, when I felt I realize that he was
               gone so I sat him down, I laid he down
               on the grass and I tried to ran down the
               boardwalk to see if I could catch the
               guys but, by the time they were gone.
               So I ran back up the boardwalk and
               that's when the Ambulance gets there.

Hastings:      When you say these three guys describe
               the guy that was originally fighting
               with Truck who stuck him as you put it?

Bishop:        I say he was about 5"11, a 160 pounds
               um, dark complexion um, he was wearing
               not a hat but, some kind of it looks
               like some kind of little cap on his head
               or something it didn't have a wing on
               it.  And, he had some it looked like he
               had some um some kind of pants or
               something rolled up to his knees and.

Hastings:      Like sweat pants?

Bishop:        Yea, like sweat pants or something.

Statement of Mr. David Bishop
Page 3

Hastings:        Did you see what kind of shoes he had
                 on?

Bishop:          No, no.

Hastings:        The other two gentleman who, who were
                 with them, when we were talking earlier
                 you said that they looked like twins?

Bishop:          Yea, they looked like brothers I heard
                 one of the girls say that call I heard
                 one of the girls say twin, like that so
                 I figure that um they were twins but,
                 they looked like brothers they were the
                 same height, the same complexion and
                 they, their, their features were
                 similar.

Hastings:        There was a different in their hair
                 styles?

Bishop:          Yea one of them had a bush the other had
                 braids going down to the back.

Hastings:        The one with the bush how big of bush
                 was it?

Bishop:          I say it stood about 5 inches off of
                 his, off of his head.

Hastings:        And the other one had braids all the way
                 through his hair?

Bishop:          Going to the back, yea, all the way
                 through.

Hastings:        Do you remember what either one of them
                 was wearing?

Bishop:          No, I can't really remember what they
                 were wearing.

Hastings:        Do you recall any words that were spoken
                 between any of your friends and the
                 suspects?

Bishop:          They were just going back and forth
                 talking I mean saying like I don't know,
                 Truck I guess Truck, Truck was like why
                 do you have to disrespect me and he was
                 ready to fight and that was really the
                 end, the guy was like what's up and than
                 they started fighting.  And it looked
                 like it he looked like he punched him

Statement of Mr. David Bishop
Page 4

Bishop:          but, he stabbed him with something.
                 Because I could tell the side that, I
                 could tell the side that he was on that
                 the dark skin dude was the one that
                 stabbed him because the way they were
                 fighting the light skin dude came from
                 the back and, where he was cut that's
                 where, that's where the dark skin dude
                 was hit his at.

Hastings:        Right?

Bishop:          I seen him hit him.

Hastings:        When you met um the girls down the Inner
                 Harbor, did you know any of these girls
                 names?

Bishop:          None I just met them.

Hastings:        Did you get any nicknames or anything
                 like that?

Bishop:          I, I didn't even talk to the girls.

Hastings:        How long were you down the Inner Harbor
                 before this happened?

Bishop:          About an ½ hour.

Hastings:        Have you ever seen any of these suspects
                 before anywhere?

Bishop:          Never.

Hastings:        Can you think of any questions that I
                 didn't ask you or any information or any
                 information that you can provide me that
                 I didn't go into?

Bishop:          If I could remember more I would try
                 but, I told you everything I know, I
                 can't remember (inaudible).

Hastings:        Thank you for your cooperation.  This
                 tape statement is terminated at 4:23,
                 thank you.

This tape was transcribed by Secretary III Myrna C.
Milburn, Criminal Investigation Bureau, AdmUnit on
November 28, 1998.

# Exhibit 8

Today's date is the 29th of July 1998. The time now is approximately 12:50 hours, this is Detective Robert Patton, the Baltimore City Police Homicide Unit. Ah, I'm conducting an interview with Ms. ah, Barbara Baily in reference to the homicide of Montrell Crighton which occurred at the Inner Harbor on the um, 18th of July 1998 at about 2 o'clock in the morning.

Patton: Just for the record Barbara just tell them your full name, your age and your date of birth?

Bailey: O.k. My name is Barbara Anita Bailey. I'm 18 and my birthday is ███████

Patton: O.k. um, Barbara we were just conducting ah, ah pre-interview for about 20 minutes and um, you told us some things in reference to what happened down at the Inner Harbor, is that correct?

Bailey: Huh. Huh.

Patton: O.k. just from the beginning tell me what happened in sequential order, what happened that night down at the harbor.

Bailey: O.k. well me and my friends were going down the harbor and we parked on,

Patton: Now I'm gonna interrupt you there, you say me and your friends ah, who was with you?

Bailey: My sister and my best friend.

Patton: And what's your sister's name?

Bailey: Tronetta and my best friend is Erica.

Patton: O.k. Tronette Bailey,

Bailey: Huh. Huh.

Patton: and Erica ?

Bailey: Jones.

Patton: Jones? O.k.

Page #2
Statement of:          Barbara Bailey

Bailey:          Well, we were on um, Gay Street and we parked, parked on Gay Street and then we started walking towards the harbor and that's when we saw Montrell and David and the other guy. We didn't know them but

Patton:          Is that the first time you had met them?

Bailey:          The first time we had met them and they um, approached us and, well they actually, Montrell approached Erica and we were like come on and trying to egg her to come on with us and stop talking. So um, she just kept talking to him, she kept talk, you know he was like so what are you doing down here, or, or you married or you got a boyfriend and she was like, "I'm married!" and he was like, "You married? What you mean, you married!" She was like, "I'm married!" So um, she, she does have a boyfriend but she called him her husband so we um, they had a conversation for like 15 minutes, but I didn't know what they were talking about cause I wasn't in to it. I wasn't paying attention and then we walked towards the harbor cause we wanted to get something to eat we was all on the Planet Hollywood. The Planet Hollywood was closed so then we was walking toward the Maryland Science Center so, thinking that something else would be opened in the other Pavilion. So that's when we met the other guys that were from D.C. and we started talking to them and they told us that their names and not all of them but there were 2 Kevins and there were a Victor and there was another one. And I don't know his name. And we were talking and then that's when Montrell came over there and we were

Patton:          Where were you, where, where were you exactly in relationship, in relationship to the harbor, where were you specifically?

Bailey:          O.k. um

Patton:          Before anything happened like fight, or anything happened?

Bailey:          Before ah, the fight happened? We were like near, o.k. we were past the Pavilion. We were closer towards the Maryland Science Center on one of those benches. That's where we were sitting at and then, then that's when Montrell, Montrell and David came over there talking to us and Montrell was like, "You suppose to be married what you doing talking to them?" And he, she was like, "These my boys!" and he was like um, "I don't give a

Page #3
Statement of:                  Barbara Bailey

Bailey:                  fuck who they are!" and he was like, "Fuck them! I don't give a fuck!" and
then the um, the guys that were from D.C. they was just chilled for a
minute, they were chilling and then Kevin was like, "I don't know about
that!" you know, if referring to when he was like, "Fuck them, I don't give
a fuck about them!" And then that's when David was like, "Man he got a
mouth over here, he talking over here", like he was egging them,
instigating them or something. And um, then I noticed that something
might happen so I got my girls together, Erica and, Da, and Shawnetta and
I told them to come on and go. And that's when Montrell was like, "Your
man look better than me?" asking Erica that, "Your man look better?" and
she didn't answer him, she was just like, "He was drunk or whatever." She
just was trying to ignore that. And so he was like, "Man FUCK YOU
THEN!" cause she didn't answer. He was just like, "Fuck you! Fuck you!"

Patton:                  Are you guys walking away? Walking towards the,

Bailey:                  We were walking back towards the Gay Street I guess, you, you know.

Patton:                  Towards where Pavilion( **please check**) was?

Bailey:                  Yeah, back towards the Pavilion and um, well, David was like, "Man she
ain't nothing but a 2000.00 dollar whore, fuck her, she ain't nothing but a
2000.00 dollar whore." and you know, I guess boys, you know how they
are they support each other just so, so he doesn't feel bad. He was like
you know, kept saying that or whatever and my friend was like appalled
you know. She was like "HA!" you know, had this like expression on her
face like, oh my GOD, so we just kept on walking and then, and he was
um, trying to um, talk to my sister like, "Man you down here too? You
suppose to have a boyfriend man, fuck you too, you suppose to have a
boyfriend and you down here talking to other guys!" And so she was like,
my sister was just like, "Man get out of my face! Get off of me!" And so
then, that's when um, Kevin and them was like, "Yoe, yall need to chill
out you know like, that's not necessary or whatever" and then that's when
David was like, "Man he got a mouth over here again!" and then that's
when the altercation happened. But before the altercation happened Victor
was the one that ran off because I get he saw that something was gonna
happen. So he ran off towards Gay Street I guess or where ever they
parked and um, he ran, and then that's when they started fighting but they
started moving back towards the Maryland Science Center and we were

Page #4
Statement of:        Barbara Bailey

Bailey:        moving towards Gay Street so it was like a distance and when they started fighting and I turned around and I saw Kevin punch Montrell. I saw him punch Montrell and then my sister was like, "Oh, he bleeding, he punched him good". And they was like that's what he get, you know what I mean, cause we thinking that he got punched.

Patton:        Did, did Kevin have something in his hands or was he wearing a ring or

Bailey:        No he didn't.

Patton:        did you see, did you what he had in his hand?

Bailey:        No we were to far to see. It looked like a punch to us we didn't see that he had anything in his hand. So I thought he might have punched him in his mouth and his mouth was bleeding cause he had blood all over his shirt but my sister saw that I really couldn't see, my sister she, you know, she good with detail so I was like, "Come on!" and we saw that the guys from D.C. started running so we figured that maybe David and Montrell were gonna go to that car and get a gun or something so we started walking faster because we had on heels we couldn't run any faster than we, than our heels permitted us to.

Patton:        So the guys from D.C. past you up (inaudible)?

Bailey:        Yeah and then, we, they past us. They ran and they were like gone. They were shew out of there. I was like, "I wonder why they ran?" They, they punched the guy and they ran off you know. So we just started running (inaudible) to our car.

Patton:        Now did you see them after that, the guys from D.C. after that?

Bailey:        Uh. Uh, we ain't see them.

Patton:        O.k. now during your conversation with these guys, did they give you guys ah, their pager numbers, their home numbers, their telephone numbers at work or anything like that?

Bailey:        No.

Page #5
Statement of:          Barbara Bailey

Patton:            Or any

Bailey:            We didn't, uh. uh. We didn't

Patton:            You guys give them numbers?

Bailey:            No we didn't give them any numbers. We didn't have a chance. We were just talking you know when we first saw them we were just having a conversation about the harbor or downtown you know just being down there, they were like, what are yall doing? Cause the conversation wasn't even focused on do yall have boyfriends and who yall down here with and can we get in touch with yall later on. It wasn't focused on that until Montrell came back over there and was like, "Yall supposed to be married" and then you know.

Patton:            Right. Now you said there was 4 guys,

Bailey:            Huh. Huh.

Patton:            o.k. and one of them, 2 of them were named Kevin and you said two of them were twins,

Bailey:            Huh. Huh.

Patton:            right? Let's deal with them twin guys first. One of the twins you say had a name of Kevin?

Bailey:            Kevin, yeah.

Patton:            Alright, and can you describe those two guys to me,

Bailey:            Well um,

Patton:            the twins?

Bailey:            The twins, they were skinny, they were light skinned, they look like they were mixed or something, they had wavy hair but it was like a sandy blonde wavy hair.

Patton:            Sandy blonde?

Page #6
Statement of:         Barbara Bailey

Bailey:         Huh. Huh.

Patton:         **(Inaudible)** color?

Bailey:         **(Inaudible)** color.

Patton:         And how was the, how did they wear their hair?

Bailey:         One of them had like a short blow out. He just wore his hair wild wavy and um, the other one had corn rows that was going back and they were long corn rows. They probably reached down to his shoulders and he had them corn rowed back. But um,

Patton:         And this sandy,

Bailey:         They were both

Patton:         sandy blonde hair?

Bailey:         Yeah it was like sandy, huh, huh.

Patton:         Both of them had the same colored hair?

Bailey:         Yeah, same color hair, they

Patton:         But one had like it, was it like in a blow out?

Bailey:         Yeah, but his wasn't as long as his brothers, his was short. And they both kind of quiet, they ain't really didn't say much, they were quiet.

Patton:         O.k. and the guy, did you know of his second twin's name, did he ever say what his name was?

Bailey:         Ah, not that I remember. I he had

Patton:         Do you know which one, which one of the twins was Kevin?

Bailey:         No, I can't remember that. I can't

Patton:         Did they look like they were mixed black?

Page #7
Statement of:          Barbara Bailey

Bailey:          Yeah.

Patton:          Mixed?

Bailey:          Yeah, they looked like they were mixed or they had some other nationality in them like Puerto Rican or something.

Patton:          But they did have sandy blonde hair?

Bailey:          Huh. Huh.

Patton:          O.k. what about the guy Victor who ran off just as the fight started?

Bailey:          Well he was light skinned and had an even tone.  He had some contacts in his eyes.  They were, they were like silver or something they were a real, like the pupil of it, it wasn't like the normal size of a pupil it was like real big you know how you can see the pupil it's, it's kind of small?

Patton:          Right.

Bailey:          But this one like big so we knew it wasn't real you know and he, he admitted that, that wasn't real and he a real close haircut but

Patton:          And he was light skinned?

Bailey:          Yeah.

Patton:          Did he look like he was mixed also?

Bailey:          He looked like he could have been mixed.

Patton:          Did he say what his nationality was?

Bailey:          He said that he was half black and half Puerto Rican.

Patton:          Did he say where he lived, Victor?

Bailey:          Victor said he um, he lived out in D.C. but he use to live out in New York.

Patton:          Excuse me.  Ah, the two twins they, they also said they were from D.C.?

Page #8
Statement of:        Barbara Bailey

Bailey:        Huh. Huh. Well they was even, they were on the same **(inaudible)** the only thing with them was my sister had pointed out something. She was like, "Where yall from?" cause they had on white slouch socks and nobody in Baltimore wears white slouch socks and so she said, "Are yall from D.C. or something or where yall from?" and he was like, "D.C." , and he was like, "How did you know?" and she was like, "Because yall dress different", she aint wanna really offend him but then she was like you know and, "Plus yall have on white slouch socks" and so um,

Patton:        And the guy, there was the dark skinned guy that's named Kevin?

Bailey:        Huh. Huh.

Patton:        O.k. can you describe him?

Bailey:        Can I describe him?

Patton:        Other than he was dark skinned.

Bailey:        He, he had um, he had like a , a, thick close haircut, kept waves, he had like wavy hair but it was um, it was close. It wasn't long and it wasn't real short. It was just close. I could tell.

Patton:        Were they all about the same age? Or the same approximate age?

Bailey:        Huh. Huh.

Patton:        They're all in their twenties?

Bailey:        They're all in their twenties. That's what they look like.

Patton:        Did they say what kind of car they were driving?

Bailey:        Uh. Uh.

Patton:        They never bragged about what kind of car they had?

Bailey:        They didn't, they sure didn't.

Page #9
Statement of:        Barbara Bailey

Patton:        Did any of those guys have any distinguishable features other than the two twins had sandy blonde hair and Victor had curly black hair ah, correction

Bailey:        Uh. Uh.

Patton:        O.k. I'm sorry

Bailey:        No.

Patton:        the twins had good curly sandy blonde hair?

Bailey:        Huh. Huh.

Patton:        And ah, Victor's hair was ah,

Bailey:        Close cut.

Patton:        Close cut.

Bailey:        Close cut, he didn't have any hair you might as well say cause it was a real close cut.

Patton:        Black?

Bailey:        Huh. Huh.

Patton:        O.k. so they were from D.C. you don't know what kind of car, they didn't brag about what kind of car they were driving, they didn't have a chance to give you guys any telephone numbers?

Bailey:        Uh. Uh.

Patton:        Did they say where they worked at or, you know how guys brag about themselves when they're talking to women they always,

Bailey:        Yes.

Patton:        put themselves forward first. Do you remember anything significant about what they may have said,

Page #10
Statement of:          Barbara Bailey

Bailey:          No they didn't

Patton:          about themselves?

Bailey:          Nope.  No.

Patton:          And you'd never seen those guys before?

Bailey:          Never.

Patton:          That was the first time you ever seen?

Bailey:          The first time we met both of them groups.

Patton:          Did they say where they had came from and where they had been before they met you guys?

