## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          :

                                                 **CIVIL NO. PJM-05-3180**

    v.          :          **CRIMINAL NO. PJM-98-0520**

**DUSTIN JOHN HIGGS**          :

                              :

...oOo...

**GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION FOR RELIEF FROM FINAL JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(d) AND PETITIONER'S RENEWED MOTION FOR PRODUCTION OF EXCULPATORY EVIDENCE AND RENEWED MOTION FOR DISCOVERY**

Comes now the United States of America, by and through undersigned counsel, and in opposition to the petitioner Dustin John Higgs's Motion for Relief From Final Judgment Pursuant To Federal Rule Of Civil Procedure 60(d) (ECF 579) and petitioner's Renewed Motion For Production Of Exculpatory Evidence And Renewed Motion For Discovery (ECF 580), states as follows:

## I.    INTRODUCTION

On January 3, 2001, this Court issued a judgment imposing the jury's sentence of death upon petitioner/defendant Dustin John Higgs.  Subsequently, this Court, the U.S. Court of Appeals, and the U.S. Supreme Court repeatedly rejected Higgs's requests to set aside his conviction and death sentence.

On December 4, 2014, two years after his final petition for certiorari was denied, the defendant filed a desperate petition, based upon supposition and speculation, asking this Court to exercise the extraordinary authority of Fed. R. Civil P. 60(d) to set aside its § 2255 judgment and to reopen the proceedings.  Higgs does not (nor can he) make out a claim of actual innocence, nor does he claim that the government failed to disclose evidence that would have mitigated against

imposition of a death sentence.   Rather, he speculates, as he did in his original § 2255 petition, that the government failed to disclose impeachment evidence relating to eyewitness Victor Gloria. The sole allegation is that the Assistant United States Attorney allegedly convinced the Baltimore City State's Attorney's Office not to charge Victor Gloria with murder.   Based upon this allegation, the defendant asks this Court to set aside the judgment and to reopen the § 2255 proceedings.   There is neither a legal nor a factual basis upon which to grant his request.

As a legal matter, Higgs has not and cannot meet the extraordinary burden imposed on moving parties under Rule 60(d), as articulated by the Supreme Court in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-46 (1944) (setting aside a fraudulently-obtained ruling by finding that it was the product of one party's "deliberately planned and carefully executed scheme" that severely undermined the "integrity of the judicial process").   The defendant has failed to establish the existence of any "scheme," much less a scheme that was deliberately planned and executed.   Neither can he establish that the integrity of the judicial process was undermined by any government actions in this case.

Simply stated, there cannot be any fraud upon the Court because the government never requested, convinced, or otherwise persuaded the Baltimore City State's Attorney's Office to refrain from charging Victor Gloria.   Without that factual predicate, the defendant cannot succeed on his claim.   Moreover, this Court has already held that even if the allegation that the government failed to disclose information relating to a Baltimore City homicide were true, the defendant was not prejudiced and therefore was not entitled to post-conviction relief.   *See* ECF 547 at 35 ("Even were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality.").   As a result, there is no basis for the extraordinary relief that

Higgs requests.   His motions should be denied without a hearing.

## II.     PROCEDURAL BACKGROUND

On or about October 11, 2000, a jury convicted Higgs of three counts of first-degree premeditated murder (18 U.S.C. § 1111(a)), three counts of first-degree murder committed in the perpetration or attempted perpetration of a kidnapping (18 U.S.C. § 1111(a)), three counts of kidnapping resulting in death (18 U.S.C. § 1201(a)(2)), and three counts of using a firearm "during and in relation to [a] crime of violence."   18 U.S.C. § 924(c).   The jury recommended a death sentence.   This Court accordingly sentenced Higgs to death.   In a published opinion, the Fourth Circuit affirmed the conviction and sentence in full.   *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (hereinafter "*Higgs-I*").   On November 29, 2004, the Supreme Court denied the defendant's petition for writ of certiorari.   *Higgs v. United States*, ___ U.S. ___, 125 S. Ct. 627, 160 L. Ed. 2d 456 (2004).

During the pendency of his direct appeal, Higgs discovered new evidence that he claimed, by way of motion for new trial filed in this Court, demonstrated the equal culpability of co-defendant Haynes, who had not received a death sentence.   This Court denied the new trial motion, and the Fourth Circuit affirmed that decision by way of an unpublished opinion.   *See United States v. Higgs*, 95 Fed. Appx. 37 (4th Cir. 2004) (hereinafter "*Higgs-II*").   Again, the Supreme Court refused to grant review.

On November 28, 2005 (364 days after the Supreme Court denied a writ of certiorari from his second appeal), Higgs filed a 122-page Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 (ECF 492, referred to herein as "Mot."), which asserted 24 claims of error.   On April 7, 2010, this Court issued an Order and written opinion denying all of Higgs's claims and entering final judgment.   *See United States v. Higgs*,

711 F. Supp. 2d 479 (D. Md. 2010).   On May 4, 2010, Higgs filed a motion seeking a certificate of appealability (ECF 550), and a motion for reconsideration and to alter or amend the judgment (ECF 551).   On July 20, 2010, this Court denied the defendant's motion for request for a certificate of appealability and motion for reconsideration.   ECF 560, 561.   Higgs noted a timely appeal.   ECF 564.

The Fourth Circuit granted the certificate of appealability only as to issue II, which related to lead bullet analysis.   On November 23, 2011, the court of appeals denied the defendant's appeal and issued its mandate.   ECF 572.   The mandate took effect on January 30, 2012, after the Court denied the defendant's request for rehearing and rehearing en banc.   ECF 575.   On December 10, 2012, the Supreme Court denied the defendant's petition for writ of certiorari.

Almost two years later, on December 4, 2014, the defendant filed the pending Motion for Relief from Final Judgment (ECF 579) and Motion for Release of *Brady* Materials (ECF 580).

## III.   FACTS

### A.      The Murders[1]

On the evening of Friday, January 26, 1996, Dustin John Higgs, Willie Mark Haynes, and Victor Gloria drove from Higgs's apartment at 13801 Briarwood Drive in Laurel, Maryland, to Washington, D.C.   Arriving in the city in Higgs's blue Mazda MPV van, the men picked up Tanji Jackson, Tamika Black, and Mishann Chinn.   Jackson knew Higgs, and they had arranged for Haynes to date Black and for Gloria to date Chinn.   After stopping at a liquor store, the couples returned to Higgs's apartment to drink alcohol and listen to music.   The men also

---

[1]    The Statement of Facts set forth in Sections A and B herein is drawn from the Fourth Circuit's first opinion in this case, *see Higgs-I*, 353 F.3d at 289-94.

smoked marijuana.[2]

Early on January 27, Higgs and Jackson began to argue, prompting Jackson to grab a knife from the kitchen. Hearing the commotion, Haynes, who had been in a bedroom with Black, broke up the fight, convincing Jackson to surrender the knife. Jackson, however, remained angry, and the three women left the apartment. As Jackson exited, "[s]he stopped at the door and said something like I am going to get you all f---ed up or robbed" or made "some kind of threat." The remark led Higgs to comment that Jackson "do know a lot of n-----s." Higgs saw Jackson stop and copy the license plate number of his van. Angered, Higgs commented aloud about Jackson's actions, which Gloria interpreted as concern that Jackson intended some retaliation.

