**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

_____
                                                      :
UNITED STATES OF AMERICA,            :
                                                      :
                     Respondent,        :          Criminal No. PJM-98-0520
                                                      :
          v.                                     :          Peter J. Messitte, U.S.D.J.
                                                      :
DUSTIN JOHN HIGGS,                        :          Greenbelt Division
                                                      :
                     Petitioner.           :
_____:

**PETITIONER'S REPLY IN SUPPORT OF MOTION FOR RELIEF FROM FINAL
JUDGMENT PURSUANT TO _HAZEL-ATLAS GLASS CO. v. HARTFORD-EMPIRE CO._
AND FEDERAL RULE OF CIVIL PROCEDURE 60(d)**

Petitioner, Dustin John Higgs, hereby files this reply in support of his _Motion for Relief_

_from Final Judgment Pursuant to Hazel-Atlas Glass Co. v. Hartford-Empire Co. and Federal_

_Rule of Civil Procedure 60(d)_ (Doc. 579) (hereinafter "Rule 60(d) motion").

**INTRODUCTION**

The government's response to Mr. Higgs's Rule 60(d) motion hinges on the notion that

Baltimore authorities made an independent determination, without federal influence, not to

charge Victor Gloria with murder because they believed Mr. Gloria to be innocent. It follows,

according to the government, that there could be no fraud on the Court. The government's

argument is meritless. Analysis of the evidence currently available leads to the almost

inescapable conclusion that federal intervention in the Baltimore investigation resulted in Victor

Gloria not being charged with a murder he very likely committed.

The response is additionally problematic because the government continues to seek to

withhold evidence that is probative of the question before the Court. As set forth in the Rule

1

60(d) motion, the chief homicide prosecutor for the Baltimore City State's Attorney's Office made clear that his charging decision was deferred pending the receipt of "background" information on Mr. Gloria from federal officials. *See* Doc. 579 at 12-13. It is difficult to conceive of any "background" the government possibly could have provided to state authorities that would have legitimately aided them in their deliberative process; the government has not provided any insight in its response. In the absence of any meaningful response or attempt to explain, the only logical conclusion is that this "background" consisted of the government informing state authorities that Mr. Gloria was a vital witness in Mr. Higgs's prosecution and that this information influenced state authorities.

The Court should, at a minimum, grant discovery and a hearing. The Baltimore Police file gives every reason to believe that further conversations between state and federal officials took place. The government continues to conceal the nature of these conversations while simultaneously faulting Mr. Higgs for failing to produce enough evidence to support his claim. Mr. Higgs submits that the available evidence demonstrates that the government's representations during § 2255 proceedings constituted fraud on the Court, as the fully developed record will confirm.

**ARGUMENT IN REPLY**

**I.      The Government's Primary Argument Is Based On Faulty Premises.**

The gravamen of the government's response is that, "[s]imply stated, there cannot be any fraud upon the Court because the government never requested, convinced, or otherwise persuaded the Baltimore City State's Attorney's Office to refrain from charging Victor Gloria." Doc. 585 at 2. The government's argument is based upon two faulty premises. First, the government's assertion that it did not formally request or attempt to convince state authorities

not to charge Mr. Gloria is belied by the record evidence demonstrating that the federal

intervention was intended to and did in fact influence the state authorities' decision.  Second, the

government erroneously suggests that the records reveal Mr. Gloria's innocence of the crime,

thereby making state authorities' supposedly independent decision reasonable.

### A.  The Available Records Demonstrate That Federal Authorities Influenced The State Authorities' Decision.

As discussed below, Mr. Higgs submits that the most likely version of events is that Mr.

Gloria stabbed Mr. Creighton.  What is clear, however, is that state authorities did not fully

investigate or charge Mr. Gloria, and it is virtually certain that this was the result of intervention

by federal authorities.  The benefit to Mr. Gloria – not being charged or even questioned by state

authorities over his role in the Creighton murder – constitutes *Brady*/*Giglio* material in its purest

sense.[1]  The benefit also reflects upon the quality of the federal investigation in a way that could

have been challenged by trial counsel.  *See Kyles v. Whitley*, 514 U.S. 419, 442 n.13 (1995)

(describing how *Brady* material can be used to challenge quality of police investigation).  The

fact that the government needed to go so far as to intervene in an unrelated murder investigation

involving its star witness underscores the weakness of the government's case.

