Cite as: 592 U. S. ____ (2021)    1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 20–927 (20A134)

———————

## UNITED STATES *v.* DUSTIN JOHN HIGGS

ON PETITION FOR WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH
CIRCUIT AND APPLICATION TO VACATE STAY

[January 15, 2021]

The petition for writ of certiorari before judgment to the United States Court of Appeals for the Fourth Circuit is granted. The December 29, 2020 order of the United States District Court for the District of Maryland is reversed, and the case is remanded to the Court of Appeals with instructions to remand to the District Court for the prompt designation of Indiana under 18 U. S. C. §3596(a).

The application to vacate stay presented to THE CHIEF JUSTICE and by him referred to the Court is granted. The January 13, 2021 order of the Court of Appeals granting a stay is vacated.

JUSTICE KAGAN would deny the petition for writ of certiorari before judgment and the application.

JUSTICE BREYER, dissenting.

Last July the Federal Government executed Daniel Lee. Lee's execution was the first federal execution in seventeen years. The Government's execution of Dustin Higgs tonight will be its thirteenth in six months. I wrote in July that "the resumption of federal executions promises to provide examples that illustrate the difficulties of administering the death penalty consistent with the Constitution." *Barr* v. *Lee*, 591 U. S. ___, ___ (2020) (dissenting opinion) (slip op., at 2). The cases that have come before us provide several of those examples.

I agree with much of what JUSTICE SOTOMAYOR says in

2                    UNITED STATES *v.* HIGGS

BREYER, J., dissenting

greater detail about many of these cases.  The present case
concerns an inmate infected with COVID–19 at the Federal
Correctional Institution in Terre Haute, Indiana.  He ar-
gues, and the District Court agreed, that COVID–19 caused
him significant lung damage and that, as a result, execut-
ing him by injection of pentobarbital will "subject [him] to a
sensation of drowning akin to waterboarding."  *In re Fed-
eral Bureau of Prisons' Execution Protocol Cases*, No. 1:19–
mc–145, Doc. 394, p. 3 (D DC, Jan. 12, 2021).  He also ar-
gues that (for complex legal reasons) it is now too late for
the Federal Government to obtain an order changing the
state law designated to govern his execution from that of
Maryland (which is where he was sentenced but which has
since abolished the death penalty) to that of Indiana (which
maintains the death penalty).

  Consider some of the other questions that the federal
death penalty cases have raised.  To what extent does the
Government's use of pentobarbital for executions risk ex-
treme pain and needless suffering?  See *Lee, supra,* at ___
(BREYER, J., dissenting) (slip op., at 2).  Has an inmate
demonstrated a sufficient likelihood that she is mentally in-
competent—to the point where she will not understand the
fact, meaning, or significance of her execution?  See *Mont-
gomery* v. *Warden, ante,* p. ___; *Barr* v. *Purkey,* 591 U. S.
___, ___ (2020) (SOTOMAYOR, J., dissenting from grant of va-
catur) (slip op., at 1).  Should a court apply contemporary
diagnostic standards to determine whether an inmate is in-
tellectually disabled at the time of his execution, such that
the execution is unlawful?  See *Bourgeois* v. *Watson, ante,*
p. ___.  Is a defendant's second habeas challenge to his
death sentence subject to the demanding standard for suc-
cessive challenges, even though Government conduct pre-
vented him from being able to bring those claims in his first
habeas petition?  See *Bernard* v. *United States, ante,* p. ___.
Can a defendant's second habeas challenge include a claim
that his trial counsel was constitutionally inadequate

BREYER, J., dissenting

where the defendant failed to raise that claim in his first habeas proceeding only because his first habeas counsel was also constitutionally inadequate? See *Purkey*, *supra*, at ___ (BREYER, J., dissenting from grant of vacatur) (slip op., at 3). Does the Federal Government have to follow state requirements for how much advance notice an inmate receives for her execution? See *Rosen* v. *Montgomery*, *ante*, p. ___. These are but a few of the many death-penalty-related questions (some technical, some not) that courts must consider, even though the result of this consideration is often delay—perhaps for many years. See *Glossip* v. *Gross*, 576 U. S. 863, 926–929 (2015) (BREYER, J., dissenting).