Bailey:          Um, not that I can remember.  I don't remember if they said anything
about                    anything except they were just hanging out.

Patton:          Now who was basically really engaged in a deep conversation with those guys from D.C., which one of them your sister or Erica?

Bailey:          Um, probably, first it was my sister and then it was Erica.  I mean, cause my sister was talking to Victor at first but then when Montrell came over there and he started like you know getting rowdy, Erica tried to kind of ignore him so she was talking more to Victor than any, than any of us.  Cause Victor he was the more talkative one, he was the one that approached us first and then the other one, the twins were the quiet ones and Kevin he was try, trying talking but I think he was smoking something, I'm not sure what he was smoking but he had, I think he had a cigarette or something in his hand.  But he was basically chilling

Patton:          Right.

Bailey:          the um, the dark skinned Kevin.  He was just like, whatever, smoking.

Page #11
Statement of:          Barbara Baily

Patton:          Right. O.k. Um, is there anything else you can remember about these guys that I didn't ask you that may help to identify them, thing about them? **(Please check).** OH! there is, in our pre-interview you indicated that they were all wearing,

Bailey:          Oh, yeah, huh.huh, they were all wearing white t-shirts.

Patton:          White t-shirts?

Bailey:          Yeah.

Patton:          And shorts?

Bailey:          And shorts.

Patton:          And tennis shoes?

Bailey:          And tennis shoes

Patton:          And socks?

Bailey:          And some of them had white slouch socks on.

Patton:          Slouch socks on? Those are the socks that hang down and drooped down

Bailey:          Yeah.

Patton:          towards your ankle.

Bailey:          Yeah, yeah, yeah. **(Inaudible).**

Patton:          You remember anything with heavy writing on their t-shirts of any kind?

Bailey:          No I, they were as simplest, you know, simplest white t-shirts **(inaudible).**

Patton:          Did you notice any of them had any, did they have any tatoos?

Bailey:          Uh. Uh. Nope! Usually if I see one I'll look at it

Patton:          Right.

Page #12
Statement of:          Barbara Bailey

Bailey:          and then I'll remember.

Patton:          What about earrings and gold teeth?

Bailey:          Maybe, maybe Victor had one.

Patton:          Earring or gold teeth?

Bailey:          Oh earring?

Patton:          Yeah earring, Victor had an earring?

Bailey:          No. No.

Patton:          Oh, Victor had

Bailey:          I think he had a gold in his mouth. I think he had one.

Patton:          In the front?

Bailey:          One on the side, on um, yeah on the side **(Inaudible)**. And, and ah,

Patton:          Alright um, we're gonna conclude the interview now. But if you think of anything after the interview I, I would appreciate that you give me a call. You have my telephone number, give me a call just let me know. Sometimes you remember things afterwards you know like,

Bailey:          Huh.Huh.

Patton:          something about it, oh yeah, he said he was, he had Alexis and mother worked at GM or something you know,

Bailey:          Huh. Huh.

Patton:          something like. Anything like that, I appreciate you ah, telephone call. Alright we're gonna conclude the interview, the time now is approximately ah, 1308 hours.

Transcribed by:          Eva E. Cooper

# Exhibit 9

The 12th of August 1998 the time now is approximately 11:38 hours. This is Detective Robert Patton Baltimore City Police Homicide Unit. Ah, conducting an interview with Ms. Charnetta Bailey in reference to the homicide stabbing of Montrell Crighton which occurred on the 18th of July 1998 at 0200 hours in the Inner Harbor Downtown Baltimore.

Patton:    O.k. Ms. Bailey for the record just tell me your full name your age your date of birth and your address?

Bailey:    I'm Charnetta Bailey my birthday is ███████, I live at ████████████████ and I'm 16.

Patton:    Sixteen. O.k. ah were you in the Inner Harbor on the 18th of July about 2 o'clock in the morning were an incident occurred where a person was ultimately stabbed, Montrell?

Bailey:    Yes I was.

Patton:    O.k. tell me in your own words exactly what happened that night.

Bailey:    O.k.

Patton:    From beginning to end wherever you want to start at but basically from when you guys get down there and, and you encounter everybody.

Bailey:    Well my sister and good a friend of ours named Erica, we parked on Gay Street and we walked on Gay Street and Montrell and Derrick and um, Schuggie was the first three guys that we met down there. We was on our way to Planet Hollywood but it happened to be closed, so before we got down there, we was talking to them the guy ah, Montrell was trying to talk to my friend Erica, um, Schuggie was trying to talk to me and the guy Derrick was trying to talk to my sister. And ah, they were conversating, all of us was conversating we all told them we had boyfriends but the ah, my friend Erica told him that she had a husband and she was married. So Montrell (inaudible) he was o.k. he told us that um, um, he was gonna leave us alone, he respect that we have boyfriends, I'll let yall go about yall business but it was nice meeting yall. So we walked on and we was going to Planet Hollywood we found out it was closed so we just said we was gonna walk around the Harbor. So we walked around the Harbor and stopped, my sister seen a couple of friends that she knew so we stopped and we was sitting on the bench. While they were talking um, Montrell, Derrick and Schuggie came back and Montrell was more hostile then. He was more like um, "What yall doing down here talking to them?" And was gossiping with us and my friend Erica was like, "This my spiritual brother, we're on a different level than us, down grading Montrell. So I thought that might have made him more pumper and um Schuggie was like, "Don't down grade my man! You don't know what kind of knowledge my man got in his head!

Page #2

Statement of:          Charnetta Bailey

Bailey:          Don't do that to my man!" And I was looking like why is Erica, you know, doing this. So um, they left us alone then and walked on or whatever. Then we stopped holding conversation with them we walked towards the Science Center. Then we turned back around and we seen a group of guys about 4 of them. One name was Victor. They were friendly light skinned. We called them Pretty Boys. They all had on white shorts , (inaudible) shoes and slouch socks. So we figured they were from D.C. Then we hold ah, slightly conversation with them and they told us that they were um, they were from D.C. and um, we found their names. One was um, Victor and one was Kevin and it was two Kevins and a Kiwi. Two, a Kevin and Kiwi were twins and then there was another Kevin.

Patton:          Kiwi?

Bailey:          Nick name.

Patton:          Nick name was Kiwi?

Bailey:          I guess so.

Patton:          So what did

Bailey:          (Inaudible). And they told us that we was a nice bunch that he was like um, usually the guys, the girls that they meet down there have knuckleheads or chicken heads, don't got good heads on their shoulders. They was like that's a nice bunch they like the way we carried ourselves and pronounced our names and they was just talking and we were real proper. And um, um then Montrell, Derrick and Schuggie came over there. Montrell was more hostile then. He was talking to us with a um, aggressive tone, disrespecting us, calling us high priced whores and telling us that we, we can't talk to nobody cause, I guess he was trying to mess up our rap. Te, telling the guys that we had boyfriends, one was married and my sister had a boyfriend also. And was like, "Don't talk to them" and the other guys in the background, they didn't say anything to him. They just was like, " Um, we don't need this tonight!" And the guy , it was like, Schuggie was like, "Calm down Montrell, calm down!" And um, Schuggie um, Montrell was like, "Nah fuck them niggas, we don't we, I don't care about them! They married, they married, they ain't nothing but high priced whores. They come down here with a 1000.00 dollar outfit on trying to be cute!" And it um, it, it escalated then it calmed down. And

Page #3
Statement of:           Charnetta Bailey

Bailey:         then um, Montrell and his friends walked a different way we walked the opposite
                way and Montrell came running back towards us and got in our face and the guy,
                guy was like, "I don't need this tonight" he was like, "No what's up with us?"
                **(Inaudible)** was saying, "Come on fellows, come one fellows!" calling his fellows
                over there and Montrell and the guy named Kevin, the tall one not the twin they
                were walking around in a circle. A beef, a beef like circle. Then I didn't see
                anymore. I turned around cause um, I was trying to gather up everybody and then
                Erica was like, "OOOOH he got banged in his mouth!" And then I turned around
                I seen the blood. Not here but here

Patton:         On his neck?

Bailey:         Yeah, he had on a white T-shirt so it was like real noticeable and um, the guy
                Victor, he, before the guy had got stabbed the guy named Victor um, ran off, but
                we didn't know he got stabbed we thought he was hit in the mouth. And he was
                like um, the Kevin was like, "Ain't nobody to big to take, we could take down.
                Ain't nobody to big we could take down!" Cause Kevin was skinnier than ah,
                Montrell. And um, they started walking with a upper pace and they kept looking
                back. And when I looked back Montrell was still standing so therefore I didn't
                know the knowledge that he was you know hurt or any. Then um, we went, they
                walked towards the valet parking and we walked, we walked the same way but
                they ran across the, um that street, I'm not sure what that street is, that wide street
                towards valet parking and we ran towards Gay Street. And we got in our car and
                we was still circling around trying to find them. We heard the ambulance going
                on and we didn't think it was nothing severe. I thought somebody finally called
                security and was you know, trying to calm everything down. We heard the
                ambulance going on and we got in the car trying to ride around trying to find
                Victor and them we were, we road around for like 25 minutes trying to find them.
                We went, we went inside valet parking asking did a couple of guys leave and they
                didn't say anything. They didn't tell us that no one left or nothing. And um, then,
                that's about it and we went on home that evening **(inaudible).**

Patton:         Now there's 2 Kevin's ah, and a Kiwi?

Bailey:         Huh. Huh.

Patton:         Alright one Kevin was the one that was actually fighting with Montrell,

Bailey:         Huh. Huh.

Page #4
Statement of:        Charnetta Baily

Patton:     right?

Bailey:     Huh. Huh.

Patton:     Then there were the 2 twins?

Bailey:     Huh. Huh.

Patton:     And then there's Victor?

Bailey:     Right.

Patton:     Now which of the two twins was Kiwi?  Now one of them had their hair braided?

Bailey:     The light skinned one.

Patton:     O.k.

Bailey:     The light skinned one.

Patton:     The one that had his hair braided back?

Bailey:     Yeah, the one that had his hair braided back.

Patton:     O.k. that was Kiwi?

Bailey:     Huh.Huh.

Patton:     O.k. and Victor, you said his name was Victor

Bailey:     Huh. Huh.

Patton:     but then his friend said

Bailey:     I don't even, I think that was the other Kevin with the short hair was like calling Vicdamone.

Patton:     Vicdamone?  But you don't believe that was his last name cause that's an actor.

Bailey:     Huh.Huh.

Page #5
Statement of:   Charnetta Bailey

Patton:  Did they ever confirm the fact that they were from D.C. while you were talking to them. I mean did that ever come out that they

Bailey:  Huh.Huh.

Patton:  were in fact from D. C.

Bailey:  Huh. Huh. Yeah.

Patton:  Victor

Bailey:  Was originally from New York. He had said he was down here with these boys that's from D.C.

Patton:  And that was victim that you talked to?

Bailey:  Huh. Huh.

Patton:  Ah, did you see a knife or anything in anybody's hands? In the guy Kevin's hands when they were, before they started fighting?

Bailey:  The distance that we were and how the energy that was there, I just thought it was a fist fight and I was scared that Kevin was gonna get hurt because Montrell was bigger than him you know, that's what my first thought was in my head. And then when I seen Kevin, not Kevin, Montrell bent over like this, I said, "Oh that's right he was drunk and he was already worked up." So I'm thinking that he wasn't gonna last long anyway when I seen Kevin walking away, I'm like that's probably why he was like, he was you know bent over some. I didn't even realize, and I didn't see any **(inaudible)** or knife or nothing.

Patton:  Alright, now had you ever seen those guys before that day, the guys from D.C.?

Bailey:  No.

Patton:  Alright, but you knew Montrell and them before?

Bailey:  Uh. Uh.

Patton:  You didn't? That was the first time you met them also?

Page#6
Statement of:          Charnetta Bailey

Bailey:          That was **(inaudible)**. Huh.Huh.  But um, Derrick said he re, remembered my sister from somewhere. But I'm not sure where he, where he remembered her from.  I guess later on he remembered her from Mondawmin or something.

Patton:          Mondawmin.  Alright.  Is there anything else you wanna tell me that ah, may help us identify these guys.  Anything you can remember?  Like they never, did they ever give you a phone number or anything?

Bailey:          No numbers, it never got that far.

Patton:          They never bragged about what kind of car they were driving?

Bailey:          Nope.

Patton:          What they did for a living?

Bailey:          No.

Patton:          I mean usual guy stuff that they,  you know how guys start bragging about who they are and what they did.

Bailey:          All we did is exchange names.  But then that's when Montrell came over there. We asked them what they were getting into tonight and they said, "Nothing, what are yall getting into?"  And we was like nothing.

Patton:          Did they say, did they say where they had been before they came down there?

Bailey:          Uh. Uh.

Patton:          They never talked about what kind of car they were driving?

Bailey:          **(Didn't hear an answer).**

Patton:          Alright, ah,  we're gonna conclude the interview.  The time now is 11:48 hours.

Transcribed by:     Eva E. Cooper

# Exhibit 10

Today's date is the 2nd of February 1999. The time now is approximately 1935 hours. This is Detective Robert Patton and Detective Kirk Hastings, of the Homicide Unit. We're in Lieutenant Cook's office. We're conducting an interview with Mr. Keith Mike, Michael Scott, in reference to the Homicide of Martrell Lamar Kreighton, which occurred on the 18th of July 1998, sometime about 0200 hours, in the Baltimore Inner Harbor area.

Patton:    Okay and for the record ah, Keith could you tell us your full name, your age, and your date of birth please?

Scott:     My name is Keith Michael Scott. My birthdate is ███████

Patton:    And ah, how old are you?

Scott:     Oh 23 years old.

Patton:    Okay and were do you live sir?

Scott:     ███ █████████.

Patton:    Okay ah, and you do you have a telephone there sir?

Scott:     Yes, my telephone number is ████████

Patton:    Okay and do you have a brother?

Scott:     Yes.

Patton:    What's his name?

Scott:     Kevin Scott.

Page - 2
STATEMENT OF:  Keith Scott


Patton:    Okay and he, is he your twin brother?

Scott:     Yes he is.

Patton:    Alright, before we get started I wanna go over
           your rights form with you. Okay earlier this evening
           at about 1835 hours, which is 6:35 p.m., we advised
           you of your rights, is that correct?

Scott:     Yes.

Patton:    Okay and we went, you read allow all 5 of your rights,
           is that correct?

Scott:     Yes.

Patton:    And you put, wrote the word yes and put your initials
           at the end of each one of those rights, is that correct?

Scott:     Yes.

Patton:    Okay and you signed your name underneath those rights
           indicating that you fully understood them, is that
           correct?

Scott:     Yes.

Patton:    Okay and you also signed your name on that form,
           indicating that you wanna to give a statement without
           having a Lawyer present, is that also correct?

Scott:     Yes.

Patton:    Okay, now I'm just gonna go over your rights form with
           you one more time. Number 1, You have the absolute right
           to remain silent. Do you understand that?

Scott:     Yes.

Patton:    Ah, you have to speak up louder?

Scott:     Yes I do.

Patton:    Okay, Number 2, Anything you say or write may be used
           against you in a Court of Law. Do you understand Mr.
           Scott?

Page - 3
STATEMENT OF:  Keith Scott


Scott:     Yes I do.

Patton:    Okay, You have the right to talk with a Lawyer at
           any time, before any questioning, before answering any
           questions, or during any questions. Do you understand
           that?

Scott:     Yes I do.

Patton:    Okay, If you want a Lawyer and can not afford to hire
           one you will not be asked any questions and the Court
           will be, will be requested to appoint a Lawyer for you.
           Do you understand that sir?

Scott:     Yes.

Patton:    Okay, If you agree to answer questions, you may stop
           at anytime and the request a Lawyer, and no further
           questions will be asked of you. Do you understand that
           sir?

Scott:     Yes.

Patton:    Ah, do you fully understand your rights sir?

Scott:     Yes I do.

Patton:    Okay now ah, on this form also, it indicates that you
           there's a sentence underneath that indicating that that
           you are willing to answer questions and you do not want
           an Attorney at this time. And your decision to answer
           questions without having an Attorney present is free and
           voluntarily on your part. Is that correct?

Scott:     Yes.

Patton:    You concur with that?

Scott:     Yes.

Patton:    Okay, and you signed your name under that statement,
           is that correct?

Scott:     Yes.