Higgs said, "f---- that," retrieved his coat, and urged the men to come with him. Before leaving the apartment, Higgs took a silver .38 caliber firearm from the end table drawer and put it in his pocket. With Higgs driving the MPV van, Haynes in the front passenger seat, and Gloria behind Higgs, the men pursued the three women. Seeing the women walking on the side of the road, Higgs instructed Haynes to get them in the vehicle. Haynes complied, and the three women got into the back seat of the vehicle, which Higgs drove toward Washington, D.C.

---

[2]     Following a 1998 arrest on federal drug charges, Gloria agreed to cooperate in the government's murder case against Higgs and Haynes. Gloria's testimony was partially corroborated by Chinn's mother and by a friend of the Jackson family, both of whom saw the victims enter a blue Mazda MPV van. Gloria pleaded guilty to being an accessory after the fact to the murders and received 84 months' incarceration and three years of supervised release.

According to Gloria, while en route to Washington, D.C., Higgs and Haynes leaned towards each other and quietly conversed. Higgs, though, drove past the Baltimore-Washington Parkway into the Patuxent National Wildlife Refuge, a federal property within the jurisdiction of the United States Park Police. When he pulled over at a secluded location, one of the girls asked if they were trying to "make [them] walk from [t]here?" Higgs responded, "Something like that." When the women exited the van, Higgs handed his gun to Haynes, who put it behind his back and left the van. Moments later, Gloria heard a gunshot and wiped the mist off the back window in time to see Haynes shoot one of the women in the chest. Gloria turned to ask Higgs what he was doing, but saw Higgs holding the steering wheel and watching the shootings in the rearview mirror. Gloria put his head down and listened to more shots and the sound of a woman screaming.

When the shooting ended, Haynes reentered the van and closed the door. He or Higgs then commented that they had to "get rid of the gun." Higgs drove to the Anacostia River, where he or Haynes threw the gun into the water. Higgs then drove back to his apartment, where the three men proceeded to sanitize of evidence. They wiped the patio doors and "everything else, the bathroom, the doorknobs, the stereo," and threw away any items the women might have touched, such as CDs, videotapes, and liquor bottles. The men left the apartment and dropped the trash by a dumpster. Higgs and Haynes left Gloria at a fast food restaurant with an admonition to "keep [his] mouth shut."

Around 4:30 a.m., a motorist found the murdered women's bodies strewn about a roadway and contacted the Park Police. Jackson's day planner was found at the scene. It contained Higgs's nickname and telephone number, as well as a note that read "13801 'MAZDA' 769GRY" — the street number of Higgs's apartment and the tag number for his van. The

6

police also recovered a .38 caliber wadcutter bullet at the scene. According to the medical examiner, Jackson and Black each had been shot once in the chest and once in the back. Chinn had been shot once in the back of the head.

### B.    The Investigation

Although Higgs was almost immediately suspected, the police investigated the murders for nearly three years before arresting him. On March 21, 1996, Park Police officers interviewed Higgs at his apartment. Higgs acknowledged his acquaintance with Jackson and said he could have talked to her the night before her death. He, however, denied that she had ever visited his apartment. Higgs said that he first heard of the murders while watching the ten o'clock news on Saturday, January 27, 1996, while at a party hosted by his girlfriend, Phyllis Smith. Higgs recalled immediately commenting to another party guest that he thought he knew "that Tanji girl." Higgs' mentioning of the victim's name revealed his guilty knowledge as the names and photos of the three victims were not released to the media until January 28, 1996.

After concluding the interview, the officers executed an arrest and search warrant arising from Higgs's suspected involvement in unrelated bank frauds. In addition to cash and documents, the officers seized crack cocaine, a .380 semiautomatic firearm, and boxes of ammunition for .380, .45, and .38 caliber weapons. On May 12, 1997, Higgs pleaded guilty to possession with intent to distribute cocaine base, for which he received 17 years' imprisonment.

The Park Police turned their attention to Higgs's girlfriend, Phyllis Smith, who initially provided a false alibi for the defendant. Smith claimed Higgs had been with her and her family on the night of the killings, helping clean her home for a party the following night. She instructed her relatives to confirm the alibi. Later, Smith testified to the grand jury that Higgs was with her at 5:00 a.m. on January 27. At trial, however, Smith recanted both accounts and

testified that Higgs called her after his arrest and asked her to provide an alibi for the night of January 26. Smith complied, believing that the police were investigating drug charges. Once she learned that the officers' questions pertained to a triple murder, however, Smith admitted her lies. At trial, Smith testified that Higgs was not with her when she cleaned her house on the evening of the 26th, when she went to bed at 1:30 a.m. on the 27th, or when she awoke three and one-half hours later to care for her son. Smith returned to bed shortly thereafter and awoke at 10:00 a.m., when she first found Higgs in her home.

Officers also interviewed Enidsia Darby, Higgs's former girlfriend and the mother of his son. Higgs telephoned Darby after his March 1996 arrest and told her that he was in custody on drug charges. Darby, however, had seen news reports about the arrest that included photographs of the murder victims. When she asked Higgs about the women, he responded by asking if Darby remembered that he had been with her at the hospital on the night of the murders. When Darby later visited Higgs in jail, he admitted having been present at the shootings. He said that Jackson had been invited to his house to smoke and drink because she had been "snitching on one of them." Higgs also told Darby that he did not know the other two victims, explaining, "They were just for his friends."

Darby also testified that Higgs had leveled death threats against his criminal accomplices. Indeed, she and Higgs had perpetrated a bank fraud in the fall of 1995 with the assistance of a woman named Andrea Waters. Waters received a percentage of the criminal proceeds, until Higgs defrauded her. When Waters announced her intention to contact the police, Higgs responded with a threat to kill her. In a separate scheme, Darby had charged the merchandise of her employer to a credit card number she received from Higgs. When the fraud prompted an investigation, Higgs threatened to kill Darby if she identified him.