The influence of federal authorities on the state investigation is made obvious by a

critical fact for which the government offers no explanation: Baltimore authorities made no

effort to interview Mr. Gloria as part of their investigation.  It is inconceivable that state

---

[1] The government has not denied Mr. Higgs's allegation that although Mr. Gloria was never questioned by state authorities, either Mr. Gloria or his attorney was specifically questioned about the Baltimore homicide by *federal* authorities, and Mr. Gloria was therefore the source of the self-serving theory that Mr. Miller and the Scott brothers were conspiring to frame him.  Mr. Gloria would thus have been aware of federal authorities' knowledge of his involvement in the Baltimore homicide and would have had an incentive to curry favor with the government.

authorities, absent federal pressure, would not have at least attempted to speak to Mr. Gloria.[2]

Even under the most favorable possible scenario for the government – in which Mr. Gloria runs

away at the beginning of the fight – Mr. Gloria would still have been an eyewitness to the events

immediately leading up to the stabbing.  Moreover, Kevin Miller told police that all four

members of Mr. Gloria's group drove back to Laurel together following the fight.  Pet. Ex. 12

(transcript of Miller interview).  If state authorities genuinely believed that Mr. Miller was the

killer, they presumably would have been interested in learning from Mr. Gloria whether during

this car ride Mr. Miller made any admissions, had any blood on his hands or clothing, or was in

possession of a knife.  Indeed, if state authorities believed that Mr. Miller was the killer and that

the Scott twins were lying to retaliate against Mr. Gloria, Mr. Gloria would have been the only

unbiased witness in the car.  It would therefore have been critically important to interview him.

The only plausible explanation for state officials' failure to take this basic step is that they did

not want to disrupt their federal colleagues' prosecution of a capital triple homicide.

Moreover, the notion – first suggested by AUSA Johnston, and subsequently adopted by

Baltimore authorities – that the statements of the Scott brothers and Mr. Miller were rehearsed in

an attempt to retaliate against Mr. Gloria is belied by the evidence, as the statements contain

significant differences.  For example: 1) Mr. Miller told police that all four members of his group

drove to Baltimore together, with Mr. Gloria driving, whereas the Scott brothers told police that

only three of them drove together and then met up with Mr. Gloria by happenstance in the Inner

Harbor; 2) Mr. Miller told police that the group parked in a garage directly across from the Inner

Harbor, whereas the Scott brothers told police that they parked on a side street a couple of blocks

---

[2] Mr. Gloria was in custody for most of the duration of the Baltimore investigation, thus he would have been easy to locate and interview.

away; 3) Mr. Miller told police that he threw a punch at one of the victim's friends, whereas the Scott brothers told police that Mr. Gloria was the only person to throw a punch at anyone; and 4) Mr. Miller told police that all four members of his group drove back to Laurel together, whereas the Scott brothers told police that Mr. Gloria ran off and did not meet back up with the group following the stabbing. Pet. Ex. 10 (transcript of Keith Scott interview); Pet. Ex. 11 (transcript of Kevin Scott interview); Pet. Ex. 12 (transcript of Miller interview). If these stories were rehearsed as part of a conspiracy to frame Mr. Gloria, they likely would have been consistent on these basic details.

AUSA Johnston's justification is particularly flimsy in light of what Mr. Miller and the Scott brothers actually told police about Mr. Gloria's actions. Mr. Miller and the Scott brothers told police that they saw Mr. Gloria punch Mr. Creighton in the neck, but did not realize that Mr. Creighton had been stabbed or see Mr. Gloria with a knife. Pet. Ex. 10, 11, 12. If Mr. Miller and the Scott brothers were lying in an attempt to frame Mr. Gloria, it would make sense that they would have told police unequivocally that they saw him commit the stabbing or possess a knife. Further, the justification also fails to account for the fact that eyewitnesses Clarence White and David Bishop, friends of the victim who would not have shared the motive purportedly held by Mr. Miller and the Scott brothers, also initially described the man matching Mr. Gloria's description as having punched Mr. Creighton in the neck.[3]

---

[3] As is discussed in the Rule 60(d) motion, Mr. White conspicuously changed his description of the killer from having "light skin" (a description consistent with Mr. Gloria) on the night of the killing to being "brown skinned" (a description consistent with Mr. Miller) upon reinterview by Baltimore Police following the involvement of federal authorities. *See* Doc. 579 at 9. Only at that point did Mr. White identify Mr. Miller as the killer. Mr. Bishop told police that he saw both the man matching Mr. Gloria's description and the man matching Mr. Miller's description punch Mr. Creighton. Pet. Ex. 7 (transcript of Bishop interview).