None of these legal questions is frivolous. What are courts to do when faced with legal questions of this kind? Are they simply to ignore them? Or are they, as in this case, to "hurry up, hurry up"? That is no solution. Higgs' case illustrates this dilemma. The District Court ruled against the Government and the Government appealed. The Fourth Circuit denied the Government's request to dispense with oral argument "in light of the novel legal issues presented" and set oral argument for January 27. App. to Pet. for Cert. 29a. The Circuit then stayed the execution pending further order. Order in No. 20–18 (Jan. 13, 2021). The Government now seeks certiorari before judgment, an extraordinary remedy that is to be granted only upon a showing that "the case is of such imperative public importance as to justify deviation from normal appellate practice." This Court's Rule 11. Given the finality and severity of a death sentence, it is particularly important that judges consider and resolve challenges to an inmate's conviction and sentence. How just is a legal system that would execute an individual without consideration of a novel or significant legal question that he has raised?

Yet, to consider these questions, some of which (such as mental competency) may not arise until a few weeks before

4             UNITED STATES *v.* HIGGS

BREYER, J., dissenting

an execution, takes time. That time means delay. The recent federal executions are again illustrative. The Federal Government executed Lee 21 years after his conviction; Brandon Bernard 20 years after his conviction; Alfred Bourgeois 16 years after his conviction; Wesley Purkey 16 years after his conviction; and Lisa Montgomery 12 years after her conviction. Today, the Government executes Higgs 20 years after his conviction. The longer the delay, the weaker the basic penological justifications for imposing the death penalty in the first place become, and the greater the psychological suffering inflicted on the death row inmate. I remain convinced that this dilemma arises out of efforts to impose the death penalty. Together with other problems that I have previously described, it calls into question the constitutionality of the death penalty itself. See *Glossip*, *supra*, at 945–946 (BREYER, J., dissenting).

But this case involves a procedural issue. The Fourth Circuit issued a stay of the execution and has not yet resolved the Government's appeal. It is rare for us to consider a question before the Circuit has decided it. And I would not depart from ordinary practice here. Consequently, I dissent.

Cite as: 592 U. S. ____ (2021)           1

SOTOMAYOR, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–927 (20A134)

_____

## UNITED STATES *v.* DUSTIN JOHN HIGGS

ON PETITION FOR WRIT OF CERTIORARI BEFORE JUDGMENT
TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH
CIRCUIT AND APPLICATION TO VACATE STAY

[January 15, 2021]

JUSTICE SOTOMAYOR, dissenting.

After seventeen years without a single federal execution, the Government has executed twelve people since July. They are Daniel Lee, Wesley Purkey, Dustin Honken, Lezmond Mitchell, Keith Nelson, William LeCroy Jr., Christopher Vialva, Orlando Hall, Brandon Bernard, Alfred Bourgeois, Lisa Montgomery, and, just last night, Corey Johnson. Today, Dustin Higgs will become the thirteenth. To put that in historical context, the Federal Government will have executed more than three times as many people in the last six months than it had in the previous six decades.

This unprecedented rush of federal executions has predictably given rise to many difficult legal disputes. One source of confusion has been the Federal Death Penalty Act (FDPA), which Congress enacted in 1994 to guide the imposition and implementation of federal death sentences. Pub. L. No. 103–322, Tit. VI, §60002(a), 108 Stat. 1959 (codified as amended at 18 U. S. C. §3591 *et seq.*). Prior to last July, the Federal Government had executed just three people since the enactment of the FDPA, two in 2001 and one in 2003. Many questions about the FDPA remain unanswered.

Another source of uncertainty has been the Department

2                          UNITED STATES *v.* HIGGS

SOTOMAYOR, J., dissenting

of Justice's (DOJ) announcement of a new execution proto-
col (the 2019 Protocol). Whereas the previous protocol pre-
scribed a three-drug cocktail for use in executions, the 2019
Protocol calls for a single drug: pentobarbital. Difficulty in
obtaining the required drugs had contributed to the Gov-
ernment's nearly two-decade hiatus in carrying out execu-
tions. The Government surely knew the 2019 Protocol
would face further litigation.