Page - 4
STATEMENT OF:  Keith Scott


Patton:     Okay, now we also told you that your under arrest. Did
            you understand that sir?

Scott:      Yes.

Patton:     Okay and we also told you that your being charged with
            the murder of Mr. Martrell Kreighton, is that, your
            understanding?

Scott:      Yes.

Patton:     Okay and ah, knowing all that do you still wanna give
            your statement about what happened at the Inner Harbor
            sir?

Scott:      Yes.

Patton:     Okay, alright ah, just start from the beginning ah,
            Mr. Scott and tell us about that morning, or that late
            evening at the Inner Harbor. First of all, do you
            remember what day of the week it was when?

Scott:      No I don't.

Patton:     Okay, alright just go ahead and start from the beginning
            about what happened, and who you were with? Alright go
            ahead sir?

Scott:      Okay.

Patton:     Alright before you got to the Inner Harbor where were
            you?

Scott:      I was around he Laurel area.

Patton:     Okay and how did you get to the Inner Harbor?

Scott:      We had drove up there.

Patton:     Alright and who was with you when you drove up there?

Scott:      It was me, my brother Kevin, a friend of mine name
            Kevin.

Patton:     Okay and your friend ah, your friend Kevin, what is
            his full name?

Page - 5
STATEMENT OF: Keith Scott


Scott:    Kevin Anthony Miller.

Patton:   Okay and ah, were does he live?

Scott:    In the Laurel area.

Patton:   Do you know his address or what apartment complex he
          lives in?

Scott:    No I don't.

Patton:   Okay how old is he about?

Scott:    He's in his 20's, 21.

Patton:   Okay and how long have you known ah, Kevin Anthony
          Miller?

Scott:    I've known him for about 3 or 4 years.

Patton:   Okay, now ah, who's car were you driving?

Scott:    We was in ah, a white car and my brother had drove
          up there.

Patton:   Was it your brother car or something or a friends car
          or what?

Scott:    No, we had brought it from a guy we know.

Patton:   Okay and what's his name?

Scott:    His name is Paul.

Patton:   Okay and what kind of car was it that you were driving?

Scott:    It was a 8, 86 **inaudible** Dodge, Dodge Aries, or Reliant,
          Dodge, Reliant.

Patton:   Okay, alright and ah, were did you guys park your car
          at when you got downtown Baltimore?

Scott:    It was one of the side streets.

Patton:   Now tell me from that point were you parked the car,
          or what your guys did after your parked the car that
          night?

Page - 6
STATEMENT OF:   Keith Scott


Scott:      We parked the car, we got out the car and went into
            the Harbor. Walked around for a while, you know having
            fun whatever. We went and had a couple of drinks.

Patton:     Did you go into a Bar?

Scott:      Yes.

Patton:     Do you know which Bar you went into?

Scott:      Ah, ump.

Patton:     I'm sorry, yes or no.

Scott:      No, no I don't.

Patton:     Okay go ahead sir, I'm sorry.

Scott:      And then after about a hour or so, we we was leaving
            the Harbor and we bumped into a guy we know from
            out Laurel name Vick. And inaudible what ever, what
            you doing up here. And about couple seconds, couple
            minutes went pass. Like 3 or 4 girls walked pass. And
            he had stopped them and was talking to them.

Patton:     Who is he?

Scott:      Vick had stopped the girls.

Patton:     Okay.

Scott:      And he was talking and about a couple minutes later
            so, 3 guys approached us, they was loud, drunk, yelling
            at the girls and us.

Patton:     You know what they were saying to you guys?

Scott:      No they was talking to the girls saying, you couldn't
            talk to me and all this, but you can talk to them.

Patton:     Who was saying that **inaudible**.

Scott:      The big guy, say his name was.

Patton:     There was a big guy and and 2 smaller guys?

Page - 7
STATEMENT OF:  Keith Scott


Scott:     Yes.

Patton:    Okay, so what happened after that?

Scott:     They they was arguing.

Patton:    Who, who was arguing?

Scott:     The big guy, he was talking to the girl.

Patton:    Okay.

Scott:     Saying why you couldn't mess with me, thought you
           was married and some other stuff I can't recall.
           So then, the girls had pulled off, like come on.
           And we had start walking off. And he was still yelling
           at them, he started coming up behind us. That's when
           he had approached Kevin Miller. We turn around and
           see Vick punch him and he ran off.

Patton:    Now when he approached Kevin Miller did he, did he
           and Kevin exchange blows?

Scott:     Nope.

Patton:    They argue?

Scott:     No.

Patton:    Did they have any words between them?

Scott:     No.

Patton:    So he approaches Kevin and does what? Kevin Miller I
           mean.

Scott:     He approached him like he was about to swing on him.

Patton:    Yeah, and then what happened?

Scott:     And that's when I see Vick hit him.

Patton:    Were did Vick hit him at?

Scott:     He punched him like on the side of his face.

Page - 8
STATEMENT OF:  Keith Scott


Patton:    How many times did Vick hit him?

Scott:     He just hit him one time.

Patton:    Did the guy start bleeding after Vick hit him?

Scott:     Yeah he was like his nose was bleeding.

Patton:    And then what happened?

Scott:     Then the girl started laughing saying that's what
           he get, or whatever. And then everybody just walked
           off.

Patton:    Did you walk or run?

Scott:     Started walking and then we started running.

Patton:    Then were did you go?

Scott:     We got in our car and left.

Patton:    Who, who got in the car with you?

Scott:     Me, my brother, and Kevin.

Patton:    Okay and were did ya'll go?

Scott:     Came back to Laurel. Dropped our friend off and went
           home.

Patton:    Were did ah, Vick go?

Scott:     I don't know were he went.

Patton:    Were did the girls go?

Scott:     I don't know were they went.

Patton:    Now this guy Vick do you know what his real name is?

Scott:     All I know is they call him Vick.

Patton:    Okay, and describe Vick to me?

Scott:     He's light skin, almost white, short hair, and a gold
           tooth.

Page - 9
STATEMENT OF:  Keith Scott


Patton:   Is he, how old is he about?

Scott:    He about 23, 24, I'm not sure.

Patton:   Do you know were he lives?

Scott:    He stayed in the Tall Oaks Apartments.

Patton:   I mean Vick? Were does Victor live?

Scott:    That's were he was staying at.

Patton:   In the Tall Oaks Apartments in Laurel?

Scott:    Yeah.

Patton:   Okay, do you know if he has a car?

Scott:    Yes he had a grey 4 door Delta 88.

Patton:   Do you know what year it was about? No.

Scott:    89, something.

Patton:   Now so basically your saying that, just to recap that
          the only person that was with you, that hit the tall
          guy, the guy that approached Kevin was Vick. Vick was
          the only one?

Scott:    Approached the other guy.

Patton:   Yeah was Vick the only one that hit anybody?

Scott:    Yes.

Patton:   Did you or your brother Kevin, Kevin Scott, hit the guy?

Scott:    No.

Patton:   Or exchange blows with anybody?

Scott:    Not at all.

Patton:   What about Kevin Miller, did he fight anybody?

Scott:    Not that I can recall, no.

Page - 10
STATEMENT OF:  Keith Scott

Patton:    I'm sorry?

Scott:     No he didn't.

Patton:    So the only person that was fighting was, was who?

Scott:     It really wasn't a fight, he just punch him and ran.

Patton:    He just hit him one time?

Scott:     Punched the guy and ran.

Patton:    And ran. Did Vick have anything in his hand?

Scott:     Not that I seen.

Patton:    Was he wearing any kind of big rings, or anything
           like that, or did he have a knife or ice pick, or?

Scott:     No he didn't.

Patton:    Or a weapon of some kind in his hand?

Scott:     No he didn't.

Patton:    Now did you see the, did the guy fall on the ground,
           fall down after Vick hit him?

Scott:     No not when he hit him.

Patton:    Was he bleeding?

Scott:     I seen blood on his face.

Patton:    Blood on his face?

Scott:     Well it look like blood.

Patton:    It look like blood. Was it a lot of blood or a little
           blood?

Scott:     Just a little bit, I think.

Patton:    Now what did the 2 smaller guys do when all of this
           was going on, what did they do?

Page - 11
STATEMENT OF: Keith Scott


Scott:      I think they was standing on the side too?

Patton:     Did they fight?

Scott:      No.

Patton:     They grab anybody? They, they ain't try to fight you
            or your brother?

Scott:      No.

Patton:     Okay ah, now we had started talking to you earlier
            before we turned the tape on, did a little oral
            interview with you and I asked you tell me everything
            you know about Victor, right?

Scott:      Right.

Patton:     Had Victor been arrested before?

Scott:      Not that I know of.

Patton:     Is he in jail now?

Scott:      Yes he's currently incarcerated.

Patton:     And were at?

Scott:      I'm not sure were he's at.

Patton:     Were inaudible, do you know were he was arrested
            at, what County he's arrested?

Scott:      Yes his, he was arrested in PG County.

Patton:     You know what he's arrested for?

Scott:      No I don't.

Patton:     Did you tell us he was arrested in reference to
            some girls being killed in PG County? Did you say
            that?

Scott:      Yes from what I heard on the News, yes.

Patton:     And he was arrested with another individual that you
            know?

Page - 12
STATEMENT OF:  Keith Scott


Scott:    Yes.

Patton:   And that persons name was?

Scott:    Willis.

Patton:   Willis, you know his last name?

Scott:    I believe it's Haze, Hanes.

Patton:   Haze or Hanes?

Scott:    Yes.

Patton:   Okay now you, right now your wearing your hair
          braided to the back. Was you wearing your hair the
          same way that night this happened?

Scott:    No I wasn't.

Patton:   How was your hair?

Scott:    My hair was shorter than this.

Patton:   Was it braided up?

Scott:    Bush, not it wasn't braided at all.

Patton:   How was your brother Kevin Scott wearing his hair
          that night?

Scott:    I think he had his hair braided that night.

Patton:   Okay.

Scott:    In a pony tail.

Patton:   Describe, describe Kevin Miller, Kevin Anthony Miller
          for me, how tall is he about?

Scott:    About 6 foot, brown skin, like short hair.

Patton:   And is he light skin or dark skin?

Scott:    He's brown skin.

Page - 13
STATEMENT OF:  Keith Scott

Patton:    Brown skin, is he darker than you?

Scott:     Yes.

Patton:    And his hair was cut real close?

Scott:     Yes

Patton:    He is thick build, or thin build?

Scott:     No he's thin.

Patton:    Thin, do you remember what you were wearing that night?

Scott:     No I don't.

Patton:    Do you remember what Kevin was wearing that night?
           Your brother Kevin?

Scott:     No.

Patton:    Do you remember what Kevin Miller was wearing that night?

Scott:     Nope.

Patton:    Do you know if you had on long pants or shorts?

Scott:     I think I had on shorts.

Patton:    Do you know what kind of socks that you had on, had
           on that night?

Scott:     Ut-um.

Patton:    Did Kevin have on, Kevin Miller have on shorts?

Scott:     I think we all had on short, if I remember right,
           I'm not sure.

Patton:    What about Victor?

Scott:     Yes he had on shorts.

Patton:    Now when you guys left Laurel, did Victor leave Laurel
           with you guys the same time?

Page - 14
STATEMENT OF:  Keith Scott


Scott:      No he didn't.

Patton:     Did you, did you plan to meet Victor downtown at the
            Inner Harbor that day?

Scott:      No I didn't, no I didn't.

Patton:     So you just by happen to chance just ran into him,
            Victor?

Scott:      Yes.

Patton:     Okay now earlier you told us that Kevin Anthony Miller
            lived at the Fox Restwood Apartments in Laurel?

Scott:      Yes.

Patton:     Is that correct, okay. And you said he live with his
            mother?

Scott:      Yes.

Hastings:   I don't have any questions.

Patton:     Okay, um, now I just wanna recap this real quick. Did
            you that night fight and swing, hit anybody?

Scott:      No I didn't.

Patton:     Did your brother?

Scott:      No he didn't.

Patton:     Did Kevin Miller?

Scott:      No he didn't.

Patton:     Did Victor?

Scott:      Yes he swung on the guy.

Patton:     Is there anything else you wanna tell us about that night
            that we've didn't ask you about? Is there anything else?
            You have to say yes or no?

Scott:      No not at this moment, no.

Page - 15
STATEMENT OF:  Keith Scott


Patton:   Okay, Victor how long have you known this guy Victor?

Scott:    I say for about not even a year, half a year of so.

Patton:   You know how much he had to drink that night?

Scott:    A few cups.

Patton:   A few what?

Scott:    A few cups.

Patton:   Of what?

Scott:    I think Remey Martin, I'm not sure, I don't remember.

Patton:   Were you drunk?

Scott:    I wasn't intoxicated, I had been drinking.

Patton:   Was your brother drunk?

Scott:    Yeah he was drinking too?

Patton:   What about Victor?

Scott:    I can't recall.

Patton:   Okay ah, we're gonna conclude the interview with Mr.
          ah, Keith Michael Scott. Time now is 1955 hours.



Tape transcribed by Jackie Taylor on 2/25/99.

# Exhibit 11

Today's date is the 2nd of February 1999. The time now is ah, 2055 hours. This is Detective Robert Patton, and Detective Kirk Hastings, of the Homicide Unit. We're conducting an interview with Mr. ah, Kevin Lee Scott, in reference to the Homicide of Martrell Lamar Kreighton, which occurred on the 18th of July 1998, at the Baltimore Inner Harbor Pavilion, on the ah, Promenade.

Patton:      Okay for the record ah, Kevin just tell us your full name, your age, and your date of birth please?

Scott:       Kevin Lee Scott.

Patton:      And your age?

Scott:       23.

Patton:      Okay and your birth date?

Scott:       ███████.

Patton:      Okay and were do you live?

Scott:       At ███ ████████.

Patton:      Okay and were is that located?

Scott:       Lanham, Maryland.

Patton:      Lanham, Maryland, okay. What's you telephone number there?

Scott:       Ah, ████████

Patton:      Okay.

Scott:       Area code 301.

Patton:      301, okay do you have a brother?

Page - 2
STATEMENT OF:  Kevin Smith

| | |
|---|---|
| Scott: | Yes I do. |
| Patton: | Okay, what's your brother's name? |
| Scott: | His name is Keith Michael Scott. |
| Patton: | Okay and do you have a nickname? |
| Scott: | Ah, common nickname is Twin, that's it. |
| Patton: | Twin, does your brother have a nickname? |
| Scott: | He go by the same. |
| Patton: | What? |
| Scott: | Twin. |
| Patton: | Twin? Okay, alright ah, on the ah, day I just told you the 18th of July, ah, you were down at the Inner Harbor, is that correct? |
| Scott: | Correct. |
| Patton: | Okay um, just tell me from the beginning ah, what you know, what you did that evening leading up to an altercation down ah, Inner Harbor? |
| Scott: | Leading up to what. |
| Patton: | To leading up to the altercation. There was a fight apparently at the Inner Harbor, right? |
| Scott: | Okay, right. |
| Patton: | Okay, now let me ask you first, you, you left Laurel to come to Baltimore, is that correct? |
| Scott: | Yes. |
| Patton: | That day, who was with you? |
| Scott: | Me, my brother and a friend of ours Kevin. |
| Patton: | Kevin, what's his last name? |

Page - 3
STATEMENT OF:  Kevin Smith

Scott:       Miller.

Patton:      Kevin Miller

Scott:       Yeah.

Patton:      Okay and ya'll came to Baltimore Inner Harbor, right?

Scott:       Correct.

Patton:      Okay and were'd you park your car?

Scott:       I believe it was a block and a half or two away from the Harbor.

Patton:      Okay, and do you know about what time you got down to Baltimore Harbor?

Scott:       I say it was between 7 and 9.

Patton:      Okay.

Scott:       I'm not sure.

Patton:      So tell me what did you guys do when you got down.

Scott:       When we got there we walked around for awhile. We had a few drinks, we stood by the water. On the way out, we ran into 2 guys.

Patton:      Okay and who were those 2 guys you ran into?

Scott:       That was Vick.

Patton:      Vick, you ran into a guy name Vick?

Scott:       Yeah.

Patton:      Okay.

Scott:       And a buddy of his.

Patton:      You know his buddies name?

Scott:       Nah, I'm not sure.

Page - 4
STATEMENT OF:  Kevin Smith


Patton:        Had you ever seen him before, the buddy of
               Vick?

Scott:         Yeah, I think I seen him before, but I'm not sure
               who he exactly is.