The investigation into Higgs's involvement in the murders revealed his participation in two shootings involving .38 caliber weapons, the same caliber of firearm used in the homicides. On November 20, 1995, about two months before the murders, Higgs got into an argument outside the Chaconia Nightclub in Washington, D.C., and shot out the windows of a vehicle from his van.   During a search of the damaged vehicle, the police recovered a .38 caliber bullet.   An accomplice to the shooting, Wondwossen Kabtamu, threw Higgs's gun out the window of the van after the crime.   The men returned to get the weapon at Higgs's insistence.   Higgs was later charged with the shooting and explained to Domenick Williams, a jailhouse lawyer, that he did not want to plead guilty to it "because they would try to use the gun in another case."   When Williams learned of the Indictment for the murders of the three women, Higgs commented to him, "You see why I can't plead guilty to that charge?"   A second shooting occurred on Cherry Lane in Laurel, Maryland, on December 10, 1995, when Higgs and Haynes fired at a man named Rodney Simms following a verbal dispute over a woman.   At the scene, the police later recovered nine millimeter and .38 caliber bullets and bullet casings.

The .38 caliber bullets at the Cherry Lane and Chaconia sites had five lands and grooves, with a right twist, just like the slugs recovered in connection with the three murders.   Despite identifying the common caliber and rifling characteristics, firearms examiners could not definitively conclude that all the projectiles were fired from the same weapon.   Nonetheless, the fact remained that the bullets recovered in connection with the murders were also .38 caliber with five lands and grooves and a right twist.[3]

---

[3]   In April 1997, Higgs pleaded guilty to the Cherry Lane shooting.   During the plea hearing, the prosecutor stated that Haynes had fired the nine millimeter handgun and that Higgs had fired the .38 caliber handgun.   Higgs did not contest the facts of the shooting, but gratuitously asserted that he "didn't have a .38.   It was the other way around."

While awaiting trial in the D.C. jail, Higgs made comments to Domenick Williams evincing the Higgs's consciousness of guilt.   He told Williams that he had rebuffed an offer to cooperate against Haynes.   When Williams said that the authorities would likely extend a similar offer to Haynes, Higgs responded "that his youngan would hold up," and "that the Government wouldn't offer a deal to the trigger man."   Higgs asked Williams, in reference to Gloria, what his chances would be "if the witness after the fact wasn't there."   Williams told him that "his chances would be good," but Higgs later "explained to [Williams] that he wasn't worrying about the [murder] case because" former D.C. Jail inmates Melvin Grayson and "T" "would be out there to handle anything that he needed."   Williams told the police about these conversations and produced letters in which Higgs reported that the Chaconia case had been dismissed, and that while Higgs had not heard from "T", "Mel has been in my corner." Through visitation records, authorities learned that Grayson had visited Higgs in jail in February and March 1999.   The Chaconia charges were dismissed in May 1999.

### C.      The § 2255 Claims Relating to Victor Gloria

As noted above, on November 28, 2005, Higgs filed a 122-page Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 (ECF 492),[4] which asserted 24 claims of error.   The only claim relevant to his present motion to set aside the § 2255 judgment was his claim that the prosecution suppressed evidence of consideration it provided to Victor Gloria in exchange for Gloria's testimony.   ECF 492 at 31-33.   Of particular relevance here, Higgs, in his § 2255 petition, claimed that as an additional benefit to Gloria, the federal government did not disclose that Gloria "received further benefits in the form of charges that were never brought against him," referring to Gloria's having been a suspect in

---

[4]    Higgs also filed a Brief in Support of his Motion, which is docketed at ECF 504.

an unrelated homicide in Baltimore, Maryland. ECF 492 at 33; ECF 504 at 44.   The defendant

argued that Gloria "was presumably never charged with this homicide in an effort to preserve his

status as a testifying witness in this federal capital triple homicide case" and that the

government's "failure to disclose this consideration violated due process."   ECF 504 at 44.

> In its response, the government addressed these allegations as follows:

> Significantly, Higgs's vague descriptions of the supposed benefits conferred on Gloria largely fail to demonstrate any connection to this trial or federal officials. Higgs observes that Smyth County, Virginia has failed to execute an arrest warrant against Gloria and that Gloria received a one-year prison sentence in a Prince George's County drug case that carried a 10-year exposure.   Higgs, however, does not allege or demonstrate a causal link between Gloria's cooperation in this case and the actions of local officials in others.   Indeed, Higgs essentially concedes that he has based his claim on speculation, asserting only that the treatment of Gloria "strongly suggests" the existence of undisclosed benefits.   Elsewhere, Higgs states in conclusory fashion that Baltimore City officials did not arrest Gloria in connection with a murder to preserve the witness's "status" in this case.   But, as the Fourth Circuit has recognized, speculation about the Government's knowledge or actions does not suffice to discharge a defendant's burden on collateral review, and will not merit relief. *See Roane*, 378 F.3d at 401.   Higgs apparently has no alternative but speculation, as he has not offered a declaration from the only person who could speak to Victor Gloria's expectations at the time of trial — Victor Gloria [himself].

ECF 520 at 88.

The government further argued that even assuming there were undisclosed promises or

consideration given to Gloria, the defendant could not establish that this undisclosed

consideration would have created a reasonable probability that its disclosure would have resulted

in a more favorable verdict.   *See* ECF 520 at 87-89.   Having considered this claim, this Court

concluded that:

> Higgs also claims that the Government offered Gloria benefits in relation to state charges pending against him in Virginia, as well as charges he potentially faced in Baltimore.

> Specifically, he submits that Virginia officials were never notified of Gloria's whereabouts during the Higgs prosecution, when presumably they should have

been, and that state charges were never brought against Gloria for a homicide in Baltimore. Again, pure speculation about supposed benefits cannot substitute for hard facts. *See Roane*, 378 F.3d at 401. Higgs, quite simply, has failed to demonstrate any causal connection between Gloria's testimony in this federal case and whatever treatment he may have received in the state jurisdictions. *Even if the Court were to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination.* Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably, counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, *any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a 'reasonable probability' of a more favorable verdict. See Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. at 678).

*Higgs*, 711 F. Supp. 2d at 508 (emphases added).

### D.     Higgs's Claim of Fraud: the Baltimore Homicide Investigation

Pursuant to a FOIA request, the defendant obtained the Baltimore City Police Department's file relating to the homicide of Martelle Creighton, which occurred on July 18, 1998. Higgs alleges that the Assistant United States Attorney (AUSA) assigned to his case contacted the Assistant State's Attorney (ASA) in Baltimore City and convinced the ASA not to charge Gloria in relation to that homicide, in order to preserve Gloria's status as a witness in the *Higgs* case. The defendant bases his claim on two pieces of paper that reflect contact between the ASA and the AUSA. However, a review of the Baltimore City Police Department records reveals the absence of *any* evidence that the federal prosecutor convinced the local prosecutor not to charge Gloria in order to preserve his status as a federal witness. To the contrary, the records establish that Victor Gloria was not a participant in the altercation that resulted in the death of Martelle Creighton. The pertinent facts related to the Creighton murder and investigation are summarized as follows, as well as in the timeline attached as **Exhibit 1**.