Regardless of the justification offered to state authorities by AUSA Johnston, it remains the case that Mr. Gloria (or the person matching his description) was initially identified as the stabber by four different eyewitnesses and was identified as acting in concert with the stabber by a fifth eyewitness.[4]  Confronted with this information, any reasonable law enforcement agency would have wanted to hear Mr. Gloria's version of events first-hand.  State authorities' failure to speak with Mr. Gloria is therefore extremely revealing.  This failure is a glaring omission that is consistent with a deliberate decision to take a hands-off approach towards Mr. Gloria, and inconsistent with an honest attempt to ascertain who killed Mr. Creighton.

The government seeks to avoid this conclusion by repeatedly arguing that it never made a formal request to Baltimore authorities not to charge Mr. Gloria.  *See*, *e.g.*, Doc. 585 at 15 ("ASA Cohen's own notes revealed, in other words, that there was no request by the federal government for the State prosecutors not to charge Gloria, nor was there any agreement between State and federal authorities not to charge Gloria in deference to the pending federal case.").  But regardless of whether the government made a formal request or simply informed state authorities of Mr. Gloria's role in their case, the result was the same: Mr. Gloria was not charged because federal officials intervened.

The government nonetheless argues that Baltimore authorities were acting independently because they retained ultimate power over the decision whether to charge Mr. Gloria.  *See* Doc. 585 at 15, 22-23, 25.  This argument begs the question.  Mr. Higgs does not dispute the fact that Baltimore officials had bottom-line authority over the charging decision.  The question is whether Baltimore authorities would have exercised their discretion in the same way had federal

---

[4] As noted in the Rule 60(d) motion, none of the witnesses initially realized that Mr. Creighton had been stabbed.  Given what we now know, however, the stabber must have been the person who appeared to punch Mr. Creighton in the neck.

officials not intervened.  The evidence demonstrates they would not have – Baltimore officials used their authority to assist their fellow law enforcement agents.[5]  Any contrary conclusion is implausible given the information already presented, and will likely be conclusively proven false through discovery and a hearing.

That federal authorities made clear to local authorities that Mr. Gloria was an important witness in their case is confirmed by the evidence, *see* Doc. 579 at 14; Pet. Ex. 22, and comports with common sense.  When the government learned that its star witness was a suspect in an unrelated homicide, it was confronted with the prospect that the capital triple murder prosecution it had spent more than three years investigating could completely unravel.  It is unreasonable to believe that the government viewed this eventuality with indifference.  The government knew that its case would be in jeopardy if Mr. Gloria were charged with murder, and its communications with Baltimore authorities sent an unmistakable and effectual signal, regardless of whether those communications are characterized as a formal "request" or "agreement."

**B. The Baltimore Police Records Demonstrate That Mr. Gloria Likely Murdered Martrelle Creighton.**

The government's position is also dependent on the notion that "the [Baltimore Police] records establish that Victor Gloria was not a participant in the altercation that resulted in the

---

[5] The government posits that it is unclear why Baltimore authorities would have been willing to assist the government.  Doc. 585 at 21.  It goes without saying that law enforcement agencies frequently collaborate and assist one another, even in the absence of an explicit *quid pro quo* in an individual case.  This is very common and perfectly legitimate, *so long as it is disclosed*.  In this instance, federal officials were investigating the more serious case, given that it involved three murders and the possibility of the death penalty.  And the Baltimore homicide was not going to be an easy case to prosecute in light of lack of physical evidence, the variety of statements, the fact that many of the witnesses had been drinking, and the fact that the victim seems to have been an instigator.  It is thus not surprising that Baltimore authorities were willing to help their federal colleagues by not pursuing Mr. Gloria, especially because they could still legitimately prosecute Mr. Miller as he likely had some level of accomplice liability.

death of Mart[r]elle Creighton." Doc. 585 at 12. The government is incorrect. Unfortunately, because federal authorities altered the trajectory of the Baltimore investigation, it will likely never be conclusively established who killed Mr. Creighton. But the records make clear that Mr. Gloria was a "participant in the altercation" and the much better view of the available evidence is that he was the killer.