Against this backdrop of deep legal uncertainty, the DOJ
did not tread carefully. Simultaneous with the announce-
ment of the 2019 Protocol, it scheduled five executions;
eight would follow in the months to come. This rapid pace
required those facing execution to fast-track challenges to
their sentences. Rather than permit an orderly resolution
of these suits, the Government consistently refused to post-
pone executions and sought emergency relief to proceed be-
fore courts had meaningful opportunities to determine if
the executions were legal.

Throughout this expedited spree of executions, this Court
has consistently rejected inmates' credible claims for relief.
The Court has even intervened to lift stays of execution that
lower courts put in place, thereby ensuring those prisoners'
challenges would never receive a meaningful airing. The
Court made these weighty decisions in response to emer-
gency applications, with little opportunity for proper brief-
ing and consideration, often in just a few short days or even
hours. Very few of these decisions offered any public expla-
nation for their rationale.

This is not justice. After waiting almost two decades to
resume federal executions, the Government should have
proceeded with some measure of restraint to ensure it did
so lawfully. When it did not, this Court should have. It has
not. Because the Court continues this pattern today, I dis-
sent.

Cite as: 592 U. S. ____ (2021)          3

SOTOMAYOR, J., dissenting

## I

The Government will execute Dustin Higgs tonight. In 2001, the United States District Court for the District of Maryland sentenced Higgs to death for his involvement in the kidnapping and killing of three people. The FDPA requires that a federal death sentence be "implement[ed]" "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U. S. C. §3596(a). If that State does not allow the death penalty, the FDPA directs courts to designate an alternate State that does. Executions were legal in Maryland in 2001, so the District Court's Judgment and Order did not designate an alternate State. See App. to Pet. for Cert. 18a–21a. Maryland has since abolished the death penalty, however, so the Government cannot implement the death sentence in accordance with Maryland law as the FDPA requires.

In August 2020, the Government asked the District Court to amend its Judgment and Order to designate Indiana, where Higgs and all other federal death-row prisoners are imprisoned, as the alternate State. Consistent with its current practice, the Government set an execution date before the District Court could rule. The District Court denied the Government's motion, holding that the court had no authority to modify its original judgment. See 2020 WL 7707165, *4 (D Md., Dec. 29, 2020) ("The Government's initial, extraordinary request that the Court amend its original judgment and sentence is something that the Court plainly cannot do"). The Government appealed to the Court of Appeals for the Fourth Circuit, which scheduled oral argument for January 27, 2021. Unwilling to wait, the Government asks this Court to grant certiorari and summarily reverse the District Court without normal briefing or argument, and direct the District Court to designate Indiana as the Government requested.

Ordinarily, this Court grants petitions for certiorari before judgment only "upon a showing that the case is of such

4                    UNITED STATES *v.* HIGGS

SOTOMAYOR, J., dissenting

imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." This Court's Rule 11. The Government falls far short of meeting this strict standard. Whether district courts can amend final orders and judgments in this situation is an open and novel question on which none of the courts of appeals have spoken. After failing to act since Higgs' sentence was imposed in 2001, the Government gives no compelling reason why it suddenly cannot wait a few weeks while courts give his claim the consideration it deserves. Certainly, there is no "imperative public importance" behind the Government's request. I would deny the Government's petition.

## II

Sadly, it is not surprising that the Court grants this extraordinary request. Over the past six months, this Court has repeatedly sidestepped its usual deliberative processes, often at the Government's request, allowing it to push forward with an unprecedented, breakneck timetable of executions. With due judicial consideration, some of the Government's arguments may have prevailed and some or even many of these executions may have ultimately been allowed to proceed. Others may not have been. Either way, the Court should not have sanctioned these executions without resolving these critical issues. The stakes were simply too high.