Patton:        And do you know Vick's last name?

Scott:         No I don't.

Patton:        Okay, do you know were Vick lives?

Scott:         No I don't. I know he stayed in the area of Laurel.

Patton:        Okay, do you know what kind of car he, he drives
               or use to drive?

Scott:         Yes he use to drive a 4 door grey, Cutless or
               Oldsmobile.

Patton:        Okay alright so your walking out, you say your
               on your way out of the Harbor when you run into
               Vick and, and a friend of his?

Scott:         Correct.

Patton:        What happened after that, inaudible Vick.?

Scott:         He stopped us, asked what we was doing, what's
               up. And was we like nothing, what's up. We was
               getting ready to leave out and the same time um,
               these 3 girls walked passed. Well a few minutes
               later, 3 girls, I don't, I don't remember if it was
               2 or 3. They came pass, Vick called them out, they
               stopped, they was talking to him for, I say maybe
               maybe close to 5 minutes. And that's when these
               other 3 guys came up. A big tall dude, and 2 short
               guys. And he was being loud, I can't remember what
               he was saying to the girl, but he was saying
               something to the girls as if, like it was his
               girlfriend or something. So by that time he was
               yelling yelling, girls said something, something
               to him. I guess, I don't know if they know him or
               they didn't and they pulled Vick away. And then
               them 4 was walking, or them 3. I'm not sure how
               many girls it was. And um, so we start walking,

Page - 5
STATEMENT OF:  Kevin Smith


keep walking the way we was going leaving out. So **inaudible**, the big dude still yelling, **inaudible** him yelling. And he was coming up behind ah, he was over to my left I believe or my right. He came up was yelling, had his guards up to big boy or whoever that was. And ah, I glanced back and see Vick swinging, hit him up in this area somewhere.

Patton:      In the face?

Scott:       In the face, facial area. So and he, he just broke after that.

Patton:      Who broke Vick?

Scott:       Vick ran, he took off running. And recall the girls laughing like hah hah. And you know we still, I wasn't, I was paying attention, but I wasn't paying attention. So they stated laughing, we still walking. Two dudes, two dudes chased Vick or I don't know if they were with Vick or them guys, I'm not, that's, that's what I'm not sure of. They they chased him and that's was that. We preceded on to our car, got in the vehicle and left, came on back to Laurel.

Patton:      You said the tall, the big guy that was arguing with the girls, or was having words with those girls came up to to to Vick and his friend as there walking away with the girls?

Scott:       Yeah.

Patton:      From behind?

Scott:       Yeah.

Patton:      And then you saw Vick hit the guy, hit the big tall guy in the, in the face?

Scott:       Yeah.

Patton:      Now did anybody else hit, hit him?

Scott:       **Inaudible.**

Page - 6
STATEMENT OF:  Kevin Smith


Patton:      Did anybody else fight?

Scott:       That that, that was it.

Patton:      So the only that was throwing any punches was
             Vick and the tall guy?

Scott:       Yeah.

Patton:      The guy, the guy that was arguing with the girls?

Scott:       Right.

Patton:      Okay, now did you or your brother or Kevin Miller
             fight anybody?

Scott:       No.

Patton:      Did you guys hit anybody?

Scott:       No.

Patton:      Did any of the friends that were with the victim,
             the big tall guy approach you guys and try to
             fight you guys?

Scott:       No.

Patton:      No.

Scott:       Not 2 words was said to me and I didn't say 2
             words.

Patton:      Okay, so the only person that was.

Scott:       Matter fact ah, was I, see I was drunk, I don't
             remember, I think I was, I might of been talking
             to one of the little dudes. As far as like what's
             going on. I said inaudible. I remember, I think I
             remember, it keep flashing back that I, I think
             I talk to the smallest, was it big dude, another
             dude, you know like a younger dude. And I think
             I recall myself talking to him as in like, what's
             going on, you know we not trying to mess, we didn't
             know that was you girl and that's it. And then we
             left.

Page - 7
STATEMENT OF:  Kevin Smith


Patton:          Now when you left, were was the big guy, what
                 did he do? After, after Vick hit him, what did
                 he do?

Scott:           He ain't do noting, he was just standing there.

Patton:          Did you see him bleeding or anything like that?

Scott:           No sir.

Patton:          You see anybody, anybody bleeding?

Scott:           I ain't see no blood. All I saw was a hit, run,
                 girl started laughing and that was that. And I
                 ain't think nothing of it.

Patton:          Did Vick have anything in his hands or have a
                 knife, or ice pick, or, or ring or something on
                 his hand?

Scott:           No.

Patton:          That you could see?

Scott:           No.

Patton:          Now describe Vick to me, how does he look?

Scott:           How does he look.

Patton:          Yeah.

Scott:           About medium build, near my height 5-10, 5-11,
                 hispanic um, Puerto Rican or Spanish, I'm not
                 sure which one.

Patton:          Is he light complexed?

Scott:           Real light complexed.

Patton:          Lighter than you?

Scott:           Yes.

Patton:          And how old is he about?

Page - 8
STATEMENT OF:  Kevin Smith


Scott:      Some where in his 20's.

Patton:     Okay, now describe Kevin Miller, how does he
            look?

Scott:      He's a maybe 6 foot, medium build, brown skin.

Patton:     How old is he about?

Scott:      Ah, I believe he's 21 now.

Patton:     Now you say there's a, a guy that's with Vick.
            How, can you describe what he look like, do you
            remember what he look like?

Scott:      Ah, he was brown skin, he had low hair and may
            have been 6 foot or under, ain't no taller.

Patton:     How as Vick wearing, how was Vick wearing his hair?

Scott:      How was he wearing his hair.

Patton:     Yeah, what style?

Scott:      It was real low, close cut.

Patton:     What about Kevin Miller, how is his hair?

Scott:      How was his hair, I believe it was low cut too.
            Like its all around shape up.

Patton:     Did you know those girls before you met them that
            night?

Scott:      No.

Patton:     Okay.

Scott:      I ain't know them.

Patton:     Had you ever seen the big guy or his friends
            before that night?

Scott:      I ain't seen none of them before that night.

Page - 9
STATEMENT OF:  Kevin Smith


Patton:      And the only person you really knew was Vick
             and had seen the guy that was with him before,
             but you don't know his name or anything?

Scott:       Yeah.

Patton:      That was with Vick?

Scott:       Correct.

Patton:      And the only person that you saw hit anybody was
             who?

Scott:       It was Vick punching him.

Patton:      I'm sorry?

Scott:       Vick was punching the, the um, tall guy.

Patton:      Did the tall guy swing back?

Scott:       Nah, Vick took off.

Patton:      Alright so Vick hit him, and just one punch
             thrown and that was it?

Scott:       That was it, that was it.

Patton:      And you guys went back to Laurel after that?

Scott:       Correct.

Patton:      Did you meet, meet up with those girls later?

Scott:       Nah.

Patton:      Did you ever call those girls later?

Scott:       No I didn't, I never talked to them.

Patton:      Did you guys ever give those girls your telephone
             numbers or anything like that?

Scott:       No.

Patton:      Alright um, I just want to back up a little bit.

Page - 10
STATEMENT OF:  Kevin Smith

Scott:        Um-hum.

Patton:       Um, before we conducted the taped interview um,
              we advised you of your rights, is that correct?

Scott:        Correct.

Patton:       Okay and we read you your rights. You read your
              right allow to us, is that correct?

Scott:        Yes.

Patton:       Okay and you put the, your initials on each one
              of the rights indicating that you understood each
              one of them?

Scott:        Yeah.

Patton:       And you signed your name on that form in 2 places?

Scott:        Yeah.

Patton:       Okay, now I'm, and on the Rights form you indicated
              that you wanted to talk to us without having a
              Lawyer present, is that correct?

Scott:        Correct.

Patton:       And that was free and voluntarily on your part,
              is that correct?

Scott:        Correct.

Patton:       Okay.

Scott:        I like to do both, I just, I like to talk now and
              I want, you know I just, wanna get, get it going.

Patton:       Okay um, did we force you to give this statement?

Scott:        No sir.

Patton:       Okay, and you understand that your under arrest,
              is that correct?

Scott:        Yeah I understand.

Page - 11
STATEMENT OF:  Kevin Smith


Patton:        That I told you that before we turned on the tape
               recorder, is that correct?

Scott:         Yes.

Patton:        And I told you your being charged with murder,
               is that correct?

Scott:         Yes.

Patton:        Okay and I told you who's murder your being charged
               with?

Scott:         Yeah.

Patton:        Okay, and you, when I read you, when you read the
               rights, you fully understood them, is that correct?

Scott:         Yes.

Patton:        Now let me ask you another question, do you know
               were Vick is now?

Scott:         Do I know.

Patton:        Yeah?

Scott:         I know he's locked up, but I couldn't tell you
               were at, or nothing like that.

Patton:        And how do you know that he's locked up?

Scott:         We saw it over Laurel and I seen it on the News
               for myself.

Patton:        Okay and he's locked up for what, do you know?

Scott:         Believe committing another murder crime in PG
               area.

Patton:        Okay.

Scott:         Three girls.

Patton:        Right now since that incident down the Inner Harbor
               had you seen Vick?

Page - 12
STATEMENT OF:  Kevin Smith


Scott:          I seen him.

Patton:         Yeah.

Scott:          Since that night.

Patton:         The the night down at the Harbor?

Scott:          Ah, I may have seen him once or twice, driving.

Patton:         Did you talk to him?

Scott:          No.

Patton:         What about Kevin Miller, did you talk to Kevin
                Miller after that night?

Scott:          Yeah I talk to him.

Patton:         What did Kevin have to say about what happened
                that night?

Scott:          Ah that, we didn't talk about that.

Patton:         You didn't talk about what happened?

Scott:          I mean that, that wasn't nothing, I mean.

Patton:         Did you know that anyone died as a result of that
                fight you had down at the Harbor or was witnessed.

Scott:          No sir. That's why it seemed kind a inaudible, and
                its to me it was just funny cause he hit him and
                ran. It was like, hit and run incident. The girls
                laughed, I mean wasn't, wasn't no gun displayed,
                no knife, nothing. It, it was like simple punch and
                left. And we just come to find out that he stabbed
                him, so.

Patton:         Do you know if Vick had some keys?

Scott:          Some keys.

Patton:         Yeah.

Page - 13
STATEMENT OF:  Kevin Smith


Scott:      I mean I wouldn't know what he had with him or anything, only think I can tell you is what he was wearing that night. And we just, you know bumped into him on the way out.

Patton:     What were you wearing that night?

Scott:      I don't know, I can't tell you what I was wearing. In the summertime, I know I had to have on some shorts.

Patton:     Do you know what your brother had on and Kevin Miller was wearing that night?

Scott:      Shorts.

Patton:     Kevin Miller was wearing shorts too?

Scott:      Ah, I think so, sometime.

Patton:     And your brother was wearing shorts also?

Scott:      I don't see why not.

Patton:     Okay, is there anything else about what happened that that night at the Harbor that ah, you can tell us that we've not asked you about? Is there anything else that you remember about what happened that night?

Scott:      Ah.

Patton:     That we didn't talk about?

Scott:      Nah I don't think so.

Patton:     Okay, Detective Hastings you have any questions?

Hastings:   No I don't.

Patton:     Okay, alright um, the time now is approximately ah, 2110 hours. We're gonna conclude the interview.


Tape transcribed by Jackie Taylor on 2/25/99.

# Exhibit 12

Today's date is the 7th of April, 1999, the time is now approximately 1135 hours. This is Detective Robert Patton and Detective John Riddick of the Homicide Unit. We're conducting an interview with Mr. Kevin Anthony Miller, in reference to the homicide of Martrell Lamar Crayton, which occurred at ah Baltimore City Inner Harbor.

Patton:        Okay ah, for the record Kevin, could you state your full name, your age and your date of birth, please.

Miller:        Kevin Anthony Miller, ███████████ █ ███.

Patton:        How old are you, Kevin?

Miller:        22.

Patton:        Okay, and your current address?

Miller:        Inaudible.

Patton:        Okay, um first let me advise you on a couple of things that we've already talked about. Ah first I want you to understand that you are under arrest, do you understand that?

Miller:        Yes.

Patton:        Okay, and I told you earlier that you're going to be, your charges are murder and deadly weapons violation is that correct?

Miller:        I didn't know I had weapon charges too.

Patton:        That's a collateral cause it's a stabbing homicide, but you understand that, and that's what I told you is that correct?

Miller:        Yes.

Patton:        And do you understand what you are charged with?

Miller:        Yes.

Patton:        Okay. Now at about 10:00 this morning, we went over your inaudible rights form, is that correct?

Miller:        Yes.

Patton:        Okay, I'm going to just go over and touch over the rights again now. Um number 1, you have the absolute right to remain silent, do you understand that?

Page 2
Statement of Mr. Miller

Miller:        Yes.

Patton:        Okay. Number 2 anything you say or write may be used against you in a court of law, do you understand that, Kevin?

Miller:        Yes.

Patton:        Okay, you have the right to talk with a lawyer at any time before any questioning or answering any question or during any questioning, do you understand that sir?

Miller:        Yes.

Patton:        Okay, if you want a lawyer and cannot afford to hire one, you will not be asked any questions and the court will be request appoint a lawyer for you, do you understand that sir?

Miller:        Yes.

Patton:        Okay, if you agree to answer questions you may stop at any time and request a lawyer and no further questions will be asked of you, do you understand that sir?

Miller:        Yes.

Patton:        Okay, all of the five rights I just read to you, we've already read, went over this 10:00 this morning and you've placed your ah word yes and your initials on each one of those rights indicating that you understood is that correct?

Miller:        Yes.

Patton:        Okay, underneath that could you read that sentence underneath that for me?

Miller:        I have read the above explanations and the rights and fully understand them.

Patton:        Okay, do you fully understand your rights, sir?

Miller:        Yes.

Patton:        Okay, and you've signed your name underneath that indicating that you did?

Page 3
Statement of Mr. Miller


Miller:      Yes.

Patton:      Okay, and ah underneath that there's another
             sentence, could you read that sentence for me?

Miller:      I am willing to answer questions and I do not want
             any attorney at this time, my decision to answer
             any questions without having an attorney present
             is free and voluntary on my part.

Patton:      Okay, and you signed your name under that sentence
             also sir?

Miller:      Yes.

Patton:      And you willing to give a statement is that
             correct?

Miller:      Yes.

Patton:      Alright um first thing I'd like to go through with
             you sir is tell me what happen at the Inner
             Harbor, and I'd like for you to start from the
             beginning ah you watched over the game from the
             time that you guys met up, came to the Harbor
             something happen and everything after that, okay.
             And could you please do it in great detail for me
             sir?

Miller:      Ah I don't remember where we actually met up at
             but I remember Vic saying let's go to the to the
             Harbor and see some girls, talk to some girls.

Patton:      Where did you guys inaudible?

Miller:      Inaudible, I don't remember what kind and all
             that.

Patton:      Who all was?

Miller:      Me, Keith, Kevin, and Vic Lucky.

Patton:      Do you know Kevin's name ?

Miller:      Keith Scott, I don't know Vic's last name.

Patton:      And who's car were you in?

Miller:      Vic.

Page 4
Statement of Mr.Miller

Patton:      Vic, and what type of car was it?

Miller:      Inaudible, I believe.

Patton:      And it was his car?

Miller:      Yes.

Patton:      And you left all all together?

Miller:      Yes.

Patton:      And who's idea was it to go to the Largo?

Miller:      Vic.

Patton:      Vic, and why did he want to go there?

Miller:      To meet some girls.

Patton:      Okay, alright do you know what time it was when you left Largo to come down to the Inner Harbor?

Miller:      All I know is night time.

Patton:      Okay, well tell me what happened? You got in the car and?

Miller:      Got in the car and went to the Harbor.

Patton:      Where did you park at?

Miller:      Parked in the garage, right across the street from the Harbor.

Patton:      Do you know the name of the garage?

Miller:      No I do not. We went to the Harbor, walked around went into this little bar, got a couple of drinks, met some couple girls in there, went outside left them girls, walked around the Harbor outside near the water. We saw some girls on a bench or they or they seen us I don't remember.

Patton:      How many girls was it?

Miller:      Three. And we was talking to them, I wasn't, they was, they was talking and um.

Page 5
Statement of Mr. Miller

Patton:        Who's they, who was talking?