During the early morning hours of July 18, 1998, David Bishop and Clarence White were with the victim, Martelle Creighton, in the Inner Harbor area of Baltimore City. There were also some females in the area speaking with another group of males. An altercation occurred between Creighton and the other group of males. One of the males, who was described as having a medium- to dark-complexion, struck victim Creighton one time in the neck. The perpetrator fled with his two light-skinned associates. Police responded to the scene. Martelle Creighton died as a result of a stab wound to his neck, which struck his carotid artery.

Investigators interviewed David Bishop shortly after the incident. Bishop provided a statement that included a description of the three individuals who fled. Bishop described the perpetrator as medium-complexioned and the other two individuals as twins. **Exhibit 2** at 2. Bishop subsequently contacted the investigators and provided contact information for Barbara Bailey, who was one of the women present at the time of the murder.

On July 29, 1998, Barbara Bailey was interviewed and gave a recorded statement. *See* **Exhibit 3**. Bailey described the individual who struck Creighton as a medium- to dark-complexioned male. **Exhibit 3** at 8. Bailey described one of the individuals as "Vic," who was light-complexioned. **Exhibit 3** at 7. She also described two other individuals who were light-skinned. **Exhibit 3** at 5-7. In describing the incident, Bailey said that "before the altercation happened Victor was the one that ran off because I get [sic] he saw that something was about to happen." **Exhibit 3** at 3.

On August 12, 1998, investigators interviewed Charnita Bailey, who provided a recorded statement. *See* **Exhibit 4**. Charnita Bailey described meeting four men:  two were named Kevin; the third was named Kiwi, and was a twin of one of the Kevins; and the fourth was Victor. **Exhibit 4** at 2. Charnita Bailey described how the victim (Creighton) and Kevin, "the

tall one not the twin," were walking around in a circle, in "[a] beef, beef like circle.    Then I didn't see anymore."    **Exhibit 4** at 3.    She further stated that "before the guy got stabbed, the guy Victor, um, ran off."    **Exhibit 4** at 3.

On November 16, 1998, eyewitness Bishop was shown photographic lineups and identified Kevin and Keith Scott as being with the perpetrator.  *See* **Exhibit 5**.  On November 20, 1998, Barbara Bailey and Charnita Bailey were also shown photographic lineups and identified Kevin and Keith Scott as accompanying the individual who struck the victim.    **Exhibit 6**.    Based upon these identifications, investigators obtained arrest warrants for Kevin and Keith Scott.

On February 2, 1999, the Scott brothers were arrested.    Both brothers gave statements stating that Kevin Miller was present at the time of Creighton's assault, but that Victor Gloria struck the victim one time, and they did not see a weapon.    **Exhibit 7** at 9; **Exhibit 8** at 7.    Kevin Scott told investigators that Victor was locked up in Prince George's County for the murder of three girls.    **Exhibit 7** at 11.    Keith Scott also said that he knew Victor Gloria was locked up for the murder of three girls and that he was locked up with Willis Hanes [*sic*], whom Keith Scott knew.    **Exhibit 8** at 11-12.    One of the Scott brothers also told police detectives that "Kevin told him not to say his name."    **Exhibit 9**.    Police notes reflected contact information for the FBI case agent and for the Park Police officers involved in the federal murder case.    **Exhibit 10**.

In fact, on the very next day, U.S. Park Police Detective Joseph Green provided a photographic lineup of Victor Gloria to the Baltimore City Police.    **Exhibit 11**.

Photographic lineups of Victor Gloria and Kevin Miller were assembled.    On March 19, 1999, Barbara Bailey was shown the photographs and did not identify either Gloria or Miller. **Exhibit 12**.    Charnita Bailey was shown the same photographic lineups.    She did not identify Victor Gloria but she did identify Kevin Miller, stating:    "[H]e looks like the guy who may have

had the knife." **Exhibit 13**. Based upon the identification, investigators obtained an arrest warrant for Kevin Miller.

On April 7, 1999, Kevin Miller was arrested and gave a recorded statement. *See* **Exhibit 14**. In his statement, Miller said Gloria was the one who struck the victim. **Exhibit 14** at 5-6, 9-10, 13. Miller also acknowledged discussing the murder and what to say with Kevin and Keith Scott. **Exhibit 14** at 15-17.

A handwritten note from ASA Marc Cohen to Detective Patton, dated April 12, 1999, exists, which summarizes a conversation between ASA Cohen (who is now deceased) and AUSA Deborah Johnston. *See* **Exhibit 15**. According to this note, AUSA Johnston provided information that could be relevant to the State homicide investigation. Specifically, the AUSA informed the ASA that Victor Gloria had pled guilty to being an accessory after the fact in a triple murder case, and that his plea agreement was sealed. AUSA Johnston further stated that "it is possible that co-defendant Scott, Scott + Miller are blaming Gloria because they are friends of defendant's in her case, especially Haynes." ASA Cohen's memo indicated that the AUSA suggested that detectives contact the case agents in the federal case for background information. **Exhibit 15**. ASA Cohen's memo further indicated what he was going to do: "After we talk to these officers, we will decide on the next course of action, that is either writ Gloria and charge him or talk to his lawyer about the case." **Exhibit 15**. ASA Cohen's own notes revealed, in other words, that there was no request by the federal government for the State prosecutors not to charge Gloria, nor was there any agreement between State and federal authorities not to charge Gloria in deference to the pending federal case. Indeed, ASA Cohen's notes reflect the contrary: *State* officials would decide whether or not to charge Gloria. **Exhibit 15**.

The only other identified reference to the United States Attorney's Office appeared in a progress report prepared by Detective Patton approximately ten days later. *See* **Exhibit 16**. In this report, Detective Patton indicated that federal authorities had information suggesting that the Scott brothers and Miller were close friends with Haynes and Higgs, and that these men were aware Gloria was going to testify against Haynes and Higgs. Accordingly, federal officials believed that the men's implication of Gloria was a form of retaliation. **Exhibit 16** at 2. The report continued, stating that ASA Cohen and Detective Patton believed that "the AUSA may be on track with their assumption." **Exhibit 16** at 2. There was no indication in Detective Patton's report that federal authorities requested any action by the Baltimore City prosecution team. Nor was there any evidence that the Baltimore City authorities agreed not to charge Victor Gloria. To the contrary, Detective Patton described what they would do to "finally discern who actually stabbed the victim." **Exhibit 16**.