As is detailed in the Rule 60(d) motion, four of the seven eyewitnesses interviewed by Baltimore Police initially stated that Mr. Gloria (or the man matching his description) was the person who stabbed Mr. Creighton. One of these four witnesses was Mr. White, a friend of Mr. Creighton's with no motive to falsely implicate Mr. Gloria, who spoke with police on the night of the killing. Pet. Ex. 5 (handwritten notes of White interview). A fifth eyewitness, Mr. Bishop, was also interviewed on the night of the killing and indicated that *both* the man matching Mr. Gloria's description *and* the man matching Mr. Miller's description punched Mr. Creighton in the neck. Pet. Ex. 7 (transcript of Bishop interview). Although Mr. Bishop, who was also a friend of Mr. Creighton's, did not initially realized that Mr. Creighton had been stabbed, he assumed upon so learning that it was Mr. Miller who did the stabbing. *Id.* In other words, four of the seven eyewitnesses initially gave statements directly implicating Mr. Gloria as the killer, and a fifth eyewitness gave a statement implicating Mr. Gloria as an accomplice.

The only two witnesses who initially gave statements that could be viewed as exculpating Mr. Gloria were the two witnesses who initially had their backs turned to the altercation, Barbara and Charnetta Bailey. As is detailed in the Rule 60(d) motion, although the Bailey sisters did state that Mr. Gloria ran away at the beginning of the fight, each was walking away with her back turned to the fight when it began. *See* Pet. Ex. 8 at 3-4 (transcript of Barbara Bailey interview: "we were moving towards Gay Street so it was like a distance and when they started

8

fighting and I turned around and I saw Kevin punch Montrell [sic].”); Pet. Ex. 9 at 3 (transcript of Charnetta Bailey interview: “Montrell [sic] and the guy named Kevin, the tall one not the twin they were walking around in a circle.  A beef, a beef like circle.  Then I didn't see anymore.  I turned around cause um, I was trying to gather up everybody and then Erica was like, ‘OOOOH he got banged in his mouth!’  And then I turned around I seen the blood.”).

The most straightforward interpretation of the Bailey sisters' statements is that they had their backs turned when Mr. Gloria stabbed Mr. Creighton and only turned around in time to see Mr. Gloria run away and Mr. Miller subsequently throw a punch.  Such an interpretation is logical and makes the Bailey sisters' statements generally consistent with the statements of the five eyewitnesses who had a better view of the stabbing, all of whom initially told police that the man matching Mr. Gloria's description punched Mr. Creighton in the neck.

This version of events also comports with common sense.  It is not plausible that Mr. Gloria – a man with a significant history of violence – immediately ran away and abandoned his friends at the first sign of a drunken fistfight in which his opponents were outnumbered.  Much more likely is that Mr. Gloria ran away because he had just stabbed Mr. Creighton and did not want to get caught.  This is particularly so given Mr. Gloria's prior arrest for assault with a knife during a fight.  Pet. Ex. 13.

## II.     Mr. Higgs Was Prejudiced.

The government argues in its response that even assuming it conducted a deliberate effort to mislead this Court, its conduct did not prejudice Mr. Higgs or subvert the judicial process.  In making this argument, the government points to this Court's § 2255 opinion.  As Mr. Higgs noted in the Rule 60(d) motion, the government's fraud affected this Court's ruling on all three prongs of the *Brady* claim.  At the time of the § 2255 opinion, neither Mr. Higgs nor this Court

9

realized the extent of the government's communication with Baltimore authorities during the Creighton investigation, nor the extent of the evidence against Mr. Gloria in the Baltimore case.

This Court, the Fourth Circuit, and *the government itself* have acknowledged that Mr. Gloria's testimony was of critical importance to the case against Mr. Higgs. Pet. Ex. 1 at 16 (sentencing transcript of Mr. Gloria, in which the Court describes him as the "critical link" in the conviction of Mr. Higgs); *id.* at 4 (argument of AUSA Johnston that "the government could not have proceeded and obtained a conviction against Mr. Higgs certainly without the assistance of Mr. Gloria"); *United States v. Higgs*, 663 F.3d 726, 730 (4th Cir. 2011) (§ 2255 appeal opinion, stating that "[a]t trial, [Mr. Gloria] provided a detailed, eyewitness account of the kidnappings and murders."). The argument that Mr. Gloria's credibility could not have been affected by the jury learning that he had been granted a free pass on a murder charge in exchange for his testimony would make the rule in *Giglio* meaningless, and is refuted by the Fourth Circuit's opinion on § 2255 appeal. *Higgs*, 663 F.3d at 741 (describing Mr. Gloria's testimony as "compelling and convincing").