## A

Even after thirteen federal executions in six months, basic, recurring questions about the FDPA and the 2019 Protocol remain unanswered. For example, what does it mean to "implement[]" a federal death sentence "in the manner prescribed by the law of the State"? 18 U. S. C. §3596(a). Answers run the gamut. Some judges believe the FDPA merely requires following the State's "top-line choice

Cite as:  592 U. S. ____ (2021)          5

SOTOMAYOR, J., dissenting

among execution methods such as hanging, electrocution, or lethal injection." *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F. 3d 106, 113 (CADC 2020) (*Execution Protocol Cases I*) (Katsas, J., concurring).  Others read the FDPA to incorporate nearly all state execution protocols, including those details that precede the execution itself.  See Order in *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 20–5361, at 4–5 (CADC, Dec. 10, 2020) (en banc) (*per curiam*) (*Execution Protocol Cases II*) (Wilkins, J., dissenting); see also *Execution Protocol Cases I*, 955 F. 3d, at 149, 151 (Tatel, J., dissenting).[1]  This Court has yet to say which interpretation is correct.  See *Mitchell* v. *United States*, 591 U. S. ___, ___ (2020) (SOTOMAYOR, J., respecting denial of application for stay) (slip op., at 2) (calling for the Court to "address this issue in an appropriate case").  Worse, the Court has actively prevented lower courts from providing definitive answers themselves.  Just four days ago, the D. C. Circuit granted Lisa Montgomery a stay of her execution so it could decide this issue en banc.  See Order in *Montgomery* v. *Rosen*, No. 21–5001 (Jan. 11, 2011) (en banc).  This Court vacated that stay without explanation.  Montgomery was executed hours later.

Another outstanding question concerns the FDPA's provision that "[a] sentence of death shall not be carried out upon a person who is [intellectually disabled]."  18 U. S. C. §3596(c).  Alfred Bourgeois and Corey Johnson presented substantial evidence that they were intellectually disabled

---

[1] Other judges and courts have taken different positions along this spectrum.  See E*xecution Protocol Cases I*, 955 F. 3d, at 134 (Rao, J., concurring); Order in *Montgomery* v. *Rosen*, No. 21–5001, pp. 7–8 (CADC, Jan. 11, 2021) (Millett, J., dissenting); *United States* v. *Vialva*, 976 F. 3d 458, 462 (CA5 2020) (*per curiam*); *LeCroy* v. *United States*, 975 F. 3d 1192, 1198 (CA11 2020) ("Whatever that phrase means, we are confident that it does not extend to ensuring a lawyer's presence at execution"); *United States* v. *Mitchell*, 971 F. 3d 993, 996–997 (CA9 2020) (*per curiam*); *Peterson* v. *Barr*, 965 F. 3d 549, 554 (CA7 2020).

6                    UNITED STATES *v.* HIGGS

SOTOMAYOR, J., dissenting

under modern diagnostic standards. Lower courts, how-
ever, held that these inmates were barred from challenging
their executions on this ground because they had previously
been denied relief under outdated diagnostic standards.
See 28 U. S. C. §2255(h). Yet there are compelling reasons
to believe that the FDPA directs courts to evaluate intellec-
tual disability based on the standards prevailing at the time
of the execution. See *Bourgeois* v. *Watson*, 592 U. S. ___,
___–___ (2020) (SOTOMAYOR, J., dissenting from denial of
certiorari and application for stay) (slip op., at 2–4); Order
in *United States* v. *Johnson*, No. 20–15, pp. 4–5 (CA4, Jan.
14, 2021) (Wynn, J., dissenting from denial of rehearing en
banc); Order in *United States* v. *Johnson*, No. 20–15, p. 7
(CA4, Jan. 12, 2021) (Motz, J., concurring in part in denial
of stay). On that view, prior proceedings relying on obsolete
medical standards do not preclude consideration of whether
an individual "is" intellectually disabled at the time of his
execution. 18 U. S. C. §3596(c). This Court should have
answered this consequential question before allowing the
Government to execute Bourgeois and Johnson. Their exe-
cutions may well have been illegal.