Miller:        Vic, Vic was mainly talking to this one girl we
               just lotty dottying with the other girls and um
               then three then three boys came up on us, talking
               about yall like these boys, yall don't like yall
               have boyfriends.

Patton:        They came up to the girls and started talking to
               the girls?

Miller:        Yeah, talking to the girls saying what yall got
               boyfriends, why yall didn't want to talk to us, I
               thought they knew the girls how they was talking,
               then they was then they was kept getting smart, I
               don't remember all what they was saying but they
               kept getting smart, I kept saying what ever, what
               ever, what ever then um.

Patton:        What was he saying exactly, who was doing most of
               the talking?

Miller:        It was the big light skin dude, he kept saying all
               you can tell a weed boys, I don't know he just
               kept getting smart, then the girls pulled Vic away
               like come on, then they like come on yall, so we
               walking away.

Patton:        Which way were you walking towards the parking
               garage or back towards the?

Miller:        Towards the garage, but we wasn't leaving  we was
               walking towards that way and um then one of them
               ran back and pointed at me saying which one kept
               talking trash, pointing at me and then one of the
               little dudes like him pointing at me saying him
               then the big dude came in my face, got in looked
               down inaudible, turned around and something. I
               don't remember how we got to fighting, for real I
               remember um the dark skin dude came in my face,
               Vic, I know I don't know what happened the light
               skin dude was towards to me Vic punched him he
               came to me that's how I know he didn't get
               stabbed, he came to me after Vic punched him the
               other dude, I know I swung at the one dude, we
               both had our hands up, I swung at him, he like
               that's all you got, he said that then I like and
               then the light skin dude came in my face after Vic
               punched him. So I know,I don't know about all that
               skirting stuff. And then he stopped and put his



Page 6
Statement of Mr. Miller

hands down and called his friend like come here come here, oh when Vic punched him he ran and I was standing there by myself, Twin standing towards the side they didn't even get in it, then I know dude came up to me I had two of them in my face after Vic punched him and then big man that one yall claim he got stabbed put his hands down call his friend like come here, Twin start calling me like come on come on we ran and left we ran to the car, got in the car and went home. Vic never said he stabbed, I never knew somebody got stabbed until Twins got locked up, called me and told me everything and they wanted me to be a witness.

Patton:   Alright now let's just go back over this a little bit, alright now you guys are?

Miller:   The girls was laughing.

Patton:   Inaudible some where and you see three girls sitting on a bench?

Miller:   I never, I never walked to the bench, I don't know I know we met three girls after we came.

Patton:   Now was there any guys talking to the girls when you guys approached the girls?

Miller:   No.

Patton:   No, did you see the big guy and his friends before you guys approached the girls?

Miller:   Oh we seen them some some boys rapping but I don't know it was about twenty of them was rapping and big man was watching them, I was watching all them rap but we ain't have no altercation or talk to them or nothing like that.

Patton:   Right, so now you said that Vic, he approached the girls first?

Miller:   After we came out inaudible, after we came out the um the um little Baha thing, I think he approached them after that.

Patton:   So you guys are talking to the girls?

Page 7
Statement of Mr. Miller

Miller:      Right

Patton:      And Vic is doing most of the talking you said.

Miller:      And talking to the one girl.

Patton:      Okay, are you talking to any of the girls?

Miller:      I think I talked to one of them, but I ain't not
             no trying to get a number.

Patton:      So inaudible guys. So while you're talking or
             while your friend and you are talking to the girls
             you say that the big guy, he just came over?

Miller:      Talking to the girl, not us at first.

Patton:      Now were they sarcastic, were they cursing at
             them?

Miller:      He was drunk I think, think he was drunk.

Patton:      What did he say, do you remember what he said to
             the girls?

Miller:      He was saying I ignoring him at first, he was
             saying did yall have boyfriends and kept saying
             somewhere of where he's from, kept saying some
             where's he's from, I don't know where he from. Kept
             saying where he from.

Patton:      I mean did the girls, I mean was he being rude and
             sarcastic to them or?

Miller:      What to the girls?

Patton:      Yes.

Miller:      Ah I can't really say, now he kept getting smart
             with me and my friends.

Patton:      Okay, they started talking to you guys cause you
             guys were talking to, I mean what was the gist of,
             why were they upset or why were they ?

Miller:      Cause the girls were talking to us and not them.
             At first I thought they knew them until we stop
             having a conversation and we said we would find
             out they ain't know them.

Page 8
Statement of Mr. Miller

Patton:     Now you said that you started to walk away?

Miller:     Yeah the girls pulled on me like come on.

Patton:     Alright so the girls are walking, all three of the
            girls are walking with Vic?

Miller:     No the one girl was walking with Vic, and the two
            girls was walking with us three.

Patton:     Yall walked away?

Miller:     Yeah cause Vic and the other girl was inaudible.

Patton:     And where was the the guys?

Miller:     They stayed there.

Patton:     Stayed by the bench?

Miller:     By the bench while we walking up they ran back up
            on us pointing at me.

Patton:     Okay, who was pointing at you?

Miller:     One of the dark skin boys, I don't know which one
            I know he was dark skin inaudible. Matter of fact
            it was the smallest dark skin one pointing at me
            like him him him.

Patton:     You were saying you because you?

Miller:     I kept saying whatever, every time he would say
            his name I would say what ever.

Patton:     Okay so when he said something sarcastic, you'd go
            sarcastically whatever?

Miller:     What ever.

Patton:     Alright igging him on. Alright okay so he now you
            guys stop and he get in your face?

Miller:     Yes.

Patton:     Right, the the one short dark skin guy, so what
            happens at that point? You guys fight, what?

Miller:     We never fought, inaudible he was like I don't
            know how, all I know is the big man came in my

Page 9
Statement of Mr. Miller

face.

Patton: Naw, I'm talking about the short guy right now that came in your face. Did the big guy come with him, they came together?

Miller: Yeah he was like him he says I don't I don't actually recall what he said all I remember is him pointing at me like him, he the one, talking trash they were like him, I don't even know what big man said, I don't remember.

Patton: Alright, so when they got to you what did he do?

Miller: I know I turned to Vic and then turned, then I had the dark skin dude in my face I don't I don't understand, I don't remember all the details.

Patton: So you saying that the big guy, try to understand this, when the big guy and the dark skin guy are initially talking to you?

Miller: Right.

Patton: Threatening you?

Miller: Right.

Patton: And then you said the big guy turned to Vic and said something to Vic?

Miller: I believe so, and then he turned back.

Patton: And then he turned back towards you.

Miller: And then Vic.

Patton: And then Vic.

Miller: But I know my hands were up, and the dark skin dude when the big guy came to me, naw I seen Vic punch him.

Patton: Alright so what I'm trying to determine when the punch took place, now did the big guy big guy comes to you and the dark skin guy comes to you then they each are pointing at you saying him him, then the big guy turns around towards Vic, steps towards Vic.



Page 10
Statement of Mr. Miller

Miller:    No he came to me first.

Patton:    Naw I'm saying after he stepped towards you, you
           said he, the big guy and the dark skin guy were
           first in  your face.

Miller:    Right.

Patton:    Then you said that he turned towards Vic.

Miller:    Yeah, but they ain't, I don't know if they did
           anything cause the.

Patton:    Then he turned back towards you?

Miller:    Right, and Vic punched him.

Patton:    Vic hit him in the neck or hit him in the face?

Miller:    Vic punched him.

Patton:    Then what did he do after Vic punched him, how did
           describe?

Miller:    He came, after he punched him.

Patton:    Did he put his hands on his face, was he bleeding?

Miller:    Naw, not yet, he rocked him like stunned him, I'm
           like I'm like yeah, I'm like I'm like damn.

Patton:    He was staggering a little bit, like he was going
           to fall down, inaudible hit a little harder?

Miller:    Yeah look like, and then um he came back towards
           me.

Patton:    Did you hear him hit?

Miller:    Yeah he hit him bop.

Patton:    He hit him real hard?

Miller:    Yeah and then Vic ran after he, soon after he
           punched him he ran. And then big man came towards
           me after Vic punched him and I swung on, I don't
           know how but I swung on the dark skin dude and
           the big man told the dark skin, so the dark, the
           big man had to been behind me inaudible, I know
           some kind of way they almost jumped me. The twins

Page 11
Statement of Mr. Miller

was looking, I'm mad at them cause I'm about to get jumped and big man just stopped and has his hand on his neck, stop said call his friend over, he friend had stopped, went over to him turned like come on come on inaudible and they ran off and the girls were laughing, we laughing and run damn Vic can hit.

Patton:     Did the girls go tho the car with yall?

Miller:     Naw, we left.

Patton:     Yall ran, left the girls?

Miller:     Yeah we ran off at twin car.

Patton:     So Vic hits him and then runs?

Miller:     Um hum straight run.

Patton:     Now do you see where he he running towards what the cars?

Miller:     Yeah we met up with him like at the corner or some shit, he was gone.

Patton:     And then all you guys got in the car together?

Miller:     Right.

Patton:     Now when you guys met up with Vic, what did he say what did yall talk about?

Miller:     Inaudible can hit like a motherfucker.

Patton:     And then he said?

Miller:     He start laughing.

Patton:     And then what you guys do after that?

Miller:     And then we all went home, we all went home.

Patton:     Now did you see Vic with any type of weapon or anything in his hand or pocket knife, ah fingernail clipper knife anything?

Miller:     No.

Patton:     Did he say he had something in his hand, keys?

Page 12
Statement of Mr, Miller

Miller:      Naw I know I know he ain't have car keys in his
             hand, but I know he had keys inaudible got there,
             but I ain't know he stabbed him, I thought he just
             punched him, he never told us he stabbed him.

Patton:      So you guys, he didn't say anything about him
             having any kind of weapon in his hand when you
             guys get in the car?

Miller:      No he did not.

Patton:      And then you guys get in the car and drive and
             drive back to Largo, and you don't remember
             anything, you don't know anything about this,
             didn't hear anything about this until after the
             twins were arrested?

Miller:      Right.

Patton:      You see Vic after that, before the twins got
             arrested?

Miller:      He was already locked up.

Patton:      Vic was?

Miller:      Yes. Hold on there was something else naw.

Patton:      Did you know those girls?

Miller:      No I did not.

Patton:      Did ah did the girls ever call you?

Miller:      No they did not.

Patton:      Did did did the twins say the same thing about the
             girls inaudible.

Miller:      No they did not.

Patton:      Did they ever call the girls? Did they ever give
             them their number?

Miller:      I think they gave them their number or that was
             the other girl, I don't we met three girls that
             night, three sets so I don't know if that was the
             set they gave their number to or not.

Page 13
Statement of Mr. Miller

Patton:        Now when all this is going on the altercation
               part of it, did you hit the big guy, grab his
               neck, did you hit anybody?

Miller:        No I did not, I didn't touch him, I didn't touch
               him, I ain't swing on at, I swung at the dark skin
               dude that had his hands up in my face.

Patton:        Um hum. Now did Kevin or Keith, Scott, the twins
               did they hit anybody?

Miller:        No they did not, they wasn't even, they was
               spectators you might as well say.

Patton:        They hit the big guy?

Miller:        No they did not. It was one swing two swings, I
               swung at the dark skin dude, Vic swung at the
               light skin, I don't know if the light skin dude
               swung at Vic or not because the light skin person,
               I meant the dark skin dude was in my face, and I
               had my back towards them.

Patton:        The exchange between Vic and the big light skin
               guy, how many punches are we talking?

Miller:        From what I seen one, Vic.

Patton:        Vic hit him one time and then ran?

Miller:        And ran, I thought he just inaudible that's the
               truth.

Patton:        I'm sorry?

Miller:        I said that's the truth I gave you he just punched
               him inaudible.

Patton:        I didn't understand you mumble.

Miller:        I said I thought he could punch real hard, he he
               he  he hit him whop.

Patton:        He hit him real hard?

Miller:        Yeah and ran.

Patton:        And ran?

Miller:        Studded him but.

Page 14
Statement of Mr. Miller

Patton:        When you say studded, he was stumble?

Miller:        Studded and then he came towards me after he
               punched him.

Patton:        When he came towards you did you hit him?

Miller:        No I did not, he stopped after he came towards me,
               looked like I was about to get jumped for a
               second, main man put his hands down called his
               friend like come here, he went to his friend or
               not he but the friend went to the big man and they
               called the twins called me like come on and that
               was it.

Patton:        Alright, at about ah 11:25 I showed you a photo
               line-up card is that correct?

Miller:        Yes it is. Yes.

Patton:        And on that photo line-up card it contains 6 black
               and white pictures is that correct?

Miller:        Yes.

Patton:        On that same card did you identify anybody?

Miller:        Vic.

Patton:        You identified Vic and where is his picture up
               here on that card?

Miller:        In the right hand bottom side.

Patton:        Bottom right picture?

Miller:        Yes.

Patton:        Did you sign your name above this picture?

Miller:        Yes.

Patton:        Did you put the date on there?

Miller:        Yes.4-7-99.

Patton:        Did you put a time on there?

Miller:        11:25 a.m.

Page 15
Statement of Mr.Miller

Patton:         Alright, on the front of the card did you write
                something on the front of the card?

Miller:         Yes I did.

Patton:         Can you read what you wrote on the card for me
                please?

Miller:         Ah Vic punched the man in the in the right side
                of his neck and ran, me and the twins followed him
                to the car, we laughed and talked about what
                happen, Vic never said that he stabbed him.

Patton:         And you signed your name on that?

Miller:         Yes I did.

Patton:         Okay, there a couple of spots where you ah
                scratched out something.

Miller:         I signed above every scratch I made.

Patton:         Okay. Now since the twins have been locked up,had
                you talked to them?

Miller:         Ah at least 3 times, they wanted some lawyer money
                and wanted me to be their witness to the case.

Patton:         So tell me about what you guys talked about.

Miller:         We talked about they wanted some.

Patton:         When they asked you, excuse me, which twin called
                you Kevin or Keith?

Miller:         They together right now.

Patton:         Okay.

Miller:         They in the same cell. They um I talked to both of
                them.

Patton:         Okay.

Miller:         One come on, then the other one come on, but we
                mainly don't talk about what happen, we already
                discussed that the first time we talked.

Patton:         Okay, when the first time you talked, what did you

Page 16
Statement of Mr. Miller

talk about?

Miller:    Um we talked about they need fifteen hundred dollars for a lawyer and they wanted some um video, they wanted me send them some um tapes or some, yeah tapes, I had to buy the tapes and send the receipt with the tapes.

Patton:    What kind of tapes, cassette tapes?

Miller:    Yeah cassette tapes ah they like no limit soldiers and um.

Patton:    And what did they, what did you guys talk about?

Miller:    Just talked about their babies coming in June and they about to get an apartment this month or their girlfriends going to be there so when they come home they they got somewhere to stay. You know.

Patton:    Did they talk about the incident?

Miller:    We was on the three way. Not over the phone no. Yeah yeah yes we did that was over the phone we talked about that over the phone.

Patton:    What did yall talk about this thing down at the Inner Harbor.

Miller:    Hold up, we didn't talk about the case over the phone, we couldn't talk, I know their girlfriends told me everything about their statements and stuff, their girlfriends told me that's that's why I was on the phone with their girlfriends after they hung up, they told me about their statements and everything they said, they wrote me a letter.

Patton:    What did they say in the letter?

Miller:    Same thing about the tapes and I don't think they really need a lawyer but they needed um some lawyer money, they didn't say how much then, they wrote um what happened, what they said happened how they, they wrote how they got to the Harbor, they ain't write about what what happened, they just wrote that they saying that they got to the Harbor.

Patton:    Did they tell you something different then what?

Page 17
Statement of Mr. Miller

Miller:      Yes they did.

Patton:      Then what you told us?

Miller:      Yes they did.

Patton:      What did they tell you?

Miller:      They said they got to the Harbor in a white car by
             this man named Paul and they still wanted me to be
             their witness.

Patton:      Why do they, why do they say that do you know,when
             it wasn't true?

Miller:      I guess they trying to be as innocent as they can
             be.

Patton:      Okay is there anything else about this incident
             that you want to tell me that I've not asked you?

Miller:      Um you didn't ask me did I stab him, and I did
             not. You didn't ask me was there a knife, I didn't
             see a knife. Um you didn't ask me did I see blood,
             you asked me before the tape recorder came on but
             you ain't ask me while the tape recorder on did I
             see blood inaudible.