On June 8, 1999, eyewitness David Bishop was shown photographic lineups of Kevin Miller and of Victor Gloria. Without hesitation, Bishop identified Miller as the perpetrator. **Exhibit 17**. Bishop failed to identify Victor Gloria. **Exhibit 18**. Likewise, on June 11, 1999, another eyewitness, Clarence White, was shown photographic lineups. White identified Kevin Miller's photograph as looking like the person who stabbed the victim. **Exhibit 19**. He also identified Kevin Scott and Keith Scott as being there. **Exhibit 20**. White did not identify Victor Gloria. **Exhibit 21**.

On June 16, 1999, the Baltimore City authorities conducted re-interviews and polygraphs of Kevin and Keith Scott. **Exhibit 22**. Both failed the polygraph examinations. **Exhibit 22**.

On August 30, 1999, Keith Scott and Kevin Scott pled guilty to second degree assault and were each sentenced to 6 months and 29 days of imprisonment. **Exhibit 23**. On October 18,

1999, Kevin Miller pled guilty to 2d degree murder and on December 10, 1999, was sentenced to five years' imprisonment.   **Exhibit 24**.

## III.   ARGUMENT

### A.   <u>Applicable Law</u>

Higgs has filed his motion for relief pursuant to Fed. R. Civ. P. 60(d)(3), which provides that a court may set aside a judgment for fraud on the court.   The fraud-upon-the-court doctrine was articulated in the Supreme Court's decision in *Hazel-Atlas Glass Co. v. Hartford –Empire Co.*, 322 U.S. 238 (1944).   There, the Court made clear that the authority to set aside judgments under Rule 60(d)(3) is limited to fraud that is a "wrong against the institutions set up to protect and safeguard the public."   *Id.* at 246.   The Court determined that the lower court judgment in that case had to be set aside because there was conclusive proof of a deliberately planned and carefully executed scheme that successfully defrauded not only the Patent Office but also the Circuit Court of Appeals.   *Id.* at 245-46.

The Fourth Circuit has made it clear that Rule 60(d) should be narrowly construed and "is typically confined to the most egregious cases, such as bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged."   *Great Coastal Express Inc. v. International Brotherhood of Teamsters* 675 F.2d 1349, 1356 (4th Cir. 1982) (describing "perjury and fabricated evidence" as "reprehensible" and unquestionable "evils," but nonetheless finding the circumstances of the case under review to be inadequate to grant relief as a fraud upon the court). Similarly, in *Cleveland Demolition Co. v. Azcon Scrap Corp.*, the Fourth Circuit defined fraud on the court as involving "corruption of the judicial process itself" and not encompassing allegations involving a "routine evidentiary conflict."   827 F.2d 984, 986 (4th Cir. 1987)

17

(internal quotation marks omitted).   Indeed, the Fourth Circuit recently reiterated the strict requirements for a fraud upon the court claim, holding that "not only must [the] fraud on the court involve an intentional plot to deceive the judiciary, but it must also touch on the public interest in a way that fraud between individual parties generally does not."   *Fox v. Elk Run Coal Company Inc.*, 739 F.3d 131, 136 (4th Cir. 2014) (Elk Run's failure to disclose unfavorable expert findings to its testifying expert did not support a finding of fraud upon the court.).

In *United States v. Herring*, the Third Circuit articulated similar requirements for a fraud-on-the-court finding under Rule 60(d): "a showing of (1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) that in fact deceives the court."   *Herring v. United States*, 424 F.3d 384, 386-87 (3d Cir. 2005).   The court further concluded that "a determination of fraud on the court may be justified only by 'the most egregious misconduct directed to the court itself,' and that it 'must be supported by clear, unequivocal and convincing evidence.'"   *Id.* (internal footnote and citations omitted).   Other courts of appeals have reached similar conclusions.   *See*, *e.g.*, *Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1267 (10th Cir. 1995) (holding that "'fraud on the court,' whatever else it embodies, requires a showing that one has acted with an intent to deceive or defraud[, *i.e.*,] . . . a showing of conscious wrongdoing — what can properly be characterized as a deliberate scheme to defraud — before relief from a final judgment is appropriate under the *Hazel–Atlas* standard"); *United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009) ("Fraud on the court which justifies vacating a judgment is narrowly defined as 'fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury.'") (quoting *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985)); *United States. v. Estate of Stonehill,* 660 F.3d 415, 454 (9th Cir. 2011) ("Any misrepresentations or false

statements made by government witnesses or attorneys were on largely tangential issues and did not substantially undermine the judicial process by preventing the district court or this court from analyzing the case.").

In response, Higgs cites *Demanjuk v. Petrovosky*'s five-factor test, which does not require intentional false conduct but instead recognizes conduct that is "willfully blind to the truth or is in reckless disregard for the truth" as adequate to support a finding of fraud upon the court.   10 F.3d 338, 348 (6th Cir. 1993).   But Higgs's proposed expansion of the "fraud upon the court" concept to include reckless disregard of the truth and willful blindness is directly contrary to settled Fourth Circuit law, which requires "an intentional plot to deceive the judiciary, [that] . . . must also touch on the public interest in a way that fraud between individual parties generally does not."   *Elk Run Coal Company Inc.*, 739 F.3d at 136; *see also Great Coastal Express*, 675 F.2d at 1356 (the fraud in that case did not "present a *deliberate* scheme to directly subvert the judicial process, sufficient to constitute fraud on the court") (emphasis added); *United States v. MacDonald*, 161 F.2d 4, 1998 WL 637184 * 3 (4th Cir. 1998) (unpub.) (expressly rejecting *Demanjuk* as "at odds with our decision in *Great Coastal*").

The moving party bears the burden of proving a fraud upon the court by clear and convincing evidence.   *See MacDonald*, 1998 WL 637184 * 2 (citing *Shepherd v. American Broadcasting Co.*, *Inc.*, 62 F.2d 1469, 1477 (D.C. Cir. 1995) (collecting cases)); *Square Const. Co. v. Washington*, 657 F.2d 68, 71 (4th Cir. 1981).

As described below, the defendant has failed to establish *any* false statements by the government in this case, much less ones that were the product of an "intentional plot to deceive" this Court or intended to "subvert[ ] the judicial process."

**B.**    **Preliminarily, Higgs Has Failed to Establish That Gloria Was Not Charged in Baltimore City as Consideration for Gloria's Testimony in <u>the Triple Homicide Case</u>.**

The defendant alleges that the government engaged in fraud upon the court when, in response to his 2255 petition, the prosecutor denied "any knowledge of or any ability to influence any benefits conferred on Mr. Gloria by local authorities in Baltimore."   ECF 579 at 2-3.   Higgs repeatedly claims that Victor Gloria "was a suspect in a homicide in Baltimore, but was not charged due to his status as a federal witness and the intervention of the federal government," ECF 579 at 23; "that Mr. Gloria was not charged in the Baltimore homicide, almost certainly as a result of federal authorities' intervention," ECF 579 at 17; and that "Mr. Gloria was not charged with this homicide at the behest of the [federal] government 'in an effort to preserve his status as a testifying witness in this federal capital case.'"   ECF 579 at 18 (quoting ECF 520 at 88).