The government also argues that Mr. Higgs could not be prejudiced because he does not allege that he is innocent of the murders. The government is mistaken. Mr. Higgs has steadfastly and repeatedly maintained that he is innocent of capital murder, including throughout his § 2255 proceedings. *See*, *e.g.*, Doc. 492 at 29-43 (§ 2255 petition, which asserts, *inter alia*, that "Mr. Higgs had no intent for the three victims to die. To the contrary, Mr. Higgs had no motive to kill the victims and no control over Mr. Haynes. Mr. Higgs is innocent of capital murder."). Indeed, the very first sentence of the first claim heading in Mr. Higgs's brief to the Fourth Circuit in § 2255 proceedings is "Higgs is innocent of capital murder." *United States v. Higgs*, No. 10-7 (4th Cir. 2010) (Initial brief of Appellant, Fourth Circuit Doc. 27 at 6). Mr.

10

Gloria was the *only* source of testimony suggesting that Mr. Higgs ordered Mr. Haynes to kill the victims in this case. And Mr. Higgs has maintained since the time of trial that Mr. Gloria's account was replete with material falsehoods. The evidence at issue in the Rule 60(d) motion therefore undermines the only evidence that Mr. Higgs is guilty of capital murder.

III.    **A Hearing Is Appropriate To Determine Whether The Government Committed Fraud On The Court.**

The standard for granting an evidentiary hearing in § 2255 proceedings is that "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court . . . shall grant a prompt hearing thereon." 28 U.S.C. § 2255(b). The Supreme Court and Fourth Circuit have consistently applied this clear standard. *See*, *e.g.*, *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (reversing and remanding for a hearing where "we cannot conclude with the assurance required by the statutory standard . . . that under no circumstances could the petitioner establish facts warranting relief under § 2255); *Sanders v. United States*, 373 U.S. 1, 19-21 (1963) (same); *Machibroda v. United States*, 368 U.S. 487, 494 (1962) ("We think the District Court did not proceed in conformity with the provisions of 28 U.S.C. § 2255 when it made findings on controverted issues of fact without notice to the petitioner and without a hearing."); *United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992) (a federal court "must hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle [him] to relief."). Given that Mr. Higgs's motion seeks to reopen his § 2255 proceedings, the same standard applies here.

The government's response makes clear that its argument that it did not commit fraud on the Court is contingent on the Court accepting its view of the underlying facts. Mr. Higgs submits that there is no basis to support the government's version for the reasons outlined above

11

and in the Rule 60(d) motion, and if the Court should agree, the government's representations during § 2255 proceedings were plainly improper.  The determinations this Court is called on to make, therefore, require resolution of highly disputed material facts.  It certainly cannot be said that the records before the Court conclusively show that Mr. Higgs is entitled to no relief, particularly in light of the as-yet undisclosed additional contacts between federal and state officials.  In light of the disputed material facts before the Court and the clear standard for the grant of hearings in § 2255 proceedings, a hearing is appropriate.

## CONCLUSION

The question whether the government committed fraud on the court requires resolution of the underlying fact-based issues surrounding the government's communications with state authorities. Mr. Higgs submits that the records before the Court demonstrate that the government influenced the state authorities' decision. Nonetheless, the parties have substantially different views of the operative facts. At a minimum, discovery and a hearing are appropriate to resolve these critical factual disputes. Mr. Higgs respectfully requests the opportunity to present argument to the Court with respect to his requests for provision of discovery and a hearing, as well as the scope of the hearing.

Respectfully Submitted,


/s/ Matthew C. Lawry
Matthew C. Lawry
Federal Community Defender Office
   for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
215-928-0520
Matthew_Lawry@fd.org

/s/ Stephen H. Sachs
Stephen H. Sachs
WilmerHale LLP
Five Roland Mews
Baltimore, MD 21210
(410) 532-8405
Steve.Sachs@wilmerhale.com


Dated: April 7, 2015

**CERTIFICATE OF SERVICE**

I, Matthew C. Lawry, hereby certify that on this 7th day of April, 2015, I electronically

filed the foregoing motion using the Court's CM/ECF system.  Electronic notice will be provided

to the following individuals:

> James A. Crowell IV
> Sujit Raman
> Deborah A. Johnston
> Sandra Wilkinson
> Assistant United States Attorneys
> Office of the United States Attorney
> 6500 Cherrywood Lane, Suite 400
> Greenbelt, MD 20770-1249

> /s/ Matthew C. Lawry
> Matthew C. Lawry