The Court has also allowed executions to proceed in the
face of significant challenges to the 2019 Protocol's method
of execution. A federal district court found that Daniel Lee,
Wesley Purkey, and Keith Nelson were likely to succeed in
showing that the 2019 Protocol violates the Eighth Amend-
ment because pentobarbital causes fluid to rapidly accumu-
late in the lungs, resulting in "'extreme pain, terror and
panic.'" See *In re Federal Bureau of Prisons' Execution Pro-
tocol Cases*, 471 F. Supp. 3d 209, 218–219 (DC 2020). Ac-
cordingly, the District Court preliminarily enjoined execu-
tions under the 2019 Protocol. *Id.,* at 225. This Court
vacated the injunction and allowed the executions to move
forward, concluding that the Government's "competing ex-
pert testimony" rendered a "last-minute" stay inappropri-
ate. *Barr* v. *Lee*, 591 U. S. ___, ___ (2020) (*per curiam*) (slip

Cite as: 592 U. S. ____ (2021)          7

SOTOMAYOR, J., dissenting

op., at 3). Lee and Purkey, however, did not file their claims at the last minute. They did so shortly after the DOJ announced the new protocol and scheduled their executions. Nelson raised his claim before his execution was even announced. It was the Government, not the inmates, who charged ahead with conducting executions under the challenged protocol, creating an "artificial claim of urgency to truncate ordinary procedures of judicial review." *Id.,* at ___ (SOTOMAYOR, J., dissenting) (slip op., at 1). The Court condoned the Government's tactics and granted a stay.

This Court repeated this error just this week. On December 16, 2020, both Corey Johnson and Dustin Higgs tested positive for COVID–19. They quickly moved to enjoin their executions, arguing that lung damage caused by the virus substantially increased the likelihood they would suffer torturous effects if executed with pentobarbital. The District Court held an evidentiary proceeding and agreed. *In re Federal Bureau of Prisons' Execution Protocol Cases*, ___ F. Supp. 3d ___, ___–___, 2021 WL 106576, *5–*9 (DDC, Jan. 12, 2021). This time, the Court of Appeals stayed the injunction, relying on this Court's flawed decision in *Lee.* Order in *Roane* v. *Rosen*, No. 21–5004, p. 4 (CADC, Jan. 13, 2021) (Katsas, J., concurring). This Court left that ruling in place, again allowing these executions to proceed despite the District Court's careful fact-finding and the risk of needless and significant pain.

B

The issues left unresolved during this saga do not end with the FDPA and 2019 Protocol. Many other challenges deserved this Court's review. None were granted. While I cannot catalogue all these claims here, some particularly troubling ones bear mention.

Consider again Corey Johnson. In addition to the claim already discussed, Johnson sought a reduction of his death sentence under the First Step Act of 2018, Pub. L. No. 115–

8                    UNITED STATES *v.* HIGGS

SOTOMAYOR, J., dissenting

391, 132 Stat. 5194.  The District Court denied Johnson's motion, concluding that his death sentence was for a crime that was not a "covered offense."  See *United States* v. *Johnson*, No. 3:92–cr–68 (ED Va., Nov. 19, 2020).  The Fourth Circuit denied a stay pending appeal.  See Order in *United States* v. *Johnson*, Nos. 20–15, 21–1, 21–2 (Jan. 12, 2021).  Judge Motz dissented from the denial of stay based on Johnson's First Step Act claim, explaining that the application of the definition of "covered offense" "present[s] difficult and important issues necessitating adequate consideration by this court." *Id.,* at 9.

Judge Motz was right.    In fact, the courts of appeals have divided on the proper way to interpret the statute's "covered offense" definition.[2] When Johnson sought a stay, this Court had already granted certiorari to resolve a split implicating this question.  See Pet. for Cert. in No. 20-5904.  Rather than granting Johnson a stay and holding his case for reconsideration in light of this, the Court allowed the Government to execute Johnson without any appellate court ruling on the merits of his claims.