Patton:      Did you see blood coming from the tall light skin
             guy inaudible or anything?

Miller:      No I did not.

Patton:      After after ah Vic hit him?

Miller:      No I did not.

Patton:      Did you see Vic with a knife or any type of weapon
             in his hand?

Miller:      No I did not.

Patton:      Did I ask did you stab him?

Miller:      No you didn't ask me that either. And I did not
             stab him. You you didn't even ask me if I was
             innocent.

Patton:      Are you innocent Kevin?

Page 18
Statement of Mr. Miller

Miller:          Yes I am innocent.

Patton:          Okay. Is there anything else that you want to tell
                 me that I didn't ask you?

Miller:          Yes I swung at the dark skin person in self
                 defense cause I I was about to get jumped, so I
                 swung at him and if I thought the big man got
                 stabbed how can he get stabbed after getting
                 punched in his neck and still coming towards my
                 face trying to fight me and then stop and call his
                 friends and then I could see a little bit when he
                 stopped and called his friends but you saying how
                 the way he got stabbed he should have just dropped
                 dead and he didn't he just came towards my face
                 and you told me that yall have surveillance
                 cameras at the Inner Harbor showing everything
                 that happen, then you told me that yall should
                 have the females testify or not testify about yall
                 have them and they test, they statement, yall
                 should show that they laughed after Vic punched
                 him.

Patton:          Did you see a little blood?

Miller:          I saw a little blood come out of his nose.

Patton:          A little blood come out, that's after?

Miller:          When Vic punched him.

Patton:          Correct you saw a little bit of blood?

Miller:          That's that's not when he first came towards me
                 that's after.

Patton:          After Vic hit him?

Miller:          After,no no after he called his friend like come
                 here, come here.

Patton:          So you saw a little bit of blood coming out of his
                 nose?

Miller:          Coming out of his nose.

Patton:          Alright ah the time now is approximently 12:05 and
                 this will conclude the interview.

Page 19
Statement of Mr.Miller

This tape was transcribed by CSO Angela Powell on 5-22-99.

# Exhibit 13

DISTRICT COURT OF MARYLAND FOR ................................................ (City/County)

LOCATED AT (COURT ADDRESS)

DISTRICT COURT CASE NUMBER 5E000 941

RELATED CASES:

| COMPLAINANT/APPLICANT | DEFENDANT |
|---|---|
| Michael B. Washburn | Victor Gloria |
| Name (Print) | Name |
| Address (Number and Street) | Address (Number and Street) |
| City, State, and Zip Code   Telephone | City, State, and Zip Code   Telephone |
| | CC# |

Agency, Sub-Agency, and I.D. #    (Officer Only)

DEFENDANT'S DESCRIPTION: Driver's License #............................... Sex M Race H Ht 5-7 Wt 150

Hair BL Eyes Br ....Complexion........ Other........... D.O.B. ............. ID

## APPLICATION FOR STATEMENT OF CHARGES    Page 1 of 2

I, the undersigned, apply for a statement of charges and a summons or warrant which may lead to the arrest of the above named Defendant because on or about 9/27/96    11:45 PM

at Applebees 7300 Baltimore Ave college Park, the above named Defendant

(Concise statement of facts showing that there is probable cause to believe that a crime has been committed and that the Defendant has committed it):

Assult with a rock Leading to injuries around and including Right eye requiring multiple stitches. While leaving Applebees restaurant, the defendant Confronted me and the witnesses listed below. He asked if we had a problem. Our answer was no and we continued to get into our car and leave. On our way out, the defendant

(Continued on attached............pages) (DC/CR 1A)

I solemnly affirm under the penalties of perjury that the contents of this Application are true to the best of my knowledge, information and belief.

9/28/96
Date                                    Officer's Signature

I have read or had read to me and I understand the Notice on the back of this form.

9/28/96
Date                                    Applicant's Signature

Subscribed and sworn to before me this 28th day of Sept, 19 96

Time: 5:30 P. M   Judge/Commissioner ................... I.D. 5 25

I understand that a charging document has been issued and that I must appear for trial ☐ on ...............
                                                                                    Date

at ............. ☒ when notified by the Clerk, at the Court location shown at the top of this form.
Time

X M. B. Will
Applicant's Signature

☐ I declined to issue a charging document because of lack of probable cause.

...............                        ...............
Date                                  Commissioner        I.D.

Witnesses' Names and Addresses:

Jonathan Washburn
Name        Number and Street/Agency/Sub-agency/I.D.        City, State, Zip

Maruf Singer
Name        Number and Street/Agency/Sub-agency/I.D.        City, State, Zip

Cassandra Strus
Name        Number and Street/Agency/Sub-agency/I.D.        City, State, Zip

TRACKING NUMBER

DC/CR 1 (Rev. 8/94)                                        COURT COPY

**DISTRICT COURT OF MA(   `ND FOR**.................................(   ..................................... (City/County)

LOCATED AT (COURT ADDRESS)

SE0005499

DISTRICT COURT
CASE NUMBER

DEFENDANT'S NAME (LAST, FIRST, M.I.)

Gloria, Victor

### APPLICATION FOR STATEMENT OF CHARGES (CONTINUED)   Page _____ of_____

Came towards the Car and threw a rock, hitting me on the
Right Side of my face at the right eye, Shattering my glasses
Causing multiple lacerations and trauma to my right eye.
~~____~~ Next, the defendant walked to the ~~____~~ drivers side of the
Car, and pulled out a knife and asked the driver " You want
Some of this shit!". The driver told him "No" and proceeded
to the entrance to Applebes Restaurant. The incident was also
witnessed by a female aquaintance of the defendant. An officer filled
out a report # 96-271-1594 - Officer Cpl. A. Graham #
15 98.

9/28/96

Date

Applicant's Signature

96/00/752056

TRACKING NUMBER

# Exhibit 14

2 FEB 99 —

U.S. Park Police  CIB (office #[redacted])
Det. RYDE ABT
primary ✳ Det. JOE GREEN (PGR # [redacted])
(office [redacted])

JAN '96 —  3/B/F VICTIMS
shot to death rt BW Pkwy
Dec '98  ⟶ 3 ARREST MADE
1) [redacted] HAYNES
PG County ID # 805870
PG County SHERIFF ID # 261890

2) [redacted] HESS, M/15/20??



3) VICTOR Gloria    SID # 1565443
AKA: VICTOR MORALES FBI # 953670RA7
AKA: Pretty VIC
DOB: [redacted]

ARRESTS IN following JURISDICTIONS;
1) MARYLAND — A.A. County
            — HOWARD County
2) VIRGINIA
3) NEW YORK

Det. JOE GREEN H
[ Front Desk ]

# Exhibit 15



Case 8:98-cr-00520-PJM   Document 579-1   Filed 12/04/14   Page 125 of 169

## REQUEST FOR PHOTO SPREAD

Offense _Homicide_     CCN _2243-96_

Location of Off. _Rt 197_     Date of Off. _1-27-96_

Filler Photographs Selected by Investigator:

1. _45067_   2. _45100_   3. _44963_   4. _44933_

5. _45147_   6. _43739_   7. _43701_   8. _Suspect_

9. _____   10. _____   11. _____   12. _____

Special Instruction: _For Baltimore City_

Requested By: _Jn Green_     Date: _2/8/99_

Date Completed: _2/3/98_     ID Tech: ▓▓▓▓ _JS_



**USMS**    35417037    **FBI NO.** 953670RA7    **DOB** ▮▮▮▮

**NAME**    GLORIA, VICTOR NMN

**SEX** M    **RACE** B    **HAIR** BLK    **EYES** BRO    **HGT** 5'7    **WGT** 150












# Exhibit 16

WITH THE INVESTIGATION
SAYS SHE HASN'T BEEN
KEPT INFORMED? WE
HAD QUITE A CONVERSATION
IN THIS AREA!
③ WE WILL HAVE TO
DISCUSS THE ENTIRE
CONVERSATION. I TOLD
HER YOU WOULD CALL
HER. ④ SHE HAS, INFORMATION
REFERENCE TO SUSPECTS.









# Exhibit 17

Case 8:98-cr-00520-PJM   Document 579-1   Filed 12/04/14   Page 132 of 169

Photo Line up of victim alone —

Victor Gloria "Vick"
B/M/ ████ (29)
████████████████
SID# 1565443
FBI# 95367-RA7

Currently charged with Murder
and is being held by U.S. Marshalls

Det Joe Green US Park Police


Kevin Anthony Miller
DoB ████████  M/B/25
████████████████████████
SID 1628168
FBI 425320 KAS

Arrest Laurel PD 9500023 - 3-22-95
Arrested PG County 1-8-98


Kevin → 2nd unk subject with "Vick"
         Kevin Miller was driving car

Keith → Kevin Scott was driving car
         had recently purchased car from
         subject known as Paul

         did not indicate there was a
         second subject with "Nuck"

# Exhibit 18

1 set leg IRONS   LT. LEWIS
1 set. leg IRON'S   Sgt. NOLAN'S
1 set Cuffs — THANDER (Homicide)
1 set CUFFS — D. TOWNSEND VCTF

3-B-F'S
JAN 96

AKA: Victor MORALES
Victor GLORIA (Pretty Vic)
SSID # 156 5443

FBI# 953670RA7

A.A. Court
Howard
N-Yo
VA
mdco

T/p#
S. PARK Police (CIB)
Det. RYDI ABT
T/p#

Primary:
Det. Joseph Green
Mgr

Willis Haynes
PG County ID 805890
PG " Sheriff ID#
261890

DUSTIN HESS
M/B

# Exhibit 19

— Things to Do —

1) Call Det. Joe Green
   U.S. Park Police

2) Request Photo Line up of
   Kevin Anthony Miller
   SID #

3) Request BWRit for Keith
   and Kevin Scott          SID
   ~~20 April 99   Keith Scott~~ )
   ~~22 April 99   Kevin Scott~~ )

4) ~~Set up CVSA for~~
   ~~Kevin and Keith Scott~~

5) Show Photo Line up of
   Kevin Miller to David Bigby

# Exhibit 20

Directions to U.S. Park
Police

S/B

295 — south to Wash. D.C.

get off Howard Rd.
EXIT

make a Right onto Howard Rd
go through traffic light
to South Capital St. Bridge
go over Bridge (exit to Right)
more to Right

Sevice Rd. to M St. make
a Right,

go to 2nd traffic light make a
Right turn into the Navy Yard,
Bldg. 136

# Exhibit 21

Case 8:98-cr-00520-PJM   Document 579-1   Filed 12/04/14   Page 140 of 169

4/12/99

B664

Re Victor Gloria.

1 I spoke to AUSA Deborah Johnston concerning Victor Gloria on 4/12/99. She told me that Gloria pled guilt to AAF in triple murder case & that his plea agreement is sealed. The two Co-D's Willis Haynes + Dustin Higgs have trial date of 2-7-2000. Because plea agreement is sealed, she could not tell me if Gloria is going to testify agt Co-D's.

2 AUSA Johnston stated that it is possible that Co-D's - Scott, Scott + Miller are blaming Gloria because they are friends of D's in her case especially Haynes. She suggested that we talk to

① Joe Theen Park Police
   B - ████████████

② Brad Sheafe  - FBI
   B - ████████████

   - they could give us background on case.

3 After you talk to these officers, we will decide on our next course of action, that is either writ Gloria + charge him or talk to his lawyer about the case.

4 Please call me

   Mark Cohn

# Exhibit 22

 File copy



# CIB - HOMICIDE
## POLICE DEPARTMENT
### BALTIMORE, MARYLAND
### Progress Report

**TO:**       Commanding Officer
             Homicide Unit

**FROM:**     Detective Patton, Robert Detective
             & Hastings, Kirk Detective

**SUBJECT:**  Progress Report
             Homicide Investigation

**SUSPECTS**(Name, DOB, Race, Sex, Age, Address):

| | | |
|---|---|---|
| Scott, Kevin Lee | B/ M 23 | |
| Scott, Keith  Michael | B/ M 23 | |
| Gloria, Victor | B/ M 23 | |

**VICTIMS**(Name, DOB, Race, Sex, Age, Address):

| | | |
|---|---|---|
| Creighton, Martrelle Lamar | B/ M 20 | |
| | | |
| | | |

**OCCURRED:**    07/18/98  0206
                301  Light Street
                **CC Number:**   981G13258    **Case Number:**  98H0172
                **District:**    CD           **Post:**         112

FOLLOW UP INVESTIGATION SUSPECT RE-INTERVIEW

In reference to the captioned investigation four individuals have been identified as being involved in the captioned murder. Three of the suspects, Kevin Scott, Keith Scott and Kevin Anthony Miller have since been arrested and are currently being held without bail at C.B.I.F.

The Fourth suspect, Victor Gloria is currently in Federal custody and is being held in reference to a 1996 triple Homicide that occurred on the Baltimore Washington Parkway. Per the U.S. Attorney's office Victor Gloria had plead guilty and is slatted to testify against his co-defendants, Willis Haymes and Dustin Higgs who are reportedly are close friends with the Scott brothers and Kevin Miller.

Your Investigator will note that when the Scott brothers and Kevin Miller were interviewed at the Homicide office all three implicated Victor Gloria stating that Gloria was the only person who had engaged the victim in physical altercation. All three stated that Victor Glory punched the victim once in the face or neck. All three stated that Victor Gloria was not armed with any type of knife or weapon when they witnessed the altercation.

The Scott brothers along with Kevin Miller stated that after Victor Gloria punched the victim he immediately ran from the area. Your Investigator will note further and in reference the statements of the Kevin Miller and the Scott brothers. Your Investigator noticed that their statements are very similar in nature and appeared to have been rehearsed.

This assumption was supported when Kevin Miller stated during his initial interview that the Scott brothers called him from Jail several times and advised him that your Investigators were looking for him and that he would probably be arrested and charged with Murder.

The U.S. Attorney's Office was advised by A.S.A. Cohen that Kevin Miller and the Scott brothers had implicated Victor Gloria in the captioned Homicide. The U.S. Attorney reported that during course of their Investigation they received information that the Scott brothers and Kevin Miller were close friends with Victor Gloria's co-defendant, Willis Haymes and Dustin Higgs and were aware that Victor Gloria was a Federal witnesses and planed to testify against Hymes and Higgs. The U.S. Attorney believes that the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria.

Your Investigators along A.S.A. Cohen believes that the A.U.S.A. is on track with their assumption. Your Investigators support is based on eyewitness information that Victor Gloria ran from the scene prior to the stabbing. The eyewitnesses identified Kevin Anthony Miller via photographic line up as the stabber and the only person seen engaging the victim in physical altercation.

In an effort to finally discern who of the four listed suspects actually stabbed the victim. Your Investigator in concert with A.S.A. Cohen believe by aggressively re-interviewing the Scott brothers we could ultimately convince them to tell the complete truth. This would clear up the apparent inconsistencies in their statements and ultimately discern from them who the actual stabber was which would corroborate the other eyewitnesses.

In addition A.S.A. Cohen indicated that if the Scott brothers cooperated and changed their statements and clear up the inconsistencies he wanted to administer a C.V.S.A. examination to verify their new statements. Your Investigator ultimately spoke with Detective J.T. Brown and tentatively scheduled the examinations for the 21st of April 1999 and obtained the writs for the same date.

On the 21st of April 1999 your Investigator in concert with Detective John Thanner transported Keith Scott and Kevin Scott from the Baltimore City Detention Center to the Homicide office for re-interview.

Once at the Homicide office the Scott brothers were placed in separate interview rooms and advised of their rights. Both refused to waive their rights and stated that their attorney's told them not to talk to the Police and to stand by their original statements.

Your Investigators explained in detail the circumstances surrounding the re-interview and the need for them to clear up the apparent inconsistent information that they initially provided in their original statements. Both brothers ultimately refused to cooperate and indicated that they were going to stand by their original statements and further refused to submit to a C.V.S.A. examination.

Your Investigators will note that the interview at this point had to be terminated and no new information was gleaned. Your Investigator at this point transported the Scott brothers back to B.C.D.C. and notified A.S.A. Cohen of the aforementioned results.

SUPERVISOR

DETECTIVE ROBERT PATTON

Det.