These are serious allegations.   Indeed, any defendant who levels such grave accusations of prosecutorial misconduct — especially one who is counseled — should have a good faith basis before doing so.   But neither Higgs nor his lawyers have *anything* concrete to offer in the way of carrying the defendant's burden of demonstrating a fraud on the court.   That is because Higgs has not and *cannot* establish that Gloria was not charged in the Baltimore City homicide case as consideration for his testimony in the federal case.   To the contrary, the entire record regarding the Creighton homicide is clear:   Gloria was not charged because Gloria did not participate in the assault and murder.   The Creighton assailants' own guilty pleas definitely establish this truth. Without the factual predicate that Gloria was not charged as consideration for his federal testimony, Higgs cannot prevail on his instant claim.   Contrary to Higgs's baseless assertion, a review of the Baltimore City Police file reflects that local authorities conducted a thorough and independent investigation of the Creighton homicide, and that their decision not to charge Victor

20

Gloria was based upon their independent evaluation of the evidence — not in response to a federal request.  (Indeed, left completely unexplained is *why* State officials would have agreed to allow an alleged murderer like Gloria escape prosecution (and potentially return to the streets) simply so that another sovereign could prosecute another set of defendants in another violent crime case.)

It bears emphasizing that immediately after Creighton's murder, which occurred on July 18, 1998, eyewitness David Bishop described three males present, two of whom confronted the victim.  **Exhibit 2** at 2.  On July 29, 1998, in a recorded statement, Barbara Bailey described four men, including an individual named Vic, as being present.  **Exhibit 3** at 5-8.  Bailey stated that Vic ran off before the altercation.  **Exhibit 3** at 3.  Bailey's sister was interviewed on August 12, 1998.  **Exhibit 4**.  Charnita Bailey also said that Victor ran off before the altercation.  **Exhibit 4** at 3.  On November 16, 1998, eyewitness Bishop was shown photographic lineups and identified Kevin and Keith Scott as being with the person who struck the victim.  **Exhibit 5**.  On November 20, 1998, Barbara Bailey and Charnita Bailey were shown photographic lineups separately and each identified Kevin Scott and Keith Scott as accompanying the individual who struck the victim. **Exhibit 6**.  Based upon the identifications, arrest warrants were obtained for the Scotts.

On February 2, 1999, the Scott brothers were arrested.  Both gave statements stating that Kevin Miller was present during the Creighton murder but that Victor Gloria struck the victim one time, and that neither saw a weapon.  **Exhibit 7** at 9; **Exhibit 8** at 7.  One of the brothers also told detectives that "Kevin told him not to say his name."  **Exhibit 9**.  Police notes reflected contact information for the FBI case agent and Park Police officers involved in the federal murder case. Exhibit 10.  In fact, on the very next day, United States Park Police Detective Joseph Green provided a photographic lineup of Victor Gloria to the Baltimore City Police.  **Exhibit 11**.  A photographic lineup of Kevin Miller was also assembled.

On March 19, 1999, Barbara Bailey was shown the photographic lineups and did not identify either Gloria or Miller.  **Exhibit 12**.  Charnita Bailey was shown the same photographic lineups.  She did not identify Victor Gloria, but she did identify Kevin Miller, stating that "he looks like the guy who may have had the knife."  **Exhibit 13**.  Based upon the identification, an arrest warrant was obtained for Kevin Miller.

On April 7, 1999, Kevin Miller was arrested and gave a recorded statement.  **Exhibit 14**.  During his recorded statement, Miller stated that Gloria was the one who struck the victim.  **Exhibit 14** at 5-6, 9-10.  Miller also acknowledged discussing the murder and what to say with Kevin and Keith Scott.  **Exhibit 14** at 15-17.

As described above, there exists a handwritten memo dated April 12, 1999 describing communications between the assigned Assistant State's Attorney (Marc Cohen) and the prosecutor who handled Higgs's federal case, Deborah Johnston.  According to the note sent to homicide Detective Patton, AUSA Johnston provided information that might be relevant to the State homicide investigation.  Specifically, she advised the State prosecutor that Victor Gloria had pled guilty to being an accessory after the fact in a federal triple murder case and that Gloria's plea agreement was sealed.  As ASA Cohen's notes reflect, AUSA Johnston further stated that it was possible that "co-defendant Scott, Scott and Miller are blaming Gloria because they are friends of defendant's in [the federal] case, especially Haynes."  The memo also indicated that AUSA Johnston suggested that detectives contact the case agents in the federal case for background information.  **Exhibit 15**.

ASA Cohen's memo further indicated what he planned to do:  "After we talk to these officers, we will decide on the next course of action, that is either writ Gloria + charge him or talk to his lawyer about the case."  **Exhibit 15**.  Clearly, nothing in ASA Cohen's memorandum

suggests that federal officials ever asked State officials not to charge Gloria, nor do ASA Cohen's words indicate any agreement not to charge Gloria in deference to the pending federal case. To the contrary, Cohen indicated that *his* team would make the final call. **Exhibit 15**.

The only other identified reference to the United States Attorney's Office in the materials submitted by the defendant in support of his Rule 60(d) claim is a progress report prepared by Detective Patton approximately ten days after ASA Cohen's memo. **Exhibit 16**. In this report, Patton indicated that federal authorities had information that the Scott brothers and Miller were close friends with Haynes and Higgs, and that they were aware Gloria was going to testify against Haynes and Higgs in the federal case. Detective Patton further noted that investigators had interviewed the Scott brothers and Miller and specifically observed that the three men's statements "are very similar in nature and appeared to have been rehearsed." **Exhibit 16** at 2. Accordingly, Detective Patton noted his concurrence, along with ASA Cohen's, in the federal prosecutor's belief that "the implication of Victor Gloria by Kevin Miller and the Scott brothers is their form of retaliation against Gloria." **Exhibit 16** at 2. Again, the defendant has put forward no evidence indicating that federal authorities requested any action by the Baltimore City prosecution team. Neither is there any evidence that the Baltimore City authorities agreed not to charge Victor Gloria, let alone at anyone's behest. To the contrary, Detective Patton described the steps his team would take to "finally discern who actually stabbed [Creighton]." **Exhibit 16** at 2.