Consider next Brandon Bernard.  Bernard, who was only eighteen when he committed the crimes for which he was executed, raised credible allegations that the Government secured his death sentence by withholding exculpatory evidence and eliciting knowingly false testimony in violation of *Brady* v. *Maryland*, 373 U. S. 83 (1963), and *Napue* v. *Illinois,* 360 U. S. 264 (1959).  But Bernard never received consideration of those claims on the merits.  Instead, the Court of Appeals for the Fifth Circuit held that, even though Bernard could not have known about the suppressed evidence when he filed his first habeas petition,

───────────

[2] Compare *United States* v. *Smith*, 954 F. 3d 446, 449–450 (CA1 2020) (the Fair Sentencing Act must modify any penalty in the statute of conviction, such as 21 U. S. C. §841), with *United States* v. *Jones*, 962 F. 3d 1290, 1298 (CA11 2020) (the Act must modify the penalty for the defendant's actual violation).

SOTOMAYOR, J., dissenting

those claims were subject to the general bar on second-or-successive habeas petitions. *United States* v. *Bernard*, 820 Fed. Appx. 309 (2020) (*per curiam*); see also 28 U. S. C. §2255(h)(1).

As Bernard correctly argued, the Fifth Circuit's ruling cannot be reconciled with this Court's decision in *Panetti* v. *Quarterman*, 551 U. S. 930 (2007), which held that the bar on second-or-successive petitions does not apply to claims that were not ripe when an inmate filed his first-in-time petition. *Bernard* v. *United States*, 592 U. S. ___, ___ (2020) (SOTOMAYOR, J., dissenting) (slip op., at 4). Indeed, the Fifth Circuit's rule makes no sense, as it "perversely rewards the Government for keeping exculpatory information secret until after an inmate's first habeas petition has been resolved." *Id.,* at ___ (slip op., at 5). Unmoved, this Court denied Bernard's petition for a writ of certiorari and application for a stay, leaving this dangerous precedent in place and, again, condoning the Government's tactics.

Finally, consider Wesley Purkey and Lisa Montgomery, whose executions this Court allowed even though the district courts concluded they were likely to succeed in showing that they had no "'rational understanding' of why the State want[ed] to execute [them]." See *Madison* v. *Alabama*, 586 U. S. ___, ___ (2019) (slip op., at 17) (quoting *Panetti*, 551 U.S., at 958). Wesley Purkey suffered from Alzheimer's disease. Thousands of pages of evidence suggested that he earnestly and steadfastly believed that the Government planned to execute him in retaliation for his "protracted jailhouse lawyering" to expose prison abuses. Electronic Case Filing in No. 1:19–cv–3570 (DDC), Doc. 1-18, p. 12; see also *Barr* v. *Purkey*, 591 U. S ___, ___–___ (2020) (SOTOMAYOR, J., dissenting) (slip op., at 4–5). The District Court therefore preliminarily enjoined Purkey's execution. Skipping over the Court of Appeals, the Government sought immediate relief from this Court, which vacated the injunction without comment.

10                    UNITED STATES *v.* HIGGS

SOTOMAYOR, J., dissenting

Lisa Montgomery likewise made a "substantial threshold
showing" to the District Court that she was incompetent to
be executed. See Electronic Case Filing in No. 2:21–cv–20
(SD Ind.), Doc. 17, p. 15. Based on expert evidence that
Montgomery was experiencing a dissociative psychotic
state, the District Court concluded that her "current mental
state is so divorced from reality that she cannot rationally
understand the government's rationale for her execution."
*Id.,* at 18. These findings with respect to Purkey and Mont-
gomery raised significant questions as to whether their ex-
ecutions comported with the Constitution. We will never
have definitive answers to those questions because this
Court sanctioned their executions anyway.

### III

There is no matter as "grave as the determination of
whether a human life should be taken or spared." *Gregg* v.
*Georgia*, 428 U. S. 153, 189 (1976) (opinion of Stewart, Pow-
ell, and Stevens, JJ.). That decision is not something to be
rushed or taken lightly; there can be no "justice on the fly"
in matters of life and death. See *Nken* v. *Holder*, 556 U. S.
418, 427 (2009). Yet the Court has allowed the United
States to execute thirteen people in six months under a
statutory scheme and regulatory protocol that have re-
ceived inadequate scrutiny, without resolving the serious
claims the condemned individuals raised. Those whom the
Government executed during this endeavor deserved more
from this Court. I respectfully dissent.