Respectfully,

**CIB - Homicide**

# Exhibit 23

(MURDER, DW)

# State of Maryland,

### City of Baltimore, to wit:

The State of Maryland

-vs-

✓ KEITH MICHAEL SCOTT

KEVIN LEE SCOTT

Defendant(s)

Date of offense: __July 18, 1998__

Location: __301 Light Street (Sidewalk)__

Complainant: __MARTRELLE LAMAR CREIGHTON__

## I N D I C T M E N T

The Jurors of the State of Maryland for the body of the City of Baltimore, do on their oath present that the aforesaid DEFENDANT(S) late of said City, heretofore on or about the date of offense set forth above, at the location set forth above, in the City of Baltimore, State of Maryland, feloniously, wilfully and of deliberately premeditated malice aforethought did kill and murder one ___Martrelle Lamar Creighton___, contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State.
(Art. 27, Sec. 616; 407-413 Common Law) 2 0900

### SECOND COUNT

And the Jurors aforesaid, upon their oath aforesaid, do further present that the aforesaid DEFENDANT(S), late of said City on the said date(s) at the said place, at the City aforesaid, unlawfully did wear and carry concealed upon and about (his/her/their) person(s), a certain dangerous and deadly weapon to wit: ___Sharp Object___; contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State.
(Art. 27, Sect. 36) 1-5202

### THIRD COUNT

And the Jurors aforesaid, upon their oath aforesaid, do further present that the aforesaid DEFENDANT(S), late of said City, on the said date(s), at the said place, at the City aforesaid, unlawfully did wear and carry openly with the intent and purpose of injuring the aforesaid Complainant, a certain dangerous and deadly weapon to wit: ___Sharp Object___; contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State.
(Art. 27, Sec. 36) 1-5200

_Patricia C. Jessamy_

The State's Attorney for the City of Baltimore

# Exhibit 24

(MURDER, D/W)

# State of Maryland,

### City of Baltimore, to wit:

| |
|---|
| The State of Maryland |
| -vs- |
| KEVIN ANTHONY MILLER |
| |
| |
| Defendant(s) |

Date of offense: __July 18, 1998__

Location: __301 Light Street (Sidwalk)__

Complainant: __MARTRELLE LAMAR CREIGHTON__

## I N D I C T M E N T

The Jurors of the State of Maryland for the body of the City of Baltimore, do on their oath present that the aforesaid DEFENDANT(X) late of said City, heretofore on or about the date of offense set forth above, at the location set forth above, in the City of Baltimore, State of Maryland, feloniously, wilfully and of deliberately premeditated malice aforethought did kill and murder one __Martrelle Lamar Creighton_____, contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State. (Art. 27, Sec. 616; 407-413 Common Law) 2 0900

### SECOND COUNT

And the Jurors aforesaid, upon their oath aforesaid, do further present that the aforesaid DEFENDANT(XX), late of said City on the said date(s) at the said place, at the City aforesaid, unlawfully did wear and carry concealed upon and about (his/xxrxxhxxxxx) person(x), a certain dangerous and deadly weapon to wit: __Unknown Sharp Object_____; contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State. (Art. 27, Sect. 36) 1-5202

### THIRD COUNT

And the Jurors aforesaid, upon their oath aforesaid, do further present that the aforesaid DEFENDANT(SX), late of said City, on the said date(x), at the said place, at the City aforesaid, unlawfully did wear and carry openly with the intent and purpose of injuring the aforesaid Complainant, a certain dangerous and deadly weapon to wit: __Unknown Sharp Object_____; contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State. (Art. 27, Sec. 36) 1-5200

*Patricia C. Jessamy*

The State's Attorney for the City of Baltimore

# Exhibit 25

Circuit Court of Maryland
Go Back

**Case Information**

Court System: **Circuit Court for Baltimore City – Criminal System**
Case Number: **199062008**  Case Status: **CLOSED**
Status Date:  **08/30/1999**
Tracking Number: **981002174784**   Complaint No: **1G13258**
District Case No:  **2B00323920**
Filing Date: **03/03/1999**

**Defendant Information**

Defendant Name: **SCOTT, KEITH MICHAEL**
Race:**BLACK**        Sex: **MALE**
DOB: ▮
Address: ▮
City: ▮   State: ▮  Zip Code: ▮

**Charge and Disposition Information**

*(Each Charge is listed separately. The disposition is listed below the Charge)*

| | |
|---|---|
| Charge No: | **1** |
| CJIS/Traffic Code: **2 0900** | Arrest/Citation No: **000000** |
| Description: | **MURDER-FIRST DEGREE** |
| Disposition: | **LESSER INCLUDED OFFENSES** |
| Disposition Date: **08/30/1999** | |

| | |
|---|---|
| Charge No: | **2** |
| CJIS/Traffic Code: **1 5202** | Arrest/Citation No: **000000** |
| Description: | **DEADLY WEAPON-CONCEAL** |
| Disposition: | **CLOSED – JEOPARDY OR OTHER CONVICTION** |
| Disposition Date: **08/30/1999** | |

| | |
|---|---|
| Charge No: | **3** |
| CJIS/Traffic Code: **1 5200** | Arrest/Citation No: **000000** |
| Description: | **DEADLY WEAPON-INT INJURE** |
| Disposition: | **CLOSED – JEOPARDY OR OTHER CONVICTION** |
| Disposition Date: **08/30/1999** | |

| | |
|---|---|
| Charge No: | **4** |
| CJIS/Traffic Code: **1 1415** | Arrest/Citation No: **000000** |
| Description: | **ASSAULT-SEC DEGREE** |
| Plea: | **GUILTY**  Plea Date: **08/30/1999** |
| Disposition: | **SENTENCED** |
| Disposition Date: **08/30/1999** | |
| Verdict: | **GUILTY**  Verdict Date: **08/30/1999** |
| Sentence Starts: **02/02/1999**   Sentence Date:**08/30/1999** | |
| Sentence Time: Yrs: **00**  Mos: **06**  Days: **29**  Confinement : **NC** | |

**Related Person Information**

Name:**SCOTT, KEVIN LEE**
Connection:**CODEFENDANT**
Address: ▮
City: ▮   State: ▮  Zip Code: ▮

Name:**VOLATILE, GERARD**
Connection:**ASST STATES ATTORNEY**

Address: ████████████████████
City: ███████████ State: ███ Zip Code: ██████

Name: **BARRICK, JOHN DET SGT**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **GORDON, DONALD DET**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **HASTINGS, KIRK DET**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **KLEINOTA, JOSEPH DET**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **RIVERA, LISSETTA TECH**
Connection: **POLICE OFFICER**
Address: **LD**

Name: **SERIO, SCOTT DET**
Connection: **POLICE OFFICER**
Address: **CID**

Name: **PATTON, ROBERT DET**
Connection: **PRIMARY POLICE OFFICER**
Address: **CID**

**Event History Information**

| Event | Date | Comment |
|---|---|---|
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330 |
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR W/Y2K UPGRADE ON 19990423 |
| CASI | 03/03/1999 | CASE ADDED THROUGH ON-LINE ON THIS DATE 990311 |
| HCAL | 04/22/1999 | P14;0930;330B;JT ; ;TSET; ;BROWN, R.W. ;849 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ;GP;JUDG; ;MITCHELL, D.B. ;842 |
| CCAS | 08/30/1999 | CASE CLOSED – ALL COUNTS DISPOSED Q226 |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland rules 16-1001 through 16-1011, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

# Exhibit 26

Circuit Court of Maryland
Go Back

**Case Information**

Court System: **Circuit Court for Baltimore City - Criminal System**
Case Number: **199062009**  Case Status: **CLOSED**
Status Date:  **08/30/1999**
Tracking Number: **981002174773**   Complaint No: **1G13258**
District Case No:  **1B00323919**
Filing Date: **03/03/1999**

**Defendant Information**

Defendant Name: **SCOTT, KEVIN LEE**
Race: **BLACK**          Sex: **MALE**
DOB: ███████
Address: ████████████████████
City: ███████  State: ███  Zip Code: █████

ALIAS:
Address: ████████████
City: ██████  State: ████  Zip Code: █████

**Charge and Disposition Information**

*(Each Charge is listed separately. The disposition is listed below the Charge)*

Charge No:           **1**
CJIS/Traffic Code: **2 0900**              Arrest/Citation No: **0000000**
Description:      **MURDER-FIRST DEGREE**
Disposition:      **LESSER INCLUDED OFFENSES**
Disposition Date: **08/30/1999**

Charge No:           **2**
CJIS/Traffic Code: **1 5202**              Arrest/Citation No: **0000000**
Description:      **DEADLY WEAPON-CONCEAL**
Disposition:      **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No:           **3**
CJIS/Traffic Code: **1 5200**              Arrest/Citation No: **0000000**
Description:      **DEADLY WEAPON-INT INJURE**
Disposition:      **CLOSED - JEOPARDY OR OTHER CONVICTION**
Disposition Date: **08/30/1999**

Charge No:           **4**
CJIS/Traffic Code: **1 1415**              Arrest/Citation No: **0000000**
Description:      **ASSAULT-SEC DEGREE**
Plea:            **GUILTY**  Plea Date: **08/30/1999**
Disposition:      **SENTENCED**
Disposition Date: **08/30/1999**
Verdict:          **GUILTY**  Verdict Date: **08/30/1999**
Sentence Starts: **02/02/1999**  Sentence Date: **08/30/1999**
Sentence Time: Yrs: **00**  Mos: **06**  Days: **29**  Confinement : **NC**

**Related Person Information**

Name: **SCOTT, KEITH MICHAEL**
Connection: **CODEFENDANT**
Address: ████████████

| City: ▉ | State: ▉ | Zip Code: ▉ |
|---|---|---|

**Name:VOLATILE, GERARD**
Connection:**ASST STATES ATTORNEY**
Address:▉

| City: ▉ | State: ▉ | Zip Code: ▉ |
|---|---|---|

**Name:BARRICK, JOHN DET SGT**
Connection:**POLICE OFFICER**
Address:**CID**

**Name:GORDON, DONALD DET**
Connection:**POLICE OFFICER**
Address:**CID**

**Name:HASTING, KIRK DET**
Connection:**POLICE OFFICER**
Address:**CID**

**Name:KLEINOTA, JOSEPH DET**
Connection:**POLICE OFFICER**
Address:**CID**

**Name:RIVERA, LISSETTE**
Connection:**POLICE OFFICER**
Address:**LD**

**Name:SERIO, SCOTT DET**
Connection:**POLICE OFFICER**
Address:**CID**

**Name:PATTON, ROBERT DET**
Connection:**PRIMARY POLICE OFFICER**
Address:**CID**

**Event History Information**

| Event | Date | Comment |
|---|---|---|
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330 |
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR W/Y2K UPGRADE ON 19990423 |
| CASI | 03/03/1999 | CASE ADDED THROUGH ON-LINE ON THIS DATE 990311 |
| HCAL | 04/22/1999 | P14;0930;330B;JT ; ;TSET; ;BROWN, R.W. ;849 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ;GP;JUDG; ;MITCHELL, D.B. ;842 |
| CCAS | 08/30/1999 | CASE CLOSED - ALL COUNTS DISPOSED Q226 |

*This is an electronic case record. Full case information cannot be made available either because of legal restrictions on access to case records found in Maryland rules 16-1001 through 16-1011, or because of the practical difficulties inherent in reducing a case record into an electronic format.*

# Exhibit 27

Circuit Court of Maryland
Go Back

**Case Information**

Court·System: **Circuit Court for Baltimore City - Criminal System**
Case Number: **199110054** Case Status: **CLOSED**
Status Date: **12/14/1999**
Tracking Number: **991001198865** Complaint No: **1G13258**
District Case No: **0B00359961**
Filing Date: **04/20/1999**

---

**Defendant Information**

Defendant Name: **MILLER, KEVIN ANTHONY**
Race: **BLACK**          Sex: **MALE**
DOB: ██████
Address: ████████████
City: █████ State: ██ Zip Code: ██████

---

**Charge and Disposition Information**

*(Each Charge is listed separately. The disposition is listed below the Charge)*

| |
|---|
| Charge No: **1** <br> CJIS/Traffic Code: **2 0900** <br> Description: **MURDER-FIRST DEGREE** <br> Disposition: **LESSER INCLUDED OFFENSES** <br> Disposition Date: **10/18/1999** |

| |
|---|
| Charge No: **2** <br> CJIS/Traffic Code: **1 5202** <br> Description: **DEADLY WEAPON-CONCEAL** <br> Disposition: **CLOSED - JEOPARDY OR OTHER CONVICTION** <br> Disposition Date: **12/10/1999** |

| |
|---|
| Charge No: **3** <br> CJIS/Traffic Code: **1 5200** <br> Description: **DEADLY WEAPON-INT INJURE** <br> Disposition: **CLOSED - JEOPARDY OR OTHER CONVICTION** <br> Disposition Date: **12/10/1999** |

| |
|---|
| Charge No: **4** <br> CJIS/Traffic Code: **1 0999** <br> Description: **MURDER-2ND DEGREE** <br> Plea: **GUILTY** Plea Date: **10/18/1999** <br> Disposition: **PROBATION AFTER CONVICTION** <br> Disposition Date: **12/10/1999** <br> Verdict: **GUILTY** Verdict Date: **10/18/1999** <br> Sentence Starts: **04/07/1999** Sentence Date: **12/10/1999** <br> Sentence Time: Yrs: **20** Mos: **00** Days: **00** Confinement : **NC** <br> Suspended Time: Yrs: **15** Mos: **00** Days: **00** <br> Probation Time: Yrs: **03** Mos: **00** Days: **00** Type: **Supervised** |

**Related Person Information**

Name: **CROWLEY, KIRK D**
Connection: **DEFENSE ATTORNEY**
Address: ████████
City: ███████ State: ██ Zip Code: ██████

Case Information                                   http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId...

Name:**STEWART, NELSON R**
Connection:**ASST PUBLIC DEFENDER**
Address:▬
City▬        State:▬  Zip Code: ▬

Name:**COHEN, MARK**
Connection:**ASST STATES ATTORNEY**
Address:▬
City:▬        State:▬  Zip Code: ▬

Name:**BARRICK, JOHN SGT**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**GORDON, DONALD DET**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**HASTINGS, KIRK DET**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**KLEINOTA, JOSEPH**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**PATTON, ROBERT DET**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**RIVERA, LISSETTE TECH**
Connection:**POLICE OFFICER**
Address:**TACT**

Name:**SERIO, SCOTT DET**
Connection:**POLICE OFFICER**
Address:**TACT**

**Event History Information**

| Event | Date | Comment |
|-------|------|---------|
| CONV | 01/01/1900 | CASE HAS BEEN CONVERTED FOR DCM UPGRADE ON 20010330 |
| CASI | 04/20/1999 | CASE ADDED THROUGH ON-LINE ON THIS DATE 19990426 |
| MOTF | 05/13/1999 | MOTION FOR SPEEDY TRIAL |
| MOTF | 05/13/1999 | MOTION TO PRODUCE DOCUMENTS |
| MOTF | 05/13/1999 | REQUEST FOR DISCOVERY |
| MOTF | 05/13/1999 | MOTION TO SUPPRESS PURSUANT TO MD 4-252 AND 4-253 |
| MOTF | 05/13/1999 | MOTION FOR GRAND JURY TESTIMONY |
| MOTF | 05/13/1999 | DEMAND FOR CHEMIST |
| FILE | 05/13/1999 | FILED APD - STEWART, NELSON R , ESQ 809167 |
| MOTF | 05/25/1999 | MOTION FOR SPEEDY TRIAL |
| MOTF | 05/25/1999 | MOTION TO PRODUCE DOCUMENTS |
| MOTF | 05/25/1999 | REQUEST FOR DISCOVERY |
| MOTF | 05/25/1999 | MOTION TO SUPPRESS PURSUANT TO MD 4-252 AND 4-253 |
| MOTF | 05/25/1999 | MOTION FOR GRAND JURY TESTIMONY |
| MOTF | 05/25/1999 | DEMAND FOR CHEMIST |
| HCAL | 06/04/1999 | P30;0930;451 ;ARRG; ;TSET; ;MURDOCK, M. BRO;8B3 |
| HCAL | 08/30/1999 | P03;0900;528 ;JT ; ;POST;PX ;HELLER, ELLEN ;848 |
| HWNO | 08/30/1999 | HICKS (MARYLAND RULE 4-271) NOT WAIVED |
| HCAL | 10/18/1999 | P27;0900;406 ;JT ;GP;SUBC; ;QUARLES, WILLIA;8A9 |
| FILE | 10/18/1999 | FILED ADF - CRAWLEY, KIRK D , ESQ 174390 |
| HCAL | 12/10/1999 | P27;0930;406 ;DISP;DS;JUDG; ;QUARLES, WILLIA;8A9 |
| CCAS | 12/14/1999 | CASE CLOSED - ALL COUNTS DISPOSED Q226 |