Again, as described above, on June 8, 1999, eyewitness David Bishop was shown photographic lineups of Kevin Miller and of Victor Gloria. Bishop identified Miller as the perpetrator. **Exhibit 17**. Bishop failed to identify Victor Gloria. **Exhibit 18**. Likewise, on June 11, 1999, another eyewitness, Clarence White, was shown photographic lineups. White identified Kevin Miller's photograph as looking like the person who stabbed the victim. **Exhibit**

**19**.   White identified Kevin Scott and Keith Scott as being there, too.   **Exhibit 20**.   White did not identify Victor Gloria.   **Exhibit 21**.   On June 16, 1999, the Baltimore authorities also re-interviewed and polygraphed Kevin and Keith Scott.   **Exhibit 22**.   Both failed the polygraph.

It is clear that the Baltimore City authorities' decision not to prosecute Victor Gloria was based upon the evidence — two eyewitnesses said Gloria left the scene before the altercation began, while three eyewitnesses identified Kevin Miller as the individual who struck the victim. Indeed, the only individuals implicating Gloria were Kevin Miller himself, and Miller's associates, Kevin and Keith Scott.   Moreover, the written impressions of both ASA Cohen and Detective Patton indicate that they were independently evaluating the evidence and making their own decisions.   There is no evidence that the decision not to charge Gloria was based upon a request from federal authorities.   Higgs has failed to show that federal authorities solicited and/or obtained the Baltimore City's prosecutor's agreement not to charge Gloria in return for Gloria's testimony in the federal case.   Without this factual predicate, Higgs's Rule 60(d) claim must fail.

## C.    **The Defendant Has Failed to Establish Fraud Upon the Court.**

As set forth above, the defendant bears the burden of proving "a deliberately planned and carefully executed scheme" to defraud the court and severely undermine its "integrity." *Hazel-Atlas Glass Co*., 322 U.S. at 245-46.   Moreover, the fraud must be material and deliberate. *Great Coastal Express*, 675 F.2d at 1353-56.

### 1.    The Defendant Has Failed to Establish a Deliberately Planned Scheme to Defraud the Court.

The government's statements in its response to the defendant's § 2255 petition and his related request for discovery were not false or misleading.   With respect to the Baltimore City homicide (Creighton), the government's assertions were limited to the following:

Elsewhere, Higgs states in conclusory fashion that Baltimore City officials did not

24

> arrest Gloria in connection with a murder to preserve the witness's "status" in this case.   But, as the Fourth Circuit has recognized, speculation about the Government's knowledge or actions does not suffice to discharge a defendant's burden on collateral review, and will not merit relief.   *See Roane*, 378 F.3d at 401.   Higgs apparently has no alternative but speculation, as he has not offered a declaration from the only person who could speak to Victor Gloria's expectations at the time of trial – Victor Gloria [himself].

ECF 520 at 88.   The defendant has failed to establish that these statements were false or that they were in any way misleading (let alone materially so).   Neither can he so demonstrate, because *the federal government never sought any consideration from the Baltimore City prosecutors*.   Indeed, ASA Cohen's own notes belie the existence of such a request or promise in stating that "*we* will decide on the next course of action, that is either writ Gloria and charge him or talk to his lawyer about the case."   **Exhibit 15** (emphasis added).

As purported evidence of fraud on the court, the defendant also cites the government's response to his motion for discovery, in which the government stated that "there is no evidence that [Gloria] was promised anything other than that which he admitted at trial."   ECF 579 at 19 (citing ECF 513 at 5).   The defendant has failed to establish that these statements were false or misleading.   Indeed, these statements remain true today.   There is simply no evidence that Gloria was promised anything in regard to the Baltimore City homicide.   Nor is there any evidence the government procured or attempted to procure consideration for Gloria from the Baltimore City authorities.   Higgs's conclusion that the government's statements — and his suppositions of a cover up — are wholly inadequate to establish a deliberately planned scheme to defraud the court.[5]

---

[5]   The defendant repeatedly asserts a *Brady* violation, but he has failed to satisfy the essential elements of such a claim.   As this Court well knows, a defendant who wishes to prevail on a *Brady* claim must establish that (1) the evidence was favorable to the defendant; (2) the evidence was suppressed by the government; and (3) that it was material.   *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).   More than supposition is required to establish a *Brady* violation.   *Wood v. Bartholomew*, 516 U.S. 1, 7-8 (1995) (failure to disclose government witnesses' polygraph

2.      The Defendant Has Not Established Government Conduct That
        Directly Impinged the Integrity of the Court.

Assuming arguendo that the defendant has presented clear and convincing evidence of a

deliberate plot to mislead the court, which he has not, Higgs's claim still must fail because he has

failed to establish that the government's actions "directly impinged the integrity of the court or its

ability to function impartially."   *Great Coastal Express*, 675 F.2d at 1356.   Indeed, the defendant

does not assert his actual innocence.   Instead, he merely argues that his attorney could have

cross-examined Gloria about the fact that Gloria was a suspect in the Creighton murder, and about

the alleged possible consideration Gloria received.   *See* ECF 579 at 24 n.7.

In its ruling on the defendant's § 2255, however, this Court preempted any claim that the

alleged consideration would have impacted its decision and thereby impacted the integrity of the

court's proceedings.   This Court specifically ruled that

---

results not a *Brady* violation).   "The evidence is material only if there is a reasonable
probability that, had the evidence been disclosed to the defense, the result of the proceeding
would have been different.   A 'reasonable probability' is a probability sufficient to undermine
confidence in the outcome."   *United States v. Bagley*, 473 U.S. 667, 682 (1985) (remanded for
determination whether undisclosed promise of renumeration created a reasonable probability that
cross-examination regarding the promise created a reasonable probability the result of the trial
would have been different); *see also United States v. Salem*, 643 F.3d 221, 225-26 (7th Cir.
2011) (finding no *Brady* violation where the defendant failed to show that cross-examination of
the government's star witness about his involvement in the homicide of a rival gang member
would have been likely to change the outcome of the case); *cf. United States v. Robinson*, 627
F.3d 941, 949 (4th Cir. 2010) (observing that it is a "rare case" in which "newly discovered
impeachment evidence is enough for a retrial" and citing cases); *United States v. Cavazos*, 542
Fed. Appx. 263, 271-72 (4th Cir. 2013) (unpub.) (affirming district court's denial of defendant's
motion for new trial because cross-examination on information found in interview memoranda of
key witness discovered and produced after trial "would [not] have enabled defense counsel to
cast any significant further doubt on the truth of [the witness's] testimony . . . ").   The
government would emphasize that its non-disclosure of communications with the Baltimore City
prosecutor did not violate *Brady*.   Moreover, as this Court has squarely observed, "[A]ny
evidence that Gloria may have received consideration for his testimony beyond that disclosed by
the Government could not have further undermined his already low credibility, nor would it have
created a 'reasonable probability' of a more favorable verdict." *Higgs*, 711 F. Supp. 2d at 508-09.

26

> [E]ven were the Court to find that the prosecution failed to turn over any of this evidence, and again assuming the factual accuracy of the supposed benefits, Higgs has not demonstrated its materiality. Gloria's credibility as a witness was thoroughly explored and impugned by Higgs' counsel through vigorous cross-examination. Gloria openly confessed to an extensive criminal history, going so far as to state that "if it is going to help Victor Gloria, Victor Gloria will do whatever he has to do." Unquestionably, counsel established that Gloria was a witness of dubious reliability, whose testimony the jury could weigh accordingly. In other words, any evidence that Gloria may have received consideration for his testimony beyond that disclosed by the Government could not have further undermined his already low credibility, nor would it have created a "reasonable probability" of a more favorable verdict.

*Higgs*, 711 F. Supp. 2d at 508-09.

As a result, the defendant has failed to prove that the non-disclosure of communication with the Baltimore City prosecution team was material or somehow subverted the judicial process. *Cf. Stonehill*, 660 F.3d at 454 ("Any misrepresentations or false statements by the government witnesses or attorneys were on largely tangential issues and did not substantially undermine the district court or this court from analyzing the case"); *United States v. MacDonald*, 161 F.3d 4, 1998 WL 637184 (4th Cir. 1998) (unpub.) (table); *United States v. Burke*, 321 Fed. Appx. 125, 2009 WL 921289 (3d Cir. 2009) (unpub.) (*Hazel-Atlas* claim denied, because even assuming the veracity of an affidavit stating that the government knew and condoned a witness's intent to lie on the stand, the defendant "failed to present 'clear unequivocal and convincing evidence' of an intentional fraud upon the court by federal prosecutors").

The Fourth Circuit's decision in *MacDonald*, 1998 WL 637184, is informative. There, the defendant, who through years of litigation steadfastly maintained his innocence, sought to set aside the denial of his original § 2255 claim and reopen the § 2255 proceedings on the basis of an alleged fraud upon the court. *Id* at *2. MacDonald alleged that new evidence established that a government agent had lied in an affidavit, which the district court relied upon in denying his § 2255 petition. Specifically, the agent knowingly did not disclose contradictory information in

27

his affidavit.   Relying upon *Great Coastal Express*, the Court determined that, in order to prevail under Rule 60, MacDonald at a minimum had to establish that "the fraud was material and deliberate."   *Id.* at *4.   The Court then affirmed the district court's denial of MacDonald's Rule 60 motion, finding "insufficient evidence in this record to even potentially establish that the government, through agent Malone, deliberately deceived the [district] court."   *Id.* at *6.   The Court also determined that the evidence was not "material to the question of [MacDonald's] innocence and therefore was not material to the outcome of his 1990 petition for habeas corpus relief."   *Id.* at *4.

Higgs, of course, does not allege that he is actually innocent of the murders.   Rather, he simply argues that the government's non-disclosure of (a routine and immaterial) communication with a local prosecutor constitutes a fraud upon the court.   As in *MacDonald*, the defendant has failed to show a deliberate deception of the court, much less a scheme to defraud the court. Moreover, Higgs cannot show that the non-disclosed information (*i.e*., the communications between ASA Cohen and AUSA Johnston) was material to this Court's ruling regarding his § 2255 petition.   Indeed, in ruling on Higgs's § 2255 petition, this Court specifically found that, even assuming Gloria received some consideration in the Baltimore City homicide investigation, this fact "could not have further undermined [Gloria's] already low credibility, nor would it have created a 'reasonable probability' of a more favorable verdict."   *Higgs*, 711 F. Supp. 2d at 508.

## IV.    HIGGS'S MOTION FOR DISCOVERY

The defendant has also filed a "renewed Motion for Production of Exculpatory Evidence and Renewed Motion for Discovery."   ECF 580.   Once again, he avers that "federal officials with knowledge and control of the evidence of that other crime knew of Mr. Gloria's involvement in the crime."   ECF 580 at 2.   He has presented no evidence to support his bald assertions that

federal officials had control over the Baltimore City murder evidence or that they knew of Gloria's involvement in Creighton's murder. To the contrary, the Baltimore City Police department had the evidence, as set forth in their files. Indeed, the evidence in the Baltimore City homicide file actually establishes that Victor Gloria was *not* involved in Creighton's murder. In fact, Gloria was not even present at the time of Creighton's stabbing.

To the extent Rule 60(d) has no discovery provision, the government assumes the defendant is seeking discovery under the assumption that this Court reopens his § 2255 claim. For the reasons set forth above, there is no basis to reopen the § 2255 proceedings and, therefore, the request for discovery should be denied. Indeed, the defendant's requests relating to the Baltimore City homicide case will not further his claim as he cannot establish that additional cross-examination of Gloria would have created a reasonable probability that the outcome of his trial would have been different.

Alternatively, under well-settled law, a habeas petitioner is not entitled to discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899 (1997). Rather, the defendant must show good cause. *See* Rule 6(a) of the Rules Governing § 2255 Cases. "Good cause" exists when there is "reason to believe that [the defendant] may, if the facts are fully developed, be able to demonstrate he is entitled to relief." *Bracey*, 520 U.S. at 908-09 (*citing Harris v. Nelson*, 394 U.S. 286, 295(1969)). Discovery is not to be allowed so that a petitioner can "explore [his] case in search of its existence." *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999); *accord United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990).

Higgs has made general, overbroad requests, and he has failed to establish the requisite good cause to support his discovery requests. Instead, he seeks to engage in a fishing expedition in hopes of finding a case. For these reasons, as well as those set forth in the government's

response to the defendant's original motion for discovery, Higgs's renewed motion for discovery should be denied.

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny Higgs's Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 60(d), as well as his renewed motion for discovery, without a hearing.[6]

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____/s/_____
James A. Crowell IV
Assistant United States Attorney

---

[6]   As the Fourth Circuit observed in *MacDonald*, a district court can properly deny a Rule 60 motion without a hearing if, "assuming the new facts [the petitioner] asserts to be true, such facts could not establish fraud by clear and convincing evidence."   1998 WL 637184 at * 2.   Indeed, as explained above, a successful Rule 60 motion must establish not only a fraud on the court — which Higgs has failed to do — but also that it was "material and deliberate."   *Id*. at *4 (citing *Great Coastal Express*, 675 F.2d at 1353-56).   Because Higgs cannot establish materiality even if his claims are true, he has failed to state a claim under Rule 60 and this Court should deny his motion without a hearing.

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2015, a copy of Government's Response to Petitioner's Motion for Relief from Final Judgment was electronically filed in this case and was served by ECF to defense counsel.

_____/s/_____
James Crowell IV
Assistant United States Attorney