9/10/2014 6:27 PM

# Exhibit 28

# MARYLAND SENTENCING GUIDELINES WORKSHEET

| OFFENDER Last | First | M.I. | Sex | Race | Sid Number | BIRTHDATE | JURISDICTION |
|---|---|---|---|---|---|---|---|
| Miller | Kevin | | 1 | 2 | 3 | 4 | | 24 |

| PSI | DATE OF OFFENSE | DATE OF SENTENCING | DISPOSITION TYPE | | |
|---|---|---|---|---|---|
| 1 Yes 2 No | 0 7 1 2 9 0 | 1 2 1 6 9 0 | | | |

1. Plea agreement - state nature of _____

2. Plea, no agreement
3. Court trial
4. Jury trial

AT THIS SENTENCING NUMBER OF:
CONVICTED OFFENSES: 0 1
CRIMINAL EVENTS: 0 1
WORKSHEET # 1 OF _____
CRIMINAL EVENT # 1

**AOC USE ONLY. DO NOT WRITE IN SPACE BELOW**
INC _____
SUS _____
ACT _____
STA _____ CON _____
PRO _____ RAN _____
FI _____
REST _____
CS _____

| CONVICTED OFFENSE TITLE | AOC CODE | MD. CODE, ART. & SECTION | STAT. MAX. | DOCKET NUMBER |
|---|---|---|---|---|
| 1st MURDER-SECOND DEGREE | | 27/411 | 30Y | 19015005? |
| 2nd | | | | |
| 3rd | | | | |

## OFFENSE SCORE(S) (Offense Against a Person Only)

| 1st Off | 2nd Off | 3rd Off | A. Seriousness Category |
|---|---|---|---|
| 01 | 01 | 01 | = V - VII |
| 03 | 03 | 03 | = IV |
| 05 | 05 | 05 | = III |
| 08 | 08 | 08 | = II |
| 10 | 10 | 10 | = I |

**B. Victim Injury**
| | | | |
|---|---|---|---|
| 0 | 0 | 0 | = No Injury |
| 1 | 1 | 1 | = Injury, Non-Permanent |
| 2 | 2 | 2 | = Permanent Injury or Death |

**C. Weapon Usage**
| | | | |
|---|---|---|---|
| 0 | 0 | 0 | = No Weapon |
| 1 | 1 | 1 | = Weapon Other Than Firearm |
| 2 | 2 | 2 | = Firearm or Explosive |

**D. Special Vulnerability of Victim**
| | | | |
|---|---|---|---|
| 0 | 0 | 0 | = No |
| 1 | 1 | 1 | = Yes |

OFFENSE SCORE (S)

## OFFENDER SCORE

**A. Relationship to CJS When Instant Count Occurred**
0 = None or Pending Cases
1 = Court or Other Criminal Justice Supervision

**B. Juvenile Delinquency**
0 = Not More Than One Finding of Delinquency or over age 25
1 = Two or More Findings, No or One Commitment
2 = Two or More Commitments

**C. Prior Adult Criminal Record**
0 = None    1 = Minor
3 = Moderate    5 = Major

**D. Prior Adult Parole/Probation Violations**
0 = No    1 = Yes

OFFENDER SCORE  0 1

## GUIDELINES RANGE

| | ACTUAL SENTENCE | Imposed, suspended, time served, probation, fine, restitution and/or community service |
|---|---|---|
| **1st Offense** 15Y TO 30Y | **1st Convicted Offense** Subsequent offender 1 Yes 2 No | 20/5/3 |
| **2nd Offense** _____ TO | **2nd Convicted Offense** Subsequent offender 1 Yes 2 No | |
| **3rd Offense** _____ TO | **3rd Convicted Offense** Subsequent offender 1 Yes 2 No | |

**OVERALL GUIDELINES RANGE** (For Multiple Counts Only) _____ TO

AOC USE: 
01 _____
02 _____
USE _____
SUS _____
ACT _____
CON _____ PRO _____
FI _____
REST _____
CS _____
SUS _____
ACT _____
CON _____ PRO _____
FI _____
REST _____
CS _____
TLRANGE _____
TURANGE _____
TOTALI _____
TOTALS _____
TOTALN _____
TFI _____
TREST _____
TCS _____
TRANGE _____
TOUTI _____
TOUT2 _____
TUSE _____

## REASON IF ACTUAL SENTENCE DEPARTS FROM GUIDELINES RANGE

modified factual statement leaves for _____ and not the Def. was _____

SENTENCING JUDGE W. D. Quarles

SIGNATURE

## INSTITUTIONAL/PAROLE RECOMMENDATION/ADDITIONAL INFO.

WORKSHEET COMPLETED BY Stephen P. Shedden, Senior Agent    TITLE

COPIES: White-Judge; Blue-AOC; Green-Attach to Commitment or Probation Order; Yellow-File; Pink-Prosecution; Gold-Defense

(Rev. 7/87)

# Exhibit 29

☐ CIRCUIT COURT ☐ DISTRICT  )URT OF MARYLAND FOR

Located at | Court Address | | Zip Code 2700.8. | Telephone 333-2712

State of Maryland

vs.

Defendant *Kevin Miller*    D.O.B.

Case No(s). 199110054

Tracking No. 99/03/192 865

Date Sentence Imposed 12/10/99

I.D. No. 929-160; 510 CO/K93168

## COMMITMENT RECORD

TO: ☒ Commissioner of Correction ☐ Warden/Sheriff of [                    ] Jail/Detention Center
YOU ARE DIRECTED to receive the above named Defendant who has been sentenced and is hereby committed to your custody by JUDGE *William D. Quarles*  The Defendant has been found guilty as to:

Case/Count/Offense No. 199110054 - Ct 1 | Charge 2nd Murder | Art. 27 | Sec. 411

Sentence 30 yrs | Concurrent with    Consecutive to Case/Count/Offense No. [      ]

☐ PAROLE ELIGIBILITY RESTRICTIONS  Art. [    ] Sec. [    ]   (PROVIDE DETAILS IN ADDITIONAL SENTENCING INFORMATION)

Case/Count/Offense No. [      ] | Charge [      ] | Art. [    ] | Sec. [    ]

Sentence [      ] | Concurrent with    Consecutive to Case/Count/Offense No. [      ]

☐ PAROLE ELIGIBILITY RESTRICTIONS  Art. [    ] Sec. [    ]   (PROVIDE DETAILS IN ADDITIONAL SENTENCING INFORMATION)

**SPLIT SENTENCE**

All but 5 yrs [ 2 yrs ] is/are suspended and the Defendant is placed on probation for a period of commencing upon:

CHECK ONE:
1. ✓ Release of Defendant from physical incarceration.
2. ___ Release of Defendant from parole, or mandatory supervision pursuant to Art. 41, Sec 4-612.

The total time to be served is [ 5 yrs ] , to run:

**SELECT ONLY ONE**

A. ☒ concurrent with any other outstanding or unserved sentence and begin on 4-7-99

B. ☐ consecutive to the last sentence to expire of all outstanding and unserved Maryland sentences.

C. ☐ consecutive to the sentence imposed in Case No. [      ]

The Defendant has been awarded [      ] days credit for time served prior to and not including date of sentence (Art. 27, Sec. 638C).

ADDITIONAL SENTENCING INFORMATION: | PROVIDE PAROLE ELIGIBILITY RESTRICTIONS OR PAROLE RECOMMENDATIONS, IF ANY:

[handwritten illegible]

$ _____ court cost(s) have been waived due to indigency.

☐ Commitment is for execution of previously suspended sentence after Defendant was found in violation of probation.
☐ Sentencing modification. This Commitment supersedes commitment issued on: [      ]

ATTACHMENTS HERETO INCLUDE: ☐ Additional Sentence(s)  ☒ Order For Probation  ☐ Conditions of Parole
☐ Order For Reimbursement of Public Defender  ☐ Other: [      ]
☐ Victim Notification Request

TRULY taken from the record of this Court.
WITNESS my Hand and the Seal of said Court this date:

☐ Appeal Bond set at $ [      ]

[signature]   [signature]

CC-DC/CR 28 (Rev. 7/97)                    Clerk/Judge

# Exhibit 30



# Department of Public Safety and Correctional Services

**Data Management Unit**
6776 REISTERSTOWN ROAD • SUITE 314 • BALTIMORE, MARYLAND 21215-2342
(410) 585-3350 • FAX (410) 764-4220 • TOLL FREE (877) 379-8636 • V/TTY (800) 735-2258 •www.dpscs.maryland.gov

9 STATE OF MARYLAND

MARTIN O'MALLEY
GOVERNOR

ANTHONY G. BROWN
LT. GOVERNOR

GREGG L. HERSHBERGE
SECRETARY

PATRICIA DONOVAN
DEPUTY SECRETARY
ADMINISTRATION

CARROLL PARRISH
DEPUTY SECRETARY
OPERATIONS

RHEA L. HARRIS
ASSISTANT SECRETARY
CHIEF OF STAFF

DAVID N. BEZANSON
ASSISTANT SECRETARY
CAPITAL PROGRAMS

WAYNE WEBB
EXECUTIVE DIRECTOR
NORTH REGION

WENDELL M. FRANCE
EXECUTIVE DIRECTOR
CENTRAL REGION

PATRICIA A. VALE
EXECUTIVE DIRECTOR
SOUTH REGION

DR. SHARON BAUCOM
EXECUTIVE DIRECTOR
CLINICAL SERVICES

PATRICIA A. MOORE
DIRECTOR
ADMINISTRATIVE SERVICE

ERNEST ELEY, JR.
DIRECTOR
COMMUNITY SUPERVISIO
SUPPORT

RANDALL L. WATSON
DIRECTOR
PROGRAMS AND SERVICE

TINA M. STUMP
DIRECTOR
SECURITY OPERATIONS

STEPHEN M. SHILOH, CCI
CHIEF EXECUTIVE OFFICE
MARYLAND CORRECTION
ENTERPRISES

## MEMORANDUM

TO:      Whom it May Concern

FROM:    Lt. Necole Haggie, Administrator, Data Management Unit

DATE:    June 20, 2014

RE:      Inmate Information

**REF:**      KEVIN ANTHONY MILLER
**DOC #:**    289908

Listed below is the requested information under the authority of the Annotated Code of Maryland, Family Law Article, Section 12-105 for the above named individual.

**Social Security No: —** ███████
**Date of Birth: —** ██████
**Admission Date: —** 12/17/1999
**Length of Sentence: —** 005y 0m 0d
**Sentence Start Date: —** 04/07/1999
**Release Date: —** 07/29/2002
**Institution Released from: —** JPRU

**Prepared By:** Sannan Andrews, Data Management Unit,
If additional information is needed, please contact (410) 585-3105.

# Exhibit 31



U.S. Departmen  °Justice

*United States Attorney*
*District of Maryland*
*Southern Division*

---

*Lynne A. Battaglia*
*United States Attorney*

*Deborah A. Johnston*
*Assistant United States Attorney*

*400 United States Courthouse*
*6500 Cherrywood Lane*
*Greenbelt, MD 20770-1249*

*301-344-4433*

*301-344-4032*
*FAX 301-344-4518*

January 21, 1999

Mr. Timothy Sullivan, Esquire

Harry Trainor

>        Re:   **United States v. Dustin Higgs**
>              **Crim. No. PJM-98-0520**

Dear Mr. Trainor and Mr. Sullivan:

We write to set forth the conditions on which the Government is willing to make discovery in this case. Under Rule 16 of the Federal Rules of Criminal Procedure, discovery is to be given "upon request", and we understand that you do request discovery. Therefore, we also request discovery pursuant to Rule 16(b).

The Government will provide discovery pursuant to and as defined in Rule 16 on the following basis:

Jencks material as defined in 18 U.S.C. § 3500, along with related Giglio material such as witness' plea agreements, criminal convictions and prior inconsistent statements, will be provided no later than one week prior to trial. However, the government reserves the right to delay provision of any such materials if the government believes that disclosure of the information will pose a security risk to any witness. Brady material which is not otherwise included in the Rule 16, Jencks or Giglio material referred to above will be provided if and when discovered. Jencks material is defined for purposes of this agreement in accordance with the specific provisions of 18 U.S.C. § 3500. Jencks material is given on agreement that reciprocal Rule 26.2 material will be provided by you at the same time we provide Jencks material.

The government agrees that at the same time that it provides Rule 16 material, it will provide notice of the existence of alleged other crimes, wrongs or acts committed by your client pursuant to Rule 404(b) of the Federal Rules of Evidence, along with copies of all physical and documentary evidence believed by the government to fall within the ambit of Rule 404(b) which the

government intends to introduce at trial in its case-in-chief. The government acknowledges its continuing duty to disclose Rule 404(b) evidence as it is recognized as such after the time period in which the government has provided Rule 16 material.

The government reserves the right to provide later notice of Rule 404(b) material if the government believes that disclosure of such information will pose a security risk to any witness. As to any such witness, the government will disclose all **Jencks** material and all Rule 404(b) evidence at the same time.

All discovery is provided on the condition that counsel will not give copies of this material to the client or to anyone outside counsel's office, absent prior approval of this office. Counsel may, of course, review this material with the client at any time or place.

Should counsel file any routine motion with the Court which seeks discovery pursuant to Rule 16 or Brady, then this discovery agreement will be void, and the Government is not bound by any of the provisions herein. Specifically, Jencks and Giglio material may not be provided until the first day of trial if the defendant should file such a motion.

The Government may be providing, as a courtesy, material which is not discoverable under Rule 16, Jencks, Giglio or Brady. The fact that certain non-discoverable materials are provided in no way obligates the Government to provide all non-discoverable materials, and the fact that certain non-discoverable materials are provided should never be taken as a representation as to the existence or non-existence of any other non-discoverable materials.

Please note that it is the policy of this Office that the government will not stipulate to a three level reduction in offense level pursuant to §3E1.1 of the United States Sentencing Guidelines unless the defendant has entered into a signed written plea agreement with the government on or before the date set for the filing of pretrial motions.

Please indicate your consent to this discovery agreement by signing and returning to us a copy of this letter. We urge you to call or write me with any questions that arise, as we may be able to resolve any questions without the filing of motions and responses with the Court.

Very truly yours,

LYNNE A. BATTAGLIA
UNITED STATES ATTORNEY

Deborah A. Johnston
Sandra Wilkinson
Assistant United States Attorneys

Accepted:

Harry Trainer, Esquire

DATE: 2/4/99

Accepted:

Timothy Sullivan, Esquire

DATE: 2/4/99

cc: Court file

# Exhibit 32

## AFFIDAVIT/DECLARATION OF HARRY TRAINOR
## PURSUANT TO 28 U.S.C. § 1746

I, Harry Trainor, do hereby declare and verify as follows:

1.    My name is Harry Trainor.  Timothy Sullivan and I represented Dustin Higgs at his federal capital trial.

2.    Victor Gloria was the government's most important witness at trial.  He made numerous assertions at trial that were central to the government's theory of the case.  Challenging his credibility and veracity were of paramount importance to our defense strategy.

3.    Prior to the trial, we received some information that Mr. Gloria may have been present at the scene of an unrelated homicide in Baltimore.  It was our understanding that this homicide occurred after the homicides for which Mr. Higgs was on trial, but prior to trial itself.  We had very little detail about the incident, and I do not recall receiving any information from the government about this issue.

4.    Recently, current counsel for Mr. Higgs have shared information with me that suggests that Mr. Gloria was not only present, but was in fact a suspect in the Baltimore homicide.  The information recently shared with me further suggests that the federal authorities responsible for Mr. Higgs's capital prosecution intervened with Baltimore authorities in order to prevent Mr. Gloria from being charged with the murder.

5.    I consider receiving a free pass on a murder charge to be an extraordinary benefit for a witness.  Had we been made aware of this benefit received by Mr. Gloria, we would have asked for all appropriate discovery relevant to the benefit, we would have fully investigated the issue, and we

1

certainly would have made significant use of the benefit to challenge Mr. Gloria's credibility during Mr. Higgs's trial.

6.   I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to 28 U.S.C. §1746.



Harry Trainor

Dated: Dec. 3, 2